## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

THE IMPERIAL SOVEREIGN COURT OF
THE STATE OF MONTANA; ADRIA
JAWORT; RACHEL CORCORAN;
MONTANA BOOK COMPANY; IMAGINE
BREWING COMPANY, LLC d/b/a IMAGINE
NATION BREWING
COMPANY; BUMBLEBEE AERIAL
FITNESS; THE WESTERN MONTANA
COMMUNITY CENTER; MONTANA
PRIDE; THE GREAT FALLS LGBTQ+
COMMUNITY CENTER; THE ROXY
THEATER; and THE MYRNA LOY,

              Plaintiffs,

   vs.

AUSTIN KNUDSEN; ELSIE ARNTZEN; J.P.
GALLAGHER; and THE CITY OF HELENA,

             Defendants.

No. CV 23-50-BU-BMM

ORDER

### INTRODUCTION

Plaintiffs the Imperial Sovereign Court of the State Of Montana ("Imperial
Court"), Adria Jawort ("Jawort"), Rachel Corcoran ("Corcoran"), Montana Book
Company ("Montana Book Co."), Imagine Brewing Company, LLC d/b/a Imagine
Nation Brewing Company ("Imagine Nation"), BumbleBee Aerial Fitness
("BumbleBee"), the Western Montana Community Center ("the Center"), Montana

Pride, the Great Falls LGBTQ+ Community Center ("Great Falls LGBTQ+ Center"), the Roxy Theater ("the Roxy"), and the Myrna Loy (collectively "Plaintiffs"), move the Court for a preliminary injunction. (Doc. 4.) Plaintiffs challenge Montana House Bill 359 ("H.B. 359") on the basis that the law violates the First, Fifth, and Fourteenth Amendments of the U.S. Constitution. 2023 Mont. Laws Ch. 719 (Doc. 3 at 38–43.) The Court issued a temporary restraining order ("TRO") on July 28, 2023, following an emergency hearing. (Doc. 13.) The Court held a subsequent preliminary injunction hearing on August 28, 2023. (Doc. 26.) For the reasons set forth below, the Court will grant Plaintiffs' preliminary injunction motion.

## BACKGROUND

Plaintiffs include both individuals and organizations. Montana Pride is an all-ages annual statewide celebration of Montana's LGBTQ+ community, with events that include a parade, drag performances, a rally, and educational workshops. (Doc. 5-9 at 4.) More than 15,000 people from across the state and country attended the events in 2022. (*Id.*) Montana Pride's thirtieth-anniversary events took place from July 30 to August 6, 2023. (*Id.* at 3–4.) Montana Pride applied for permits for the 2023 events on June 30 and July 13, 2023. (*Id.* at 3, 8–14, 16–22.) Montana Pride represents that the applications proved "functionally identical" to those that the City of Helena approved in 2022. (Doc. 5-9 at 5.)

The City of Helena supported Montana Pride's application and acknowledged that denying the requested permits would "infringe upon Plaintiff[s'] constitutional rights." (Doc. 10 at 2.) The City of Helena urged the Court to block enforcement of H.B. 359 in time to allow Montana Pride to proceed without subject[ing] city employees to criminal and civil liability under [] H.B. 359." (*Id.* at 2–3.) The Court granted a TRO to allow the City of Helena to issue Montana Pride's requested permits without risk of liability pursuant to H.B. 359. (Doc. 13 at 19–20.)

Jawort, a journalist and author, is a transgender ("trans") woman and a Two-Spirit member of the Northern Cheyenne Tribe. (Doc. 5-2 at 3.) The term "Two-Spirit" reflects "traditional Indigenous acceptance of trans and non-binary definitions of gender." (*Id.*) Jawort planned to deliver a lecture on trans and Indigenous Montana history at the Butte Public Library on June 2, 2023. (*Id.*) Jawort alleges that officers for the City-County of Butte-Silver Bow ("Butte-Silver Bow") ordered the library to cancel the lecture on June 1, 2023. (*Id.*) Plaintiffs attach the cancellation email that the Butte Public Library sent to Jawort. (*Id.* at 7.) The email explains that Butte-Silver Bow had determined that "hav[ing] a trans[] person in the library" posed "too much of a legal risk" under H.B. 359. (*Id.* at 3, 7.) Butte released a public statement on its official Facebook page that stated as follows:

> PSA
>
> In accordance with Governor Greg Gianforte signing H.B. 359 into law, our county cannot allow an event where a

> drag king or queen reads children's books and engages in
> other learning activities with minor children present. Due
> to this law, we have had to cancel the speaker at the Butte
> Public Library [who] was scheduled for Friday.

(*Id.* at 10.) Jawort intended to present as herself and not in drag. (*Id.* at 5.) Jawort further alleges that her lecture lacked "anything resembling 'prurient interest.'" (*Id.*)

Corcoran is an educator in Billings Public Schools who dresses up as fictional and historical characters as a learning tool. (Doc. 5-10 at 3–4.) Corcoran represents that dressing up serves "to foster a successful and welcoming learning environment," "celebrate the success of [her] students, cultivate a sense of community, and further encourage learning in the classroom." (*Id.* at 4.) Corcoran selects characters to dress up as without regard for "the gender or sex of the person being portrayed." (*Id.*)

Imperial Court is a Montana nonprofit membership organization that produces community-based drag performances. (Doc. 5-3 at 2–3.) Imperial Court members perform at Pride events across Montana, including the 2023 Montana Pride events. (*Id.* at 5–7.) Imperial Court also fundraises for local causes and hosts educational seminars. (*Id.* at 3.) Montana Book Co. is an independent LGBTQ+-owned bookstore in Helena, Montana, that hosts author readings, book clubs, drag story hours, and other community events. (Doc. 5-7 at 3–5.)

The Center and the Great Falls LGBTQ+ Center are LGBTQ+ community centers in Missoula and Great Falls, Montana, respectively. (Doc. 3 at 9.) Both centers organize community events that include drag performances. (*Id.*)

4

BumbleBee operates an aerial arts and pole fitness studio in Helena, Montana. (*Id.* at 8.) Imagine Nation is a brewery and community center in Missoula, Montana, that hosts drag events. (*Id.*)

The Roxy is a nonprofit community-owned theater in Missoula, Montana. (*Id.* at 10.) The Myrna Loy is an independent nonprofit arts and culture center in Helena, Montana. (*Id.*) Montana Book Co., the Roxy, the Myrna Loy, and Imagine Nation have received state funds, lease space from an entity that has received state funds, and/or expect to receive state funds in the future. (Doc. 5-7 at 4; Doc. 5-5 at 3; Doc. 5-6 at 3; Doc. 3 at 8.)

Austin Knudsen ("Knudsen") is the Attorney General for the State of Montana ("the State"). (Doc. 3 at 11.) Elsie Arntzen ("Arntzen") is the Montana Superintendent of Public Instruction. (*Id.* at 12.) J.P. Gallagher ("Gallagher") is Butte-Silver Bow's Chief Executive. (Doc. 3 at 11.) The City of Helena is the state capital and an incorporated municipality. (*Id.* at 12.) The City of Helena evaluates and issues permits for events held within city limits.

Representative Braxton Mitchell ("Rep. Mitchell") introduced H.B. 359 on January 29, 2023. The Montana state legislature passed H.B. 359 on May 11, 2023. Montana Governor Greg Gianforte signed H.B. 359 into law on May 22, 2023. The statute took immediate effect. H.B. 359 § 7. The text of H.B. 359 criminalizes a wide range of conduct, including "drag story hours" in schools and libraries that receive

any amount of state funding. *Id.* § 3(2). The statute prohibits minors from attending certain "sexually oriented shows." *Id.* § 2(1). H.B. 359 proscribes all "sexually oriented" performances in libraries or schools that receive public funding, *id.* § 3(1)–(2), on public property "in the presence of" a minor, *id.* § 3(3)(a), and in any location owned by an entity that receives any state funding. *Id.* § 3(3)(b).

H.B. 359 defines "drag story hour" as "an event hosted by a drag queen or drag king who reads children's books and engages in other learning activities with minor children present." *Id.* § 1(3). The statute defines "drag king" and "drag queen" as "a male or female performer who adopts a flamboyant or parodic [male or female] persona with glamorous or exaggerated costumes and makeup." *Id.* § 1(1), (2). H.B. 359 defines "sexually oriented performance" as "a performance that, regardless of whether performed for consideration, is intended to appeal to a prurient interest in sex and features" any of the following: "the purposeful exposure, whether complete or partial, of . . . a human genital, the pubic region, the human buttocks, or a female breast, if the breast is exposed below a point immediately above the top of the areola" or "prosthetic genitalia, breasts, or buttocks," "stripping," or "sexual conduct." *Id.* § 1(10).

H.B. 359 defines "stripping" as the "removal or simulated removal of clothing in a sexual manner for the entertainment of one or more individuals," regardless of whether nudity results. *Id.* § 1(11). The statute contains no definition for "sexual

6

conduct" and instead cross-references the definition contained in Montana's criminal child abuse statute, Mont. Code Ann. § 45-5-625. H.B. 359 § 1(8) (2023). The definition of "sexually oriented" encompasses the undefined term "salacious dancing" in addition to "any lewd or lascivious depiction or description of human genitals or of sexual conduct[.]" *Id.* "Lewd" and "lascivious" are not defined. *Id.* H.B. 359 similarly fails to define "in the presence of" a minor. *Id.* § 3(3)(a).

Owners, operators, managers, and employees of "sexually oriented" businesses convicted under H.B. 359 face fines from $1,000 to $10,000 and, for a third or subsequent offense, mandatory revocation of business licenses. *Id.* § 2(2). Libraries, schools, public employees, and entities that receive any state funding face fines of $5,000 and mandatory suspension (first offense) or permanent revocation (subsequent offenses) of an applicable teaching, administrative, or specialist certificate if convicted of violating H.B. 359. *Id.* § 3(4). H.B. 359 provides for a private right of action in addition to imposing criminal liability. *Id.* § 4. A minor who attends a drag story hour or "sexually oriented performance" in violation of H.B. 359 § 2, or the minor's parent, may bring a civil action up to ten years after an alleged violation against any "person who knowingly promotes, conducts, or participates as a performer." *Id.* § 4(1), (3).

Plaintiffs filed this action on July 7, 2023. (Doc. 1.) Plaintiffs filed an Amended Complaint on July 17, 2023. (Doc. 3.) Plaintiffs sue Knudsen and Artnzen

in their official capacities, Gallagher in his individual and official capacity, and the City of Helena in its capacity as a municipal entity. (Doc. 3 at 5.) The Amended Complaint contains the following five causes of action: (I) First Amendment Free Speech Violation, as applied to Jawort; (II) Fourteenth Amendment Equal Protection Violation, as applied to Jawort; (III) First Amendment Free Speech Violation, as applied to Montana Pride; (IV) First Amendment Facial Free Speech Violation; and (V) Fifth Amendment Facial Due Process Violation. (Doc. 3 at 38–43.) In addition to injunctive relief, Plaintiffs seek declaratory judgment that H.B. 359 proves facially unconstitutional; damages in favor of Jawort and Montana Pride and against Gallagher and the City of Helena, respectively; and attorney's fees and costs. (*Id.* at 44.)

Plaintiffs filed a TRO/preliminary injunction motion on July 17, 2023. (Doc. 4.) Plaintiffs sought an emergency TRO on or before July 30, 2023, so that Montana Pride could take place without requiring the thousands of attendees, performers, and other community members to chill their protected speech or face criminal and civil liability. (Doc. 5 at 8.) The City of Helena filed a Response in support of Plaintiffs' TRO request on July 24, 2023. (Doc. 10.) The Court held an emergency TRO hearing on July 26, 2023. (Doc. 12.) The Court issued a limited TRO pending its determination of Plaintiffs' entitlement to a preliminary injunction on July 28, 2023. (Doc. 13.) Knudsen and Arntzen ("State Defendants"), filed a Response on August

2, 2023. (Doc. 17.) Gallagher filed his Response and Answer on August 4, 2023, and August 8, 2023, respectively. (Doc. 18; Doc. 21.) Gallagher takes no position on the preliminary injunction motion. (Doc. 18 at 2.) The State and the City of Helena filed their Answers on August 10, 2023. (Doc. 22; Doc. 23.) The Court conducted a preliminary injunction hearing on August 28, 2023. (Doc. 26.) The Court dismissed Defendant City of Helena without prejudice and dismissed Count III of the Amended Complaint with prejudice on September 6, 2023, upon motion of the parties. (Docs. 29 and 30.)

Plaintiffs seek a preliminary injunction to bar Defendants Knudsen and Arntzen from enforcing H.B. 359 pending this Court's resolution of the Plaintiffs' Count IV and Count V regarding the constitutionality of H.B. 359. (Doc. 4.) The Court's analysis will focus on whether H.B. 359 facially violates Plaintiffs' First Amendment free speech rights and facially violates Plaintiffs' Fifth Amendment due process rights.

## LEGAL STANDARD

District courts possess discretion regarding the grant or denial of preliminary relief. *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). A party seeking a preliminary injunction must establish the following four elements: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips

in their favor; and (4) that a preliminary injunction would be in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm to the opposing party and the public interest[] merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit evaluates the above factors under a sliding scale. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). A stronger showing on one factor may offset a weaker showing on another. *Id.* at 1132.

## DISCUSSION

Plaintiffs urge the Court to issue a preliminary injunction to extend the TRO and prevent enforcement of H.B. 359 until the Court decides the case on the merits. The Court will address each of the *Winter* factors with respect to Plaintiffs' request for a preliminary injunction.

### I.    Likelihood of Success on the Merits.

Plaintiffs contend that they have demonstrated a likelihood of success on the merits of the following two claims: (Count IV) First Amendment facial challenge to H.B. 359, and (Count V) Fifth Amendment vagueness/overbreadth facial challenge to H.B. 359. (Doc. 5 at 18, 37.) Plaintiffs assert that H.B. 359 has chilled their speech and subjected them to a reasonable fear of prosecution for engaging in protected speech and expression. The Court must evaluate whether Plaintiffs have established standing before considering whether Plaintiffs have demonstrated a likelihood of

success on the merits of Counts IV and V. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A. Standing.

To establish standing, a plaintiff must demonstrate the following three factors: (1) that they suffered an injury to a legally protected interest that is concrete, particularized, and actual or imminent; (2) that the defendant likely caused the injury; and (3) that judicial relief likely would redress the injury. *Id.* at 560–61. The U.S. Supreme Court has "altered its traditional rules of standing" for overbreadth challenges to legislative acts on First Amendment grounds. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

State Defendants level two arguments against Plaintiffs' standing. State Defendants first contend that all Plaintiffs fail to allege a cognizable injury because the State is not prosecuting any current enforcement actions under H.B. 359. (Doc. 17 at 27.) A plaintiff need not subject themselves to criminal prosecution, however, to establish a cognizable First Amendment injury. "Article III requires a threat of prosecution, not actual prosecution." *Friends of George's*, No. 2:23-cv-02163-TLP-tmp, 2023 WL 3790583, *16 (W.D. Tenn. June 2, 2023). The harm of censorship "can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Plaintiffs also have alleged concrete injury in the form of chilled speech and cancelled and modified events, as discussed below.

11

State Defendants additionally assert that Knudsen and Arntzen do not represent appropriate defendants. (Doc. 17 at 28–31.) A federal action may result in an injunction to bar a responsible state official from enforcing a challenged provision, a declaratory judgment that the provision proves unconstitutional, or both. "[S]tate officials who enforce[] an unconstitutional law 'come[] into conflict with the superior authority of [the] Constitution.'" *Ex Parte Young*, 209 U.S. 123, 159–60 (1908).

Knudsen, as Montana's Attorney General, serves as the top state official responsible for enforcing Montana's criminal laws. The Attorney General must perform the following functions pursuant to statutory duties: prosecute all causes in the supreme court "in which the state has an interest," Mont. Code Ann. § 2-15-501(1) (2023); "exercise supervisory powers over county attorneys [including] the power to order and direct county attorneys in all matters pertaining to the duties of their office" upon which order a county attorney must "promptly institute and diligently prosecute in the proper court and in the name of the state of Montana any criminal or civil action or special proceeding," Mont. Code Ann. § 2-15-501(5) (2023); "when required by the public service or directed by the governor, [] assist the county attorney of any county in the discharge of the county attorney's duties," Mont. Code Ann. § 2-15-501(6) (2023); "when required by the public service or directed by the governor, [] prosecute [] appropriate cases […] in which the state has

12

an interest," Mont. Code Ann. § 2-15-501(6) (2023); and "perform all other duties as required by law," Mont. Code Ann. § 2-15-501(9) (2023).

The Montana Code fails to define the statutory phrases "required by the public service" and "in which the state has an interest." These phrases encompass "broad and abstract terms that necessarily result in deference to the superseding state official." Tyler Quinn Yeargain, *Discretion Versus Supersession: Calibrating the Power Balance Between Local Prosecutors and State Officials*, 68 Emory L.J. 95, 116 (2018). The Montana Supreme Court has interpreted the phrase "in which the state has an interest" in the context of the Attorney General's broad power to determine when to institute legal action: "as an executive officer of the State of Montana, the Attorney General determines when to prosecute or to defend cases in which the State has an interest." *W. Tradition P'ship, Inc. v. Att'y Gen. of State*, 291 P.3d 545, 550 (Mont. 2012).

The prosecutorial powers of the Montana Attorney General are vast. The Montana Constitution and the Montana Code do not clearly demarcate the boundaries of this power. For example, the Attorney General may "direct, in a binding fashion," the prosecutorial powers of any county attorney and "may in effect deputize himself (or be deputized by the governor) to stand in the role of a county prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d

13

908, 919, 920 (9th Cir. 2004) (state attorney general was a proper party in a challenge to a state criminal statute where state law empowered the attorney general to "assist" county attorneys and so "do every act that the county attorney can perform").

The Attorney General's authority to prosecute under H.B. 359 has not been tested. "[T]he consequence of [the U.S. Supreme Court's] departure from traditional rules of standing in the First Amendment area is that any enforcement of a statute thus placed at issue is totally forbidden until and unless a limiting construction or partial invalidation" cures the constitutional malady. *Broadrick v. Oklahoma*, 413 U.S. at 613. The question of whether the Attorney General does indeed possess legal authority to prosecute under H.B. 359 might remain open unless and until the officer chose to attempt to prosecute under H.B. 359. This uncertainty does not shield the Attorney General from the equitable power of this Court to belay the attempt.

Taken together, the ambiguity of state law and the sensitivity of First Amendment expressive rights instruct that the threat of *attempted* prosecution by the Attorney General proves equivalent, in its capacity to chill speech, to the threat of prosecution by any county attorney in the state, whose authority to prosecute under the statute is not in question. "[A] federal court may] command[] a state official to do nothing more than refrain from violating federal law" without violating the state's sovereign immunity. *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011). Attorney General Knudsen stands as a proper party to enjoin from

14

enforcement of the statute.

Arntzen, as Montana's Superintendent of Public Instruction, possesses authority to channel the powers of the Board of Public Education ("the Board") over the certification of educators in the state. Montana law empowers the Board to initiate proceedings under Mont. Code Ann. § 20-4-110 (2023) to revoke or suspend certificates, but that power is not unlimited. The Board "may initiate proceedings [under the section] *if a request for the suspension or revocation [. . .] is made to it by the superintendent of public instruction*," Mont. Code Ann. § 20-4-110(2)(b) (2023) (emphasis added), or, in limited circumstances, on the request of the trustees of a district, Mont. Code Ann. § 20-4-110(2)(a) (2023).

The Board may suspend or revoke certificates only for a finite list of reasons once those proceedings are set in motion. Mont. Code Ann. § 20-4-110(1) (2023). If a person were convicted under H.B. 359 § 3, the law requires that "proceedings [] be initiated to suspend the teacher [. . .] certificate of the offender under [Mont. Code Ann. §] 20-4-110." H.B. 359 § 3(4). Upon conviction under H.B. 359 § 3 after an initial such suspension, "proceedings must be initiated to permanently revoke the teacher [. . .] certificate of the offender under [Mont. Code Ann. §] 20-4-110." *Id*. These provisions demonstrate that the Superintendent of Public Instruction represents a proper party to enjoin. H.B. 359 authorizes the Superintendent of Public Instruction to permit proceedings to be initiated to suspend or revoke such a

certificate under Mont. Code Ann. § 20-4-110.

The Superintendent of Public Instruction stands as a member of a finite group legally authorized to enable the Board of Public Education to initiate proceedings to suspend or revoke certificates under Mont. Code Ann. § 20-4-110. Importantly, nothing in Montana law limits the power of the Superintendent of Public Education in making these requests. By contrast, in deciding whether to revoke or suspend a certificate, Montana law limits the Board to the list of reasons set forth in Mont. Code Ann. § 20-4-110(1) (2023). No similar provisions limit the Superintendent of Public Instruction in deciding whether "the [B]oard may initiate proceedings" under the section. The Superintendent of Public Instruction could permit the Board to initiate proceedings that eventually would fail. The hassle and embarrassment of even a meritless proceeding presents a potential occupational penalty to a targeted certificate holder. The Superintendent of Public Education's authority to allow the initiation of proceedings under Mont. Code Ann. § 20-4-110 (2023) includes the authority to enforce H.B. 359 by requesting the initiation of proceedings in accord with its mandates. Arntzen represents a proper defendant.

### i.   Individual Standing.

The Court next will consider whether Plaintiffs have established individual standing, associational standing, and/or organizational standing. Jawort alleges actual injury to her First and Fourteenth Amendment rights flowing from the

16

cancellation of her June 2, 2023, lecture on trans and Indigenous Montana history at the Butte Public Library. (Doc. 5-2 at 3, 7, 10.) Jawort has proffered evidence that the event cancellation occurred in response to H.B. 359 and because of her status as a trans person and the LGBTQ+-related message she wished to deliver. (Doc. 5-2 at 3–5, 7, 10.)

Corcoran alleges imminent injury on the basis of her reasonable fear of prosecution under the plain text of H.B. 359 for dressing up in gendered costumes in the classroom. (Doc. 5-10 at 3–4.) Jawort and Corcoran directly link their speech-based injuries to H.B. 359. Blocking enforcement of H.B. 359 would remedy Jawort and Corcoran's actual and imminent injuries. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding a preliminary injunction was warranted where "First Amendment interests [of moving parties] were either threatened or in fact being impaired at the time relief was sought.") Jawort and Corcoran each have established individual standing. *Lujan*, 504 U.S. at 560–61.

### ii.   Associational Standing.

An entity possesses standing to sue on its members' behalf when it can satisfy the following three elements: (1) that its members otherwise would have standing to sue in their own right, (2) that the interests at stake prove germane to the entity's purpose, and (3) that neither the claim asserted nor the relief requested requires the participation of the individual members in the suit. *Hunt v. Wash. State Apple Advert.*

*Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs allege that Imperial Court, the Center, and the Great Falls LGBTQ+ Center are membership organizations. (Doc. 5-3 at 2–3; Doc. 3 at 31.) Plaintiffs allege that all members of these organizations have suffered violations of their First Amendment rights to free speech and expression. (Doc. 3 at 32.) Imperial Court members allegedly have suffered from drag show cancellations, postponements, and modifications. (Doc. 5-3 at 5–7.) Imperial Court members also have dropped out of scheduled drag performances due to fear of criminal and civil sanctions under H.B. 359. (Doc. 3 at 30.) These alleged injuries prove cognizable and satisfy the causation and redressability prongs for the same reasons as Jawort's and Corcoran's alleged speech-based injuries. The Court, the Center, and the Great Falls LGBTQ+ Center have satisfied the first *Hunt* factor. 432 U.S. at 343.

The Imperial Court's mission is to "educate and advocate for LGBTQ+ individuals and allies through the production of community-based drag performances that explore multiple gender expressions" and to "create a safe and welcoming environment." (Doc. 5-3 at 2.) The Center and the Great Falls LGBTQ+ Center each seek to support LGBTQ+ people and communities. (Doc. 3 at 9.) The interests asserted in this action prove "germane" to the purposes of the Imperial Court, the Center, and the Great Falls LGBTQ+ Center. *Hunt*, 432 U.S. at 343.

Plaintiffs, aside from Jawort, seek only declaratory and injunctive relief rather

than damages. (Doc. 3 at 44.) The Imperial Court, the Center, and the Great Falls LGBTQ+ Center members need not be party to this action. *Hunt*, 432 U.S. at 343; *see also Garcia v. City of Los Angeles*, 611 F. Supp. 3d 941, 952 (C.D. Cal. 2020). The Court determines that the Imperial Court, the Center, and the Great Falls LGBTQ+ Center have established associational standing and may assert claims on behalf of their members. *Hunt*, 432 U.S. at 343.

### iii.    Organizational Standing.

Organizational standing requires an organization to meet the same three *Lujan* individual standing elements: injury-in-fact, causation, and redressability. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).

With respect to the injury-in-fact element, an organization must demonstrate that its "ability to further its goals has been 'perceptively impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Montana Pride, Imperial Court, BumbleBee, the Center, the Great Falls LGBTQ+ Center, Montana Book Co., Imagine Nation, the Roxy, and the Myrna Loy ("Organizational Plaintiffs") each allege chilled First Amendment speech and expression that satisfies the perceptive impairment injury-in-fact standard. (Doc. 3 at 32.) Organizational Plaintiffs further allege a fear of prosecution under H.B. 359,

19

a statute that they argue proves unconstitutionally vague and overbroad. (*Id.* at 30–37.) Imperial Court and BumbleBee additionally allege actual economic, reputational, and professional injury in the form of cancelled, postponed, or modified drag shows and pole modeling events, respectively. (Doc. 5-3 at 5–7; Doc. 5-4 at 5–6.) Organizational Plaintiffs' alleged injuries prove cognizable and satisfy the causation and redressability prongs for the same reasons as Jawort's and Corcoran's alleged injuries.

Organizational Plaintiffs have established organizational standing. *Cf. Friends of George's*, 2023 WL 3790583, at *2–3. Each Plaintiff possesses at least one basis for standing. *Lujan*, 504 U.S. at 560–61; *Broadrick*, 413 U.S. at 612. The Court will proceed to evaluate the first *Winter* factor: likelihood of success on the merits. 555 U.S. at 22.

### B. First Amendment Facial Claim.

First Amendment rights do not extend to obscene speech and expression. Laws regulating obscenity, however, "must be specifically defined." *Miller v. California*, 413 U.S. 15, 24 (1973). Speech must meet the following three criteria to qualify as legally "obscene": (1) the speech, "taken as a whole, appeal[s] to the prurient interest in sex," "applying contemporary community standards"; (2) the speech "portray[s] sexual conduct in a patently offensive way"; and (3) the speech, "taken as a whole, do[es] not have serious literary, artistic, political, or scientific

value." *Id.* (internal citations and quotation marks omitted).

Existing Montana law shields minors from obscene material. Montana's obscenity statute criminalizes purposely or knowingly providing obscene material, obscenely exposing one's body, and giving obscene performances to minors, among other conduct. Mont. Code Ann. § 45-8-201(1) (2023). This statute employs a definition of "obscene" that incorporates the *Miller* requirements. *Id.* § 45-8-201(2). H.B. 359, by contrast, contains no requirement that, "taken as a whole" and "applying contemporary community standards" the regulated conduct "appeals to the prurient interest." *See generally* H.B. 359. The statute similarly fails to require that speech be "patently offensive." *Id.* H.B. 359 contains no carveout for speech or expression with serious literary, artistic, political, or scientific value. *Id.*

State Defendants conceded during the July 26, 2023, hearing that the statutory text of H.B. 359 regulates speech and expression outside that considered "obscene" under *Miller.* The Court determined in its July 28, 2023, TRO that H.B. 359 regulates protected speech as defined in *Miller*, 413 U.S. at 34–35. (Doc. 13 at 8–9.)

### i.  Appropriate First Amendment Mode of Analysis.

Defendants argue that the Court should undertake an "overbreadth" analysis rather than the standard First Amendment scrutiny analysis. Courts apply an "overbreadth" test in the context of speech unprotected by the First Amendment, including threats, "fighting words," obscenity, and child pornography. *See* Marc

Rohr, *Parallel Doctrinal Bars: The Unexplained Relationship Between Facial Overbreadth and 'Scrutiny' Analysis in the Law of Freedom of Speech*, 11 ELON L.J. 95, 100 (2017). A statutory prohibition that conforms to the specific test for that category of unprotected speech (e.g., the *Miller* test for obscenity) proves constitutional. A restriction that extends beyond the category-specific test may be facially overbroad. The U.S. Supreme Court invalidated, for example, a Georgia "fighting words" statute that exceeded the judicially approved definition of that category of unprotected speech. *Gooding v. Wilson*, 405 U.S. 518, 528 (1972).

The First Amendment overbreadth analysis proves inapposite to H.B. 359. Apart from unprotected "low value speech," federal courts reviewing restrictions on speech "because of disapproval of the ideas expressed" apply different tiers of scrutiny. *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992). H.B. 359 does not regulate obscenity or child pornography. The Court applies the First Amendment tiered scrutiny analysis. *Cf. Friends of George's*, 2023 WL 3790583, at *18; *HM Fla.-ORL, LLC v. Griffin*, No. 6:23-CV-950-GAP-LHP, 2023 WL 4157542, *6–8 (M.D. Fla. June 23, 2023).

"[T]hat the government must remain neutral in the marketplace of ideas" represents "a central tenet of the First Amendment." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978). Courts subject content- and viewpoint-based restrictions on speech or expression to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155,

22

163 (2015). Content discrimination takes place when the government selects "the subjects that may be discussed[.]" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 59 (1983) (Brennan, J., dissenting). Viewpoint discrimination, in turn, "occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Id.* The Court will consider whether H.B. 359 imposes content-based restrictions and/or viewpoint-based restrictions on speech or expression.

### ii. Whether H.B. 359 Constitutes a Content-Based Restriction.

A regulation proves "facially content-based under the First Amendment if it 'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC.*, 596 U.S. 61, 69 (2022) (internal citation omitted). Content-based restrictions are "presumptively unconstitutional." *Reed*, 576 U.S. at 163.

The only two other district courts to have considered First Amendment challenges to similar state "drag bans" concluded that those laws constitute facially content-based restrictions. *Friends of George's*, 2023 WL 3790583, at *19; *HM Fla.*, 2023 WL 4157542, at *7. The district court in *Friends of George's* issued a TRO blocking the Adult Entertainment Act ("AEA"), Tennessee's drag ban, the day before it would have taken effect. 2023 WL 3790583, at *3. The Florida drag ban at

issue in *HM Florida*, by contrast, had come into effect at the time of the district court's ruling. 2023 WL 4157542, at *1.

H.B. 359 bans drag story hours during "regular operating hours and at any school-sanctioned extracurricular activity" in schools and libraries that receive any public funding. H.B. 359 § 3(2). The law imposes significant restrictions on "sexually oriented" performances and "sexually oriented businesses" based upon broad definitions of sexual and gendered content. *Id.* §§ 2, 3. State Defendants argue that the codification instruction contained in H.B. 359 § 5(1) narrows the sweep of civil and criminal liability. (Doc. 17 at 20–21.) Section 5(1) of H.B. 359 incorporates the definitions contained in Montana's criminal provisions for "Offenses Against Public Order." H.B. 350 § 5(1) (citing Mont. Code Ann. § 45-8 (2023)). State Defendants note that the definition of "performance" contained in Mont. Code Ann. § 45-8-205 (2023), within "Offensive, Inhumane, and Indecent Conduct," excludes films "rated G, PG, PG-13, or R by the motion picture association of America." Mont. Code Ann. § 45-8-205(5) (2023).

H.B. 359 still restricts a broad range of other speech and expression even with the carveout for rated films. This other speech and expression ranges from theatre productions to book readings to drag shows, based upon their content. The constitutional problems with H.B. 359 statutory scheme identified by the Court in its TRO persist. (Doc. 13 at 14–16.) H.B. 359 does not qualify as a neutral time,

place, or manner regulation. *City of Austin*, 596 U.S. 61 at 69.

State Defendants also argue that H.B. 359 proves content-neutral because it addresses the Montana legislature's concern with the "secondary effects of sexually expressive conduct on minors." (Doc. 17 at 19–20.) None of the three cases cited by State Defendants supports this conclusion. *City of Erie v. Pap's* upheld a municipal ordinance in Pennsylvania that banned nudity in public places. 529 U.S. 277, 282–83 (2000). The U.S. Supreme Court determined that the regulation proved "unrelated to the suppression of expression" because the city's interest was in combatting harmful "secondary effects" of nude dancing and bore no relation to the expressive message of the conduct. *Id.* at 296. *City of Erie* evaluated the regulation under a "less stringent" standard that applies only to regulations that are unrelated to the content of the expression being limited. *Id.* The plaintiff in *City of Erie* also failed to dispute the validity of the city council's findings about harmful secondary effects on public health, safety, and "serious criminal activity." *Id.* at 297–98.

*Friends of George's* rejected a similar "secondary effects" argument. 2023 WL 3790583, at *26. The district court in *Friends of George's* concluded that its "determination that the AEA was enacted for an impermissible purpose is broad enough to reject the notion that the AEA is aimed not at the content of expressive speech but rather at its secondary effects." *Id.* As in *Friends of George's*, H.B. 359 targets speech based upon content. Unlike in *City of Erie*, Plaintiffs vehemently

25

dispute the validity of the Montana legislature's findings relating to drag, gender nonconformity, and harm to minors. The secondary effects doctrine does not apply.

The two other cases upon which Defendants rely prove equally inapposite. *Clark* v. *Community for Creative Non-Violence* concerned an advocacy group's challenge to a Washington, D.C., ordinance that prohibited sleeping overnight in certain public parks. 468 U.S. 288, 289–90 (1984). The plaintiffs sought to sleep overnight in Lafayette Park and the National Mall as a protest of housing insecurity. *Id.* The parties agreed that the regulation was content-neutral. *Id.* at 295. The U.S. Supreme Court upheld the restriction as a valid time and place restriction "designed to limit the wear and tear on park properties" and "unrelated to suppression of expression." *Id.* at 299. *Ward v. Rock Against Racism* involved a challenge to New York City's sound-amplification ordinance for Central Park. 491 U.S. 781, 784 (1989). *Ward* upheld the ordinance as a content-neutral place and manner restriction that proved "narrowly tailored to serve the substantial and content-neutral governmental interests of avoiding excessive sound volume" in the park. *Id.* at 803.

H.B. 359 focuses on the communicative content of the speakers. H.B. 359 imposes a content-based restriction. *City of Austin*, 596 U.S. at 69. Strict scrutiny applies.

### iii.   Whether H.B. 359 Constitutes a Viewpoint-Based Restriction.

The Court also considers whether H.B. 359 engages in viewpoint-based

regulation. Government suppression of speech based on a speaker's "specific motivating ideology," opinion, or perspective proves impermissible. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). Viewpoint-based restrictions on speech "raise the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V.*, 505 U.S. at 387 (1992) (internal citation and quotation marks omitted). Viewpoint-based discrimination represents "a 'more blatant' and 'egregious form' of content discrimination." *Reed*, 576 U.S. at 168 (quoting *Rosenberger*, 515 U.S. at 829).

Tennessee's AEA restricted the speech and expression of drag performers, defined as "male or female impersonators," by including them under an umbrella of "adult cabaret entertainment." Tenn. Code Ann. §§ 7-51-1401(2), (12). H.B. 359 similarly restricts "drags king[s]" and "drag queen[s]," defined as "male or female performer[s] who adopt[] a flamboyant or parodic [male or feminine] persona with glamorous or exaggerated costumes and makeup." H.B. 359 § 1(1)–(3). The district court in *Friends of George's* concluded that the AEA's criminalization of "male or female impersonators" "target[ed] the viewpoint of gender identity—particularly those who wish to [portray or express] a gender that is different from" that assigned to them at birth. 2023 WL 3790583, at *21. The same reasoning applies to H.B. 359 and its criminalization of drag performers.

H.B. 359 goes even further than the AEA. H.B. 359 places a near-blanket ban

27

on "drag story hour" in schools and libraries receiving public funds. H.B. 359 §§ 1(3), 3(2). The AEA, by contrast, made no mention of "drag story hour." *See* Tenn. Code Ann. §§ 7-51-1401 *et seq.*, 39-17-901. The AEA incorporated the *Miller* obscenity test into its definitions for "harmful to minors" and "obscene." Tenn. Code Ann. §§ 39-17-901(6), (10)–(11). H.B. 359 fails to track the *Miller* obscenity factors and contains no carveout for speech or expression possessing "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24.  H.B. 359, like the AEA, "targets the viewpoint of gender identity." *Friends of George's*, 2023 WL 3790583, at *21. H.B. 359's facially viewpoint-based regulation subjects it to strict scrutiny.

### iv.   Whether H.B. 359's Legislative History Evinces an Impermissible Purpose.

Courts apply strict scrutiny to content-neutral statutes where "there is evidence that an impermissible purpose or justification underpins" the law. *City of Austin*, 596 U.S. at 76. A court considering this question evaluates a statute's legislative history to determine whether "an impermissible legislative motive" animates the law. *Reed*, 576 U.S. at 166. This investigation proves particularly important where a challenged law possesses no enforcement history. *Friends of George's*, 2023 WL 3790583, at *22 (citing *Reed*, 576 U.S. at 166). State Defendants contend that H.B. 359's legislative history demonstrates that the Montana legislature possessed legitimate concerns about drag events causing harm to children, in part because the public expressed "significant public concern" about

drag as harmful to children. (Doc. 17 at 19.) The Court, like the district court in *Friends of George's*, will examine H.B. 359's legislative history. 2023 WL 3790583, at *23–27.

Legislators' Statements About H.B. 359's Purpose.

The Montana legislature held public meetings on February 9, 2023, and April 4, 2023. H.B. 359 sponsor Rep. Mitchell's opening remarks for the bill during the February 9, 2023, House Judiciary Committee Hearing lasted approximately three minutes. Mont. Leg., H. Jud. Comm. Hrg., 08:21:01–08:24:02 (Feb. 9, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/47759?agendaId=251847. Rep. Mitchell mentioned "drag" nine times during his opening. Rep. Mitchell explicitly stated that "[t]he reason I'm bringing this bill is because . . . drag shows in recent years have been specifically aimed at children." *Id.* at 08:21:57. Rep. Mitchell stated that "there's no such thing as a family-friendly drag show," referred to drag queens as "hyper-sexualized," and warned that "there's clearly a sick agenda being pushed here" and that "[d]rag shows are damaging to a child's psychology and general welfare[.]" *Id.* at 08:22:52; 08:23:16–19; 08:23:52.

Rep. Mitchell delivered the same introductory comments for H.B. 359 at the Senate Judiciary Committee Hearing on April 4, 2023. Mont. Leg., Sen. Jud. Comm. Hrg., 08:53:08 (Apr. 4, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/

PowerBrowser/PowerBrowserV2/20170221/-1/47987?agendaId=269135.        Rep.

Mitchell made the following closing remarks:

> This bill is to protect children from hypersexualized events
> that are meant for adults, not children. Due to the mature
> themes surrounding drag shows and the exposure to
> inappropriate activities, children may adopt and accept
> certain stereotypes or attitudes that could lead to social,
> psychological, linguistic difficulties. Children may also
> create an inadequate understanding of gender roles and
> experiences, which is damaging to their long-term social
> and emotional development . . . . I don't think anyone
> wants to go back home and say they voted to allow drag
> queens in schools.

*Id.* at 11:09:40. State Senator Carl Glimm ("Sen. Glimm"), the Senate carrier for the

bill, focused his opening remarks in support of H.B. 359 during a Senate Floor

Session on April 17, 2023, on the danger that drag events sexualize children,

including a reference to unspecified "sickening examples" available via "a simple

Google search." Mont. Leg., Sen. Floor Sess., 18:09:01–18:10:14 (Apr. 17, 2023),

http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV

2/20170221/-1/46256?agendaId=273842.

    Amendment Process.

    H.B. 359 underwent numerous amendments before being enacted. The

Montana House first amended H.B. 359 on February 15, 2023. The amendment

modified the definition of a "drag performance" to remove the reference to gender

identity and instead encompass performances featuring "topless dancers, exotic

dancers, strippers, or male or female impersonators" who appeal to a "prurient interest." H.B. 359.2 § 1(1). The amendment added a definition for "prurient interest" as anything "having a tendency to excite lustful thoughts." *Id.* § 1(3). The amendment also added a prohibition on drag performances on public property where children are present and in locations owned by an entity that receives any form of state funding. *Id.* § 3(3)(A), (B).

The second amendment to H.B. 359 added "obscene" to the definition of "drag performance." H.B. 359.3 § 1(1). The amended version of the bill defined "obscene" according to Mont. Code Ann. § 45-8-201 (2023), which incorporates the three-part *Miller* obscenity test. H.B. 359.3 § 1(7). It also defined "prurient interest" under Mont. Code Ann. § 45-8-205 (2023) and added an effective date. H.B. 359.3 §§ 1(8), 6.

The Montana Senate adopted an amendment from State Senator Chris Friedel ("Sen. Friedel") on April 17, 2023 ("Friedel amendment"). Sen. Floor Sess. at 18:17:07 (Apr. 17, 2023). The Friedel amendment removed each reference to "drag" and "drag story hour;" replaced "drag performance" with "adult-oriented performance," and removed the requirement that the performance be "obscene." H.B. 359.3 § 1(1)–(2). Sen. Friedel asserted that his amendment proved necessary because a reviewing judge would "strike [H.B. 359] down for unconstitutionality." *Id.* at 18:11:23–18:11:59. Sen. Glimm cautioned that the Friedel amendment would

31

"allow[] all these [drag events] under art and so it really just completely guts the bill[.]" *Id.* at 18:12:40. State Senator Brad Molnar ("Sen. Molnar") expressed concern that the Friedel amendment would "hurt the original intention of the bill" because it would not apply to some or all drag story hours. *Id.* at 18:13:40–18:14:27.

The Montana House considered the Friedel amendment to H.B. 359 during a House Floor Session on April 24, 2023. Mont. Leg., H. Floor Sess. 16:54:20 (Apr. 24, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/Power BrowserV2/20170221/-1/49742?agendaId=276646. Rep. Mitchell stated during the floor session that the Friedel amendment had "completely derailed the intent of this legislation." *Id.* at 16:54:42. Rep. Mitchell also expressed concern that the changes to the "public property [requirement] obviously would make the bill unconstitutional." *Id.* at 16:55:12. The House rejected the Friedel amendment and sent the bill to a Free Conference Committee. *Id.* at 16:57:37.

The conference committee submitted a report two days later, on April 26, 2023. The House adopted the conference committee's report on May 1, 2023, after less than four minutes of discussion. Mont. Leg., H. Floor Sess., 14:28:43 (May 1, 2023), http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBro wserV2/20170221/-1/46179?agendaId=278282. The final version of H.B. 359 added the "drag story hour" ban in publicly funded schools and libraries; added definitions for "drag king" and "drag queen;" replaced "adult oriented" with

"sexually oriented;" and added a private right of action. *Id.* at 14:21:40; 14:22:32.

Rep. Mitchell explained that the "only time drag is referenced in this bill now is for the story hour aspect. When these folks try to perform in schools and libraries it's usually conducted in a very sexual manner." *Id.* at 14:21:52. Rep. Mitchell stated that that the reason "we have to specifically state ['drag story hour'] in the bill . . . is because all that [drag performers] have to do is just call it 'art story hour' and they get away with it[.]" *Id.* at 14:22:08. Rep. Mitchell characterized opponents' concerns that H.B. 359 would be applied to artistic and theatrical productions like "Ms. Doubtfire or Peter Pan" as "absolutely false." *Id.* at 14:22:27.

The Senate adopted the conference committee's report on May 2, 2023, following less than three minutes of discussion. Mont. Leg. Sen. Floor Sess. 14:07:26. (May 2, 2023) http://sg001-harmony.sliq.net/00309/Harmony/en/PowerB rowser/PowerBrowserV2/20170221/-1/46267?agendaId=278927.  House  Speaker Matt Regier ("Rep. Regier") closed discussion of H.B. 359 by stating that "H.B. 359 doesn't stop drag, it only protects youth from it." *Id.* at 14:04:49.

Public Testimony.

Defendants additionally contend that public testimony on H.B. 359 during the 2023 Montana legislative session demonstrated "significant public concern about potential harm to minors." (Doc. 17 at 19.) Members of the public testified at both legislative hearings on H.B. 359 on February 9, 2023, and April 4, 2023.

State Defendants first cite testimony from a private person during the House Judiciary Committee Hearing on February 9, 2023. H. Jud. Comm. Hrg. at 8:48:50 (Feb. 9, 2023). The proponent expressed concern about an out-of-state drag event that allegedly had sexualized children. *Id.* The Court lacks sufficient information to evaluate these allegations. The Court notes that anecdotal evidence about an event outside Montana, even if verified, would fail to support a causal relationship between drag story hours and performances and harm to children.

State Defendants also highlight the testimony of a proponent of H.B. 359 who referenced an academic article about "drag pedagogy" during the Senate Judiciary Committee Hearing on April 4, 2023. (Doc. 17 at 19 n.2.) The proponent quoted an excerpt from the article that drag, queer, and trans pedagogies seek to "destabilize the normative function of schooling" to support an argument that drag harms children. Sen. Jud. Comm. Hrg. at 08:58:50 (Apr. 4, 2023); *see* Harper Keenan & Lil Miss Hot Mess, *Drag Pedagogy: The Playful Practice of Queer Imagination in Early Childhood*, 50 Curriculum Inquiry 440, 444 (2020). The proponent mischaracterizes the article. The authors critique traditional schooling models that they claim limit critical thinking and participatory learning. The article supports the academic and developmental merits of drag in early childhood education on the basis that drag "promotes a spirit of creative inquiry and world making" and "a vision of self-determination and freedom within a collective[.]" *Id.* at 452.

34

Particularly concerning to the Court is the same proponent's testimony that a Drag Queen Story Hour employee had been arrested on child pornography charges. Sen. J. Comm. Hrg. at 08:59:38 (Apr. 4, 2023). The Associated Press has refuted this claim, noting that it represents "[m]isleading, anti-LGBTQ rhetoric . . . used to target drag storytimes[.]" Ali Swenson, *Man Charged for Child Porn Didn't Work for Drag Queen Story Hour*, AP (June 22, 2022), https://apnews.com/article/fact-check-drag-queen-story-hour-not-arrested-416945160416. Neither the proponent's disagreement with the academic article, nor their reliance upon a disproved and inflammatory claim, provides a basis for a finding that drag harms children.

Twenty-eight proponents spoke in favor of H.B. 359 during the House and Senate Judiciary Committee Hearings. H. Jud. Comm. Hrg. at 08:24:22–09:08:33 (Feb. 9, 2023); Sen. Jud. Comm. Hrg. at 08:55:42–09:04:09 (Apr. 4, 2023). Speakers on behalf of the following organizations provided testimony in support: Montana Office of Public Instruction ("OPI"), Montana Family Rights Alliance, Montana Family Foundation, Moms for Liberty Yellowstone County ("Moms for Liberty"), and Mass Resistance. Eighteen people also provided testimony in support. No proponent offered evidence-based support for a link between drag and the sexualization or abuse of children.

Eighty-seven total opponents spoke against H.B. 359 during the hearings. H. Jud. Comm. Hrg. at 09:08:40–10:08:35; Sen. Jud. Comm. Hrg. at 09:04:17–

10:29:00. Seventeen organizational or institutional supporters offered testimony, including seven rights-based advocacy or policy organizations (Montana Coalition Against Domestic and Sexual Violence, American Civil Liberties Union ("ACLU") of Montana, Human Rights Campaign, Forward Montana, Montana Budget and Policy Center, Montana Women Vote, and Montana Human Rights Network); three LGBTQ+ and/or drag-focused orgs (Montana Pride, Imperial Court, and the Jedi Order); two professional associations (Montana Federation of Public Employees and Montana Library Association); two medical providers (BridgerCare and Planned Parenthood Advocates of Montana); and four arts organizations (Myrna Loy Theater, Holter Museum of Art, Alpine Theater Project, and Grand Street Theater). Ten current state representatives spoke in opposition, representing constituents from Bozeman, Butte, Helena, Livingston, Missoula, and Poplar. Forty-nine private citizens provided additional opposition testimony.

    <u>Analysis.</u>

The legislative history provides substantial evidence that an impermissible purpose animates H.B. 359. Sponsor Rep. Mitchell uniformly described the purpose of the law as restricting drag story hours and performances. *See, e.g.*, H. Jud. Comm. Hrg. at 08:21:57 (Feb. 9, 2023); H. Sen. Jud. Comm. Hrg. at 08:53:08 (Apr. 4, 2023); H. Floor Sess. at 14:21:52–14:22:08 (May 1, 2023). Rep. Mitchell has affirmed that H.B. 359 does not aim to restrict non-drag-related artistic content that the Court has

determined to fall within the statutory text. H. Floor Sess. at 14:22:27 (May 1, 2023).

Rep. Mitchell, Sen. Glimm, Rep. Regier, and Sen. Molnar repeated arguments that "there's no such thing as a family-friendly drag show," that drag performers are "hyper-sexualized," that opponents to the bill were pushing "a sick agenda," that "[d]rag shows are damaging to a child's psychology and general welfare," and that drag shows constitute "sickening examples" of the hyper-sexualization of children. H. Jud. Comm. Hrg. at 08:22:52; 08:23:16–19; 08:23:52 (Feb. 9, 2023); Sen. Floor Sess. at 18:09:01–18:10:14 (Apr. 17, 2023).

H.B. 359's amendment process reflects a continuing focus on restricting the speech and expression of drag performers and gender non-conforming people. The Montana legislature considered and ultimately rejected incorporating the *Miller* test during the amendment process. The legislature removed references to drag in response to concerns about constitutionality. Sen. Floor Sess. at 18:11:23–18:11:59 (Apr. 17, 2023). The legislature later restored the references in a subsequent version of the bill after Rep. Mitchell and other supporters expressed concerns that the amendment would preclude H.B. 359's application to drag performances and drag story hours and thereby had "completely derailed" the bill's purpose. *See, e.g.*, H. Floor Sess. at 16:54:20 (Apr. 24, 2023).

The Court also takes notice of Rep. Mitchell's acknowledgement that the Friedel amendment's prohibition on "adult-oriented" performances in public places

in the presence of minors would prove "obviously [] unconstitutional." *Id.* at 16:55:12. H.B. 359 as enacted substitutes "sexually oriented" for "adult oriented" and imposes an otherwise identical restriction on public performances in the undefined "presence of minors." *Compare* H.B. 359.4 § 3(3), *with* H.B. 359 § 3(3).

Public testimony from proponents of H.B. 359 offered only anecdotal and/or unsupported evidence of a purported link between drag and gender nonconformity with harm to children. The legislative history includes extensive public concerns about the bill's constitutionality raised by organizations, private individuals, and legislators. H.B. 359's public testimony adds further support to the Court's finding that the legislature passed the law for an impermissible purpose. The legislative history of H.B. 359 evinces an overt and impermissible purpose to target the speech and expression of LGBTQ+ community members, particularly trans, Two-Spirit, and gender non-conforming people. Strict scrutiny would apply even were H.B. 359's statutory text content-neutral and viewpoint-neutral. *Reed*, 576 U.S. at 166.

### (3) Strict Scrutiny Analysis.

A defendant bears the burden of demonstrating that a challenged statute proves "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (internal citation omitted). A court must determine "whether the challenged regulation represents the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). State Defendants

38

provided no evidence during the July 26, 2023, TRO hearing to support a finding that H.B. 359 furthers a compelling government interest.

State Defendants assert in their Response that H.B. 359 addresses the Montana legislature's concern that "sexually oriented performances and drag story hours are "indecent" and "potentially harmful to minors." (Doc. 17 at 19.) The Court does not dispute that the government possesses a legitimate and compelling interest in protecting the safety and welfare of children. State Defendants have failed to demonstrate, however, that the restrictions on speech and expression imposed by H.B. 359 bear any connection to this interest. *Reed*, 576 U.S. at 163.

State Defendants urge the Court to accept a purported link between drag performances and adverse outcomes for children's wellbeing. (Doc. 17 at 19, 22.) State Defendants emphasize that Imperial Court acknowledges that some drag performances are not appropriate for children and that the organization crafts performances differently depending on the audience. (*Id.* at 22 (citing Doc. 5-3 at 4).) The fact that drag organizations carefully tailor performers' costumes and conduct to be age-appropriate for children's performances undermines the assertion that H.B. 359 responds to a real problem.

State Defendants presented no evidence before the Court to indicate that limiting children's exposure to speech and expression critical of gender norms or by gender non-conforming people bears any relationship to promoting children's

39

welfare. State Defendants rely largely on statements by members of the Montana legislature and witnesses at the hearings on H.B. 359 to support their claims of potential harm to children. The Montana legislature's justification for H.B. 359 relies on a conflation of sexual abuse with exposure to sexual orientation, gender identity, and gender expression. State Defendants' claim that H.B. 359 is "not aimed at banning or suppressing a performer's sexual expression" reflects the same conflation. (*Id.* at 19.)

In fact, the research indicates that sexual orientation, gender identity, and gender expression do not equate to determine a person's sexual activity. LGBTQ+ people are no more likely than heterosexual people to sexually abuse children. Gene G. Abel & Nora Harlow, *Child Molestation Prevention Study*, *in* THE STOP CHILD MOLESTATION BOOK (2001). Ninety percent of people who sexually abuse children are family members or trusted adults. David Finkelhor, *Characteristics of Crimes Against Juveniles*, CRIMES AGAINST CHILDREN RESEARCH CTR. & OFF. JUVENILE J. & DELINQUENCY PREVENTION (2012). The conflation of gender and sexual minority identities with child sexual abuse or "hyper-sexualization" contributes to the marginalization of LGBTQ+ people.

LGBTQ+ youth, for example, are 3.8 times more likely to experience childhood sexual abuse and 1.2 times more likely to experience parental physical abuse than their non-LGBTQ+ peers. Heather L. McCauley, Katherine Bogen,

Robert W.S. Coulter, & Emily F. Rothman, *Sexual Assault Risk and Prevention Among Sexual and Gender Minority Populations*, *in* SEXUAL ASSAULT RISK REDUCTION AND RESISTANCE: THEORY, RESEARCH, AND PRACTICE, 333–52 (L.M. Orchowski & Christine A. Gidycz eds. 2018); *see also* Nathaniel M. Tran, Laura E. Henkhaus, & Gilbert Gonzales, *Adverse Childhood Experiences and Mental Distress Among U.S. Adults by Sexual Orientation*, 79 J. AM. MED. ASSOC. PSYCHIATRY 377 (Feb. 2022).

Trans people are over four times more likely than cisgender people to be victims of violent crime. Andrew R. Flores, Ilan Meyer, Lynn L. Langton, & Jody L. Herman, *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, 111 AM. J. PUB. H. 726 (2022). Trans and nonbinary youth, while no more likely than cisgender youth to perpetrate sexual violence, are more than twice as likely to experience sexual violence. Michele L. Ybarra, Kimberly L. Goodman, Elizabeth Saewyc, Jillian R. Scheer, & Ida Frugård Strøm, *Youth Characteristics Associated with Sexual Violence Perpetration Among Transgender Boys and Girls, Cisgender Boys and Girls, and Nonbinary Youth*, 5 J. AM. MED. ASSOC. NETW. OPEN 1, 6–7 (June 2022).

The promotion of unsupported claims about LGBTQ+ people and drag performers as "groomers" feeds animus against LGBTQ+ people. This animus has pronounced consequences for children's well-being. "Much of the distress that

LGBTQ children and adolescents experience is not the result of their gender non-conformity or LGBTQ identity . . . but rather the way they are treated for being LGBTQ[.]" Substance Abuse & Mental Health Services Administration, *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, U.S. DEP'T H. & HUM. SERVS. PUB. NO. (SMA) 15-4928, 20 (Oct. 2015).

A recent study found that nearly one-third of LGBTQ youth reported that their mental health was poor most of the time or always due to anti-LGBTQ+ policies and legislation. TREVOR PROJECT, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People*, 13 (May 2023). Forty-one percent of LGBTQ+ youth seriously considered attempting suicide in the past year. *Id.* at 4. Most youth who are out as trans or perceived as trans while in school (K–12) experience some form of mistreatment, including being verbally harassed (54 percent), physically attacked (24 percent), and/or sexually assaulted (13 percent) because they are trans. Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet, & Ma'ayan Anafi, *2015 U.S. Transgender Survey*, NAT'L CTR. FOR TRANSGENDER EQUALITY, 4 (Dec. 2016). Seventeen percent of trans youth surveyed experienced such severe mistreatment that they left a school as a result. *Id.* The Court rejects the State's attempt to invoke a professed concern for children's welfare as cover for government overreach and discrimination.

State Defendants additionally rely upon *Rust v. Sullivan* and *Interpipe*

*Contracting, Inc. v. Becerra* to assert that H.B. 359 represents a valid exercise of the Montana legislature's power to place conditions on public appropriations. 500 U.S. 173, (1991); 898 F.3d 879 (9th Cir. 2018). "Congress may selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust*, 500 U.S. at 193.

*Rust* upheld a restriction prohibiting doctors employed by family planning clinics that received Title IX funding from discussing abortion with their patients. 500 U.S. at 203. *Interpipe* involved a challenge to SB 954, a California statute that restricted employers from deducting their employees' wages to support the employers' preferred industry advancement funds absent their employees' collective consent. 898 F.3d at 903. The Ninth Circuit upheld the law on the basis that it "trim[med] a state subsidy rather than infringe[d] a First Amendment right." *Id.* at 898. The Ninth Circuit additionally determined that SB 954 did not discriminate based upon viewpoint. *Id.* at 900–01.

Both cases prove distinguishable. Nothing about H.B. 359 allocates or places conditions upon state funding. Receipt of any amount of state funding instead serves as a prerequisite for criminal and civil liability under sections three and four. H.B. 359 §§ 3(1–2), (3)(b), 4. A school, library, or business that has received any amount of public funding at any time proves subject to H.B. 359 regardless of the dollar

amount, ratio of state to private funding, or time elapsed since receipt of the funding. *Cf. Interpipe*, 898 F.3d at 898.

State Defendants finally argue that H.B. 359 complies with the First Amendment because it does not impose an outright ban. (Doc. 17 at 23–24.) State Defendants note that H.B. 359 "does not prevent [drag shows on] non-publicly funded private property" and "does not restrict drag show story hours at libraries or schools after regular hours, or as part of non-school sanctioned extracurricular activities." (*Id.* at 23.) State Defendants explained during the hearing on July 26, 2023, that a drag story hour still could take place at a library at 11:00 P.M. Forcing protected expression to take place under cover of darkness, rather than banning it outright, does not save H.B. 359 from constitutional infirmity. H.B. 359 is not narrowly tailored to serve a compelling government interest. *Ashcroft*, 542 U.S. at 666. Plaintiffs likely will succeed on the merits of their First Amendment claim in Count IV.

## v.    Fifth Amendment Facial Claim.

Plaintiffs assert that H.B. 359 proves unconstitutionally vague and overbroad. (Doc. 5 at 37.) The Fifth Amendment to the U.S. Constitution requires that no person may "be held criminally responsible for conduct which [they] could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954) (internal citations omitted). Criminal laws must define an offense "with sufficient

definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A statute that fails to meet either of these requirements violates the Due Process Clause and proves facially invalid. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

Plaintiffs argue that H.B. 359 contains numerous vague and overbroad definitions. (Doc. 5 at 33–35, 38.) Plaintiffs additionally highlight that the statute fails to define other terms. (*Id.*) State Defendants assured the Court during the July 26, 2023, TRO hearing that H.B. 359's statutory language proves sufficiently definite and tailored and that Plaintiffs face no risk of criminal prosecution under its terms. State Defendants distinguished H.B. 359 from the analogous Tennessee and Florida drag bans, each deemed unconstitutionally vague and overbroad, on the basis that those laws failed to define "lewd." H.B. 359 fails, however, to define "lewd and lascivious." H.B. 359 § 1(8). H.B. 359 additionally fails to define the terms "flamboyant or parodic [gendered] persona," "glamorous or exaggerated costumes and makeup," "salacious dancing," "sexual manner," and "presence of an individual under the age of 18[.]" *Id.* §§ 1(1)–(2), (8), (11), 3(3)(b).

State Defendants neglect to explain the absence of definitions for these terms in their Response. State Defendants instead offer the conclusory statement that "the vast majority of [H.B. 359's] intended applications" cover the "intentional exposure

of minors to indecent and potentially harmful conduct in locations and contexts where such exposure is likely to occur." (Doc. 17 at 25–26.) State Defendants further note that H.B. 359's "defined terms, other terms defined in law, the plain meaning of its terms, narrowing context, and the Legislature's obvious underlying intent" together clarify that the law is sufficiently clear and definite. (*Id.* at 26.) The Court disagrees.

H.B. 359's missing definitions and its definitions for "drag king," "drag queen," "drag story hour," "nude," "public property," "sexually oriented," "sexually oriented business," "sexually oriented performance," and "stripping" run a significant risk of vagueness and overbreadth. H.B. 359 § 1(1)–(4), (6), (8)–(11). A "flamboyant or parodic" gendered persona with "glamorous or exaggerated costumes or makeup" could be interpreted to include any number of theatrical and artistic performances. *Id.* § 1(1)–(2). A performer who removes no clothing or who removes only outer layers still might fall within H.B. 359's definition of "[s]tripping." *Id.* § 1(11). H.B. 359 remains silent as to whether "depiction[s] or descriptions[s] of human genitals or of sexual conduct" encompass non-live content or literary, film, theatrical, or other artistic depictions. *Id.* § 8. "Nude," as defined by H.B. 359, could apply both to someone fully clothed, with part of their buttocks visible through partially sheer fabric, and to someone in a bathing suit that partially uncovers the lower portion of a breast. *Id.* § 1(4)(b).

46

H.B. 359's broad private right of action allows any minor or their parent to bring a suit against someone whom they believe has violated the statute up to ten years after the alleged violation. H.B. 359 § 4. H.B. 359 contains no carveout for content possessing "serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24. The law makes no reference to geographical limitations. A minor could be considered "present" in a public park even if they were hundreds of yards away and out of earshot. *Id.* § 3(3)(a). Parental consent proves irrelevant to potential criminal liability. H.B. 359 provides for no affirmative defenses. *See generally* H.B. 359. The statute leaves the public in the dark about what conduct might carry criminal and civil sanctions. *Morales*, 527 U.S. at 56.

H.B. 359 fails to define the conduct that it criminalizes "with sufficient definiteness that ordinary people can understand what conduct is prohibited," *Kolender*, 461 U.S. at 357. H.B. 359 additionally appears likely to "encourage arbitrary and discriminatory enforcement." *Id.* H.B. 359's liability scheme, including a private right of action, creates a significant risk of arbitrary enforcement against people who are not drag performers but who do not conform to traditional gender and identity norms. Whether a performance qualifies as "sexually oriented," for example, rests upon a distinction between "female" and "prosthetic" breasts. H.B. 359 §§ 1(4)(b); (10)(a)(i)–(ii).

A trans man who has undergone gender affirming surgery to remove breast

tissue could face liability for showing his bare chest. *Id.*; *see also* H.B. 458. A trans woman who receives medically necessary hormone replacement therapy and who has developed breast tissue or who has undergone gender affirming surgery to receive breast implants could face similar liability. Authorizing members of the public and state authorities alike to draw such a distinction with respect to the bodies of other people likely would all but require them to engage in identity-based discrimination and gender-based discrimination. *Id.* § 1(4)(b), (10)(a)(i)–(ii).

H.B. 359 also permits private citizens and state authorities to pursue legal action based upon a judgment as to who qualifies as a "drag king" or "drag queen." *Id.* § 1(1)–(2). This assessment appears to hinge upon a personal, subjective determination about what qualifies as a "flamboyant or parodic" gendered persona with "glamorous or exaggerated" clothing and makeup, without any statutory definition of these terms for guidance. *Id.* H.B. 359's statutory scheme targets drag story hours and drag performances. It also targets trans, Two-Spirit, non-binary, intersex, and gender-nonconforming people, as well as others who dress or present in ways different from the gender assigned to them at birth. Butte-Silver Bow's decision to cancel Jawort's history lecture on the basis that "hav[ing] a trans[] person" in the Butte Public Library posed "too much of a legal risk" under H.B. 359 serves as an example of this hazard. (Doc. 5-2 at 3, 7, 10.)

H.B. 359 fails to define the conduct it criminalizes "with sufficient

definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 357. Its terms also "encourage arbitrary and discriminatory enforcement," particularly in light of the impermissible purpose revealed by the legislative history. *Id.* As with the Florida drag ban enjoined in *HM Florida*, H.B. 359 proves "dangerously susceptible to standardless, overbroad enforcement[.]" 2023 WL 3790583, at *9. Plaintiffs have demonstrated a likelihood of success on the merits of Count V. *Morales*, 527 U.S. at 56. The Court determines that Plaintiffs have satisfied the first *Winter* element.

## II.    Irreparable Harm.

Plaintiffs assert that irreparable harm has occurred and will continue in the absence of a preliminary injunction. (Doc. 5 at 38–39.) State Defendants counter that Plaintiffs have experienced no irreparable injury for the same reasons that they possess no standing. (Doc. 17 at 33.) The Court has considered and rejected these standing arguments above. The Government possesses a compelling state interest in children's wellbeing and safety. This compelling interest remains untethered, however, from the text and application of H.B. 359. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese v. Cuomo*, 592 U.S. ___, 141 S. Ct. 63, 67 (2020). The harm of censorship "can be realized even without an actual prosecution." *Am. Booksellers Ass'n*, 484 U.S. at 393.

Plaintiffs would continue to suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs cannot avoid potential criminal and civil liability under H.B. 359 unless they engage in self-censorship or abandon their organizational missions. Imperial Court has curtailed its speech and expression, including at other recent Pride events across the state, in response to H.B. 359. (Doc. 5-3 at 5–7.) Imperial Court and BumbleBee have experienced irreparable harm due to cancelled, postponed, or modified events. (*Id.*; Doc. 5-4 at 5–6.) The Roxy represents that it is "unsure how [it] can possibly comply" with the statute. (Doc. 5-5 at 10.) The Myrna Loy similarly alleges that it "is unable to determine how we can come into compliance with H.B. 359 while still serving our mission[.]" (Doc. 5-6 at 6.) Corcoran, the Roxy, the Myrna Loy, Montana Book Co., BumbleBee, and Imagine Nation all allege fear of the potential revocation of their professional licenses or certificates pursuant to H.B. 359 § 3(3)(b), (4).

Both Plaintiffs' alleged loss of First Amendment freedoms and their reasonable fear of criminal and civil liability under H.B. 359 constitute irreparable injury. *Roman Cath. Diocese*, 592 U.S. at ___, 141 S. Ct. at 67; *Am. Booksellers Ass'n*, 484 U.S. at 393. Plaintiffs have demonstrated irreparable harm and have satisfied the second *Winter* element.

## III.   Public Interest.

Defendants assert that "[t]he State, and the public at large, maintains a

compelling interest in enforcing H.B. 359" because it is a statute enacted by the Montana legislature. (Doc. 17 at 33–34.) Constitutional violations never serve the public interest. *See HM Fla.*, 2023 WL 4157542, at \*9; *Friends of George's, Inc.*, 2023 WL 2755238, at \*7. Plaintiffs have presented evidence that drag story hours, drag performances, and gender expansive speech and expression serve the public interest. (*See* Doc. 5-3 at 3–4; Doc. 5-9 at 3–4; Doc. 5-10 at 4.) No evidence before the Court indicates that State Defendants have suffered any harm following the Court's grant of a TRO. Montana law already proscribes subjecting minors to obscenity. Mont. Code Ann. § 45-8-201 (2023). Parents simply can decide not to take their children to drag story hours or drag performances. The public interest factor strongly weighs in favor of Plaintiffs for purposes of a preliminary injunction.

## CONCLUSION

"Fear . . . cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free [people] from the bondage of irrational fears." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). "[S]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975).

H.B. 359 targets protected speech and expression. The statutory text and legislative history evince anti-LGBTQ+ animus. No evidence before the Court indicates that minors face any harm from drag-related events or other speech and expression critical of gender norms. H.B. 359's terms prove vague and overbroad, chilling protected speech and creating a risk of disproportionate enforcement against trans, Two-Spirit, and gender nonconforming people. *Morales*, 527 U.S. at 56. Plaintiffs have demonstrated entitlement to a preliminary injunction. *Winter*, 555 U.S. at 22. The Court will enjoin Defendants from enforcing H.B. 359.

The parties stipulate that Defendants Knudsen and Arntzen are not entitled to a jury trial on Plaintiffs' claims for declaratory and injunctive relief raised in Counts IV and V. (Doc. 31.) The parties stipulate, however, that Defendant Gallagher is entitled to a jury trial on Plaintiffs' claims under § 1983 raised in Counts I and II. (Doc. 31.) These claims relate to alleged violations of Plaintiff Jawort's rights under the First and Fourteenth Amendments. (Doc. 3.) Plaintiffs' Counts I and II also allege that "[f]urther implementation of [H.B.] 359 by Defendant Knudsen will result in further violation of Jawort's First Amendment [and Fourteenth Amendment] rights." *Id*. The parties have not stipulated that Defendant Knudsen is entitled to a jury trial on these claims, but instead represent to the Court that they "intend to identify those issues that are purely legal—and suitable for judicial resolution" as to Knudsen re Counts I and II—if indeed any such issue exists. (Doc.

31.)

Jawort allegedly has suffered speech-based irreparable professional, reputational, and dignitary harm flowing from the cancellation of her June 2, 2023, history lecture at the Butte Public Library. (Doc. 3.) Butte-Silver Bow's decision to cancel the lecture occurred despite Jawort's express intent to present as herself rather than in drag. (Doc. 5-2 at 4–5.) Jawort likely will rely on this fact in arguing that Butte-Silver Bow's actions rose to the level of identity- and/or gender-based discrimination in violation of the Equal Protection clause.

## ORDER

Accordingly, **IT IS ORDERED** that:

1. Plaintiffs' Motion for a Preliminary Injunction (Doc. 4) is hereby **GRANTED**.

2. Defendants Austin Knudsen, Attorney General for the State of Montana, and Elsie Arntzen, Montana Superintendent of Public Instruction, are **HEREBY ENJOINED** from instituting, maintaining, or prosecuting any enforcement proceedings under H.B. 359.

DATED this 13rd day of October, 2023.

_____
Brian Morris, Chief District Judge
United States District Court

53