IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

THE IMPERIAL SOVEREIGN COURT OF THE )
STATE OF MONTANA; ADRIA JAWORT; RACHEL )
CORCORAN; MONTANA BOOK COMPANY; IMAGINE ) Civil Docket
BREWING COMPANY, LLC d/b/a IMAGINE ) No.
NATION BREWING COMPANY; BUMBLEBEE ) CV-23-50-BU-BMM
AERIAL FITNESS; THE WESTERN MONTANA )
COMMUNITY CENTER; MONTANA PRIDE; THE )
GREAT FALLS LGBTQ+ COMMUNITY CENTER; )
THE ROXY THEATER; and THE MYRNA LOY )
)
            Plaintiffs, )
      vs. )
)
AUSTIN KNUDSEN; ELSIE ARNTZEN; JP )
GALLAGHER; and THE CITY OF HELENA, )
)
            Defendants. )
_____)

Transcript of Motion Hearing


Paul G Hatfield Federal Courthouse.
901 Front Street
Helena, MT 59626
Monday, August 28, 2023
2:32 p.m. to 3:48 p.m.


BEFORE THE HONORABLE BRIAN MORRIS

UNITED STATES CHIEF DISTRICT COURT JUDGE


Yvette Heinze, RPR, CSR
United States Court Reporter
Missouri River Federal Courthouse
125 Central Avenue West
Great Falls, MT 59404
yvette_heinze@mtd.uscourts.gov
(406) 454-7805

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   PRESENT ON BEHALF OF THE PLAINTIFFS:

3                  Constance Van Kley
                   Rylee Sommers-Flanagan
4                  UPPER SEVEN LAW
                   PO Box 31
5                  Helena, MT 59624

6                  Niki Zupanic
                   ZUPANIC LAW PLLC
7                  PO Box 1982
                   Helena, MT 59624

8

9   PRESENT ON BEHALF OF THE DEFENDANT,
    AUSTIN KNUDSEN and ELSIE ARNTZEN:
10
                   Michael Russell
11                 MONTANA DEPARTMENT OF JUSTICE
                   Agency Legal Services
12                 1712 9th Ave.
                   Helena, MT 59601
13

14  PRESENT ON BEHALF OF THE DEFENDANT,
    JP GALLAGHER:
15
                   Cynthia L. Walker
16                 BOONE KARLBERG PC
                   201 West Main
17                 PO Box 9199, Suite 300
                   Missoula, MT 59807-9199
18

19  PRESENT ON BEHALF OF THE DEFENDANT,
    CITY OF HELENA:
20
                   Rebecca Dockter
21                 MONTANA DEPARTMENT OF FISH WILDLIFE AND PARKS
                   1420 East 6th Avenue
22                 PO Box 200701
                   Helena, MT 59620-0701
23

24  ALSO PRESENT:
                   Elsie Arntzen
25                 Murry Warhank

1                             PROCEEDINGS

2          (Open court.)

3               THE COURT:  Madam Clerk, please call the next case on

4    the Court's calendar.

5               THE CLERK:  Yes, Your Honor.  This is the time the

6    Court has set aside for a motion hearing in Civil Cause 23-50.

7    This is a Butte Division case before Honorable Brian Morris,

8    The Imperial Sovereign Court of the State of Montana versus

9    Knudsen, et al.

10              THE COURT:  Thank you.

11              Counsel, good afternoon.  There's enough of you.  Why

12   don't you make appearances, please.

13              MS. VAN KLEY:  Your Honor, Constance Van Kley on

14   behalf of plaintiffs.  And with me at counsel table are

15   Rylee Sommers-Flanagan and Niki Zupanic.

16              THE COURT:  Good afternoon.

17              MR. RUSSELL:  Good afternoon, Your Honor.

18   Michael Russell on behalf of Defendants Knudsen and Arntzen.

19              MS. DOCKTER:  Good afternoon, Your Honor.

20   Becky Dockter with the City of Helena.

21              MS. WALKER:  Good afternoon, Cindy Walker for the

22   Defendant JP Gallagher.

23              THE COURT:  All right.  Anyone else?  Well, welcome.

24              This is a hearing set for plaintiffs' motion for

25   preliminary injunction.  Since the hearing on the TRO, we've

1  had written responses filed by the state and the other

2  defendants and a reply brief from the plaintiffs.

3          One thing I will talk about at the end of the hearing

4  today and would like you to start considering now is,

5  regardless of the outcome today, if we have any further

6  proceedings and we have a bench trial in this matter, how would

7  we reach a final resolution?

8          In the Tennessee case, there was an abbreviated bench

9  trial held.  I think with Florida, there's just been a

10  preliminary injunction to date.  So that's something we need to

11  talk about after we finish our arguments today.

12          So this is plaintiffs' motion for preliminary

13  injunction.  Who is going to argue?

14          MS. VAN KLEY:  Thank you, Your Honor.

15          Good afternoon, and may it please the Court.

16  Constance Van Kley on behalf of plaintiffs for a mix of

17  individuals, organizations, and businesses affected by

18  Montana's House Bill 359.

19          Plaintiffs ask the Court to grant their motion for a

20  preliminary injunction on Counts 4 and 5, which are the facial

21  challenges to HB 359 brought under the First and Fifth

22  Amendments, respectively.

23          Because Montana Pride has concluded, we are seeking

24  relief with regard to the preliminary injunction exclusively

25  against the state defendants, Attorney General Austin Knudsen

1    and Superintendent of Public Instruction Elsie Arntzen.

2            THE COURT:  All right.  Let's talk about those state

3    defendants for a minute.  Why are they the proper parties here?

4            MS. VAN KLEY:  Thank you, Your Honor.  The state

5    defendants are the proper defendants because they satisfy the

6    required elements of causation and redressability under the

7    *Lujan* standing analysis.

8            Those two considerations are somewhat collapsed in

9    this case.  The question of causation is whether plaintiffs'

10   injuries are fairly traceable to the defendants.

11   Redressability kind of addresses the same question.  If the

12   plaintiffs' claims are fairly traceable to the defendants, can

13   the Court grant relief that is meaningful as to these

14   particular defendants?  And the answer for both questions here

15   is yes.

16           I would direct the Court's attention to the case

17   *Planned Parenthood of Idaho v Wasden*, 376 F.3d 908.  It's a

18   Ninth Circuit case from 2004.  In *Planned Parenthood of Idaho*,

19   the Ninth Circuit considered precisely this question:  When is

20   a state attorney general properly named?  And really it comes

21   down to the particular features of state law.

22           In the *Planned Parenthood of Idaho* case, the Ninth

23   Circuit said there are two times when it is appropriate to

24   bring a challenge against the state attorney general when

25   you're challenging a state criminal law.  Obviously, that law

1    was criminalizing certain abortion practices.  And to quote the

2    Ninth Circuit, "Where an attorney general cannot direct, in a

3    binding fashion, the prosecutorial activities of the officers

4    who actually enforce the law or bring his own prosecution, he

5    may not be a proper defendant."

6           So *Planned Parenthood of Idaho* says there are two

7    times when a state attorney general can properly be named in a

8    pre-enforcement challenge to a criminal law like this:

9           First, the state attorney general is properly named

10   when that attorney general can bind the county attorney to act

11   to initiate criminal prosecutions, to prosecute criminal

12   prosecutions, to dismiss criminal prosecutions.

13          The second is when the attorney general can actually

14   step into the shoes of the county attorney.

15          Setting aside that second path, certainly, under

16   Montana law, Attorney General Knudsen has the authority to bind

17   county attorneys to initiate and prosecute criminal cases.

18          THE COURT:  What's your authority?

19          MS. VAN KLEY:  There are two parts.  The first is

20   Montana Code Annotated Section 2-15-501.  This is the section

21   of the code that refers to the duties of the attorney general.

22          It is the duty of the attorney general -- and I

23   quote -- "to exercise supervisory powers over county attorneys

24   in all matters pertaining to the duties of their offices.  The

25   supervisory powers granted to the attorney general by this

1 subsection include the power to order and to direct county

2 attorneys in all matters pertaining to the duties of their

3 office.  The county attorney shall, when ordered or directed by

4 the attorney general, promptly institute and diligently

5 prosecute in the proper court and in the name of the state of

6 Montana any criminal or civil action or special proceeding."

7 County attorney does not have discretion under this

8 section of the code to refuse enforcement if directed by the

9 state attorney general.

10 THE COURT:  How does Montana's duties from the

11 attorney general differ from those of the state of Tennessee?

12 There, the district court determined that the county attorney

13 in Nashville was the appropriate defendant.

14 MS. VAN KLEY:  Your Honor, I think we also could name

15 a county attorney.  I think a county attorney could be a proper

16 defendant in that case.

17 In the *Friends of George's* case, the parties agreed

18 to dismissal of the attorney general.  I don't know the details

19 for that.  They initially named the state of Tennessee, the

20 governor, and the attorney general.  I don't know what happened

21 behind the scenes.

22 We could name a county attorney.  We could name -- we

23 could try to get a class certified as to all the county

24 attorneys.  We could name the county attorneys in every county

25 where plaintiff resides.  But that's not the question -- that

1  doesn't answer the question as to whether Attorney General

2  Knudsen is a proper defendant.  There isn't a need, unless you

3  have a necessary party, which nobody is arguing here.  There's

4  no need to sue every single person that potentially could be

5  sued.  The question here is only whether or not causation and

6  redressability are proper as to -- or are satisfied as to

7  Attorney General Knudsen.

8          THE COURT:  What about with regard to Superintendent

9  Arntzen?

10          MS. VAN KLEY:  So Superintendent Arntzen, similarly,

11  I don't have a case, like *Planned Parenthood of Idaho*, that

12  applies to superintendents of public instruction.  The

13  superintendent of public instruction under Montana law has the

14  ability to initiate teacher disciplinary practices by

15  presenting the issue to the board.

16          And I have a statute here.  The superintendent of

17  public instruction -- I'm quoting from Montana Code Annotated

18  20-3-106, "The superintendent of public instruction has the

19  general supervision of the public schools in districts of the

20  state and shall perform the following duties or acts."  One of

21  those enumerated duties is to issue, renew, or deny teacher

22  certification and emergency authorizations of employment.

23          I would like to also -- this one's a little more

24  complicated.  And so may I approach?

25          THE COURT:  You may.  Give it to the clerk, please.

1      (Complying.)

2            MS. VAN KLEY:  This is the statute that's cited by

3    the state defendants in their brief.  This is Section 20-4-110

4    of Montana Code Annotated.  And the state defendants use this

5    section of the code to argue that, in fact, it should be the

6    Board of Public Education and not Superintendent Arntzen who

7    should be named.

8            And, again, this question of whether or not you could

9    sue somebody else does not resolve the question of whether or

10   not this particular defendant is properly sued.

11           The Board of Public Education, under Subsection 1,

12   may discipline teachers for a number of enumerated reasons that

13   involve conduct that is not similar to the conduct proscribed

14   by House Bill 359:  Making a line in their request for

15   certification; being incompetent in the exercise of their

16   duties, gross neglect of duty; criminal offense involving moral

17   turpitude, not just a criminal offense; immoral conduct,

18   certain -- a number of reasons, none of which have anything to

19   do with Drag Story Hours.  The House Bill Number 359 does not

20   amend this code section.

21           And so if the Board of Public Instruction were to

22   take disciplinary action against a teacher, it would be under

23   Subsection 2 of this statute.  The board may initiate

24   proceedings under this section if a request for the suspension

25   or revocation is made to it by subpart B, the superintendent of

1    public instruction.

2           So the superintendent of public instruction -- and I
3    think this is true whether or not it falls under one of these
4    subsections.  The superintendent of public instruction,
5    Defendant Elsie Arntzen, has the power to initiate the
6    disciplinary process with regard to teachers, including
7    Plaintiff Rachel Corcoran.

8           So as to both Defendant Knudsen and Defendant
9    Arntzen, the causation and redressability prongs of the *Lujan*
10   analysis are satisfied.

11          THE COURT:  What about with regard to the private
12   right of action?

13          MS. VAN KLEY:  So this comes up quite a bit in the
14   state's brief because of the case *Whole Woman's Health v*
15   *Jackson*, the US Supreme Court case dealing with Texas's SBA,
16   which included a private right of action against abortion
17   providers or citizens who assist in abortions.

18          In that case, the law SB 8, did not include criminal
19   prosecutions.  There was no amendment to the criminal code.
20   Nobody had the right to bring a criminal action against the
21   individuals who were deemed to be in violation of SB 8.  And
22   the Court said, with regard to that challenge, that the
23   plaintiffs didn't have standing and that the defendants were
24   not proper defendants under the *Ex Parte Young* analysis when
25   the plaintiff sued judges who are not adverse to the litigants

who come before them and state court clerks who do not have the
opportunity to exercise discretion about what they will and
will not docket.

        And so although HB 359 also includes a private right
of action, it includes criminal penalties, which are
enforceable by Defendant Knudsen, and it also includes
occupational penalties against teachers enforceable by
Defendant Arntzen.

        In the *Whole Woman's Health* case, there was also a
claim brought against Texas licensing officials, who under SB 8
had the authority to initiate disciplinary actions against
medical providers.  The Supreme Court in *Whole Woman's Health*
said those claims can go forward.

        *Whole Woman's Health* presents an interesting analysis
of a private right of action, but it just doesn't apply here
because House Bill 359 is not -- does not include solely a
private right of action.  We are not suing judges.  We are not
suing state court clerks.  It is put to the side entirely.

        And I think, just as we don't need to sue every
single defendant that we possibly could sue, the fact that
there are these other penalty provisions within the law does
not mean that our challenge to the criminal penalty provisions
or the occupational penalty provision regarding teachers is
improper.

        I'd like to go back to the big picture of standing

really briefly.  There's a doctrine that's sort of colloquially described as "Standing for one is standing for all."  To quote the Ninth Circuit in *National Association of Optometrist and Opticians v Brown*, 567 F.3d 521, "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."

And in the First Amendment context, so long as one plaintiff faces the choice of self-censorship or prosecution, that plaintiff can litigate the constitutional deficiencies that affect others.  As the US Supreme Court said in *Broadrick v Oklahoma*, even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its rights.  "However, in the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or existence."

And turning to the specifics of injury in fact in the First Amendment context, I think we talked about this at the TRO hearing.  I won't belabor the point.  But I would like to just present something that the Ninth Circuit said very recently, in 2018, in the case of *Italian Colors v Becerra*, which is 878 F.3d 1165.  "In order to avoid this chilling effect, the Supreme Court has endorsed what might be called a

'hold your tongue and challenge now' approach rather than
requiring litigants to speak first and take their chances with
the consequences."

        Because the fact that criminal prosecution is on the
other end of speech causes plaintiffs to self-censor, that
fact, the threat of criminal prosecution and the attendant
self-censorship, is an injury in the First Amendment context.

        All of the plaintiffs suffer an injury.  In fact, I'd
say that all of them have standing.  But because of that
doctrine of standing for all, I'll just focus briefly on the
most obvious cases.

        With regard to the -- and, again, focusing on these
particular defendants who are named for purposes of the
preliminary injunction.  With regard to the Drag Story Hour
ban, Plaintiff Rachel Corcoran is a teacher who dresses in
costume.  Under her interpretation of HB 359 and under my
interpretation of HB 359, when she dresses in costume to teach
to her students and those costumes have discernable gender, it
is at least arguably within the scope of the ban on Drag Story
Hours.  She, therefore, faces criminal prosecution and
disciplinary action.

        With regard to the other piece of the law, the ban on
so-called sexually oriented performances, The Roxy Theater and
the Myrna Loy are both sexually oriented businesses, kind of
absurdly, but as defined by the statute because they serve

alcohol on premises, and they show performances that may be
deemed sexually oriented performances.  They are also
recipients of straight funds.  So two different -- for two
different reasons, they are subject to criminal penalties.

Now, Your Honor, we spoke at length about the merits
during the temporary restraining order hearing.  I don't want
to be redundant.  I'd like to go briefly through the *Winter*
factors.  But, first, I'd like to point out that the state in
its brief has really offered no evidence to rebut the arguments
that we raised in our brief or the determinations of the Court
in the temporary restraining order order.

THE COURT:  Well, Ms. Van Kley, you are asking again
now for emergency relief here.  What harm is imminent?  The
last time, for the TRO hearing, the Pride event was happening
that weekend.  What's going on that justifies the emergency
relief?

MS. VAN KLEY:  Your Honor, we are asking for a
preliminary injunction, which does not present the same
concerns that a temporary restraining order presents.

With regard to the temporary restraining order, the
state had an opportunity to attend the hearing.  They didn't
have an opportunity to present their arguments in a brief.
That is now fully briefed.  The state has had the opportunity,
just as the plaintiffs did, to present declarations or other
evidence in support of their response to the preliminary

1  injunction motion.

2          And so this is -- the question is not whether harm is
3  going to happen right now, but whether or not harm is likely to
4  occur during the pendency of the lawsuit if there isn't a
5  preliminary injunction in place.

6          And for that, the standard of irreparable harm in the
7  First Amendment, I'll direct the Court to *Elrod v Burns*, a
8  US Supreme Court case from 1976, 427 US 334.  "The loss of
9  First Amendment freedoms, for even *minimal* periods of time,
10 unquestionably constitutes irreparable injury."

11         Setting aside the plaintiffs -- that we just
12 discussed with regard to standing, on the whole, plaintiffs
13 have offered a significant body of evidence that their speech
14 has been chilled as a result of HB 359.  We can extrapolate
15 from that very naturally that that speech is going to continue
16 to be chilled.  That is irreparable injury under the
17 First Amendment, and that is what is required under the *Winter*
18 factors.

19         So if HB 359 is not preliminary enjoined, plaintiffs
20 and others will be forced to self-censor in order to avoid
21 penalties at the hands of the state.  That satisfies the
22 irreparable injury prong.  It really also goes to the equitable
23 considerations and public interest prongs of the *Winter*
24 analysis because the state does not have an interest in
25 violating individuals' constitutional rights.  The state does

1  not have an interest in censoring speech.  And existing law in
2  Montana protects minors sufficiently from speech that truly is
3  obscene.

4          Turning to the first *Winter* factor, likelihood of
5  success on the merits --

6          THE COURT:  Before you go there, what about the
7  nonstate defendants, the City of Helena and JP Gallagher and
8  the City of Butte?

9          MS. VAN KLEY:  Your Honor, given the representations
10 of the City of Helena at the TRO hearing, given that the
11 permits for Montana Pride did in fact issue and that the City
12 of Helena sees itself in what it described as a Hobson's
13 choice, between censoring individuals and complying with the
14 HB 359, we aren't directly seeking a preliminary injunction
15 against the City of Helena because they do not intend to
16 violate individuals' First Amendment rights.

17         With regard to Defendant JP Gallagher, Plaintiff
18 Adria Jawort's claims against him are based on past harm.
19 There's no indication that Defendant JP Gallagher is going
20 to -- that we are aware of.  We don't have evidence to show
21 that JP Gallagher is going to in the future violate
22 individuals' First Amendment rights.  And so our request for
23 relief on the preliminary injunction is limited to the state
24 Defendants Austin Knudsen and Elsie Arntzen.

25         THE COURT:  All right.

1      MS. VAN KLEY:  And we are moving for a preliminary

2  injunction under Count 4, which is the First Amendment free

3  speech claim, and, 5, the void for vagueness claim.  I know we

4  talked about this quite a bit.  I'd just like to address a few

5  things that came up in the state's response brief.

6      The state -- the Court determined in its TRO order

7  that HB 359 covers at least some speech that is outside the

8  scope of obscenity.  And the Court determined that it did not

9  merely regulate obscenity, which is already criminalized under

10  Montana law.  The state does not really dispute that.  What it

11  is -- my reading of its brief is instead that it argues that

12  some drag is obscene.

13      Focusing particularly on plaintiff, the Imperial

14  Court, the state argues that because the Imperial Court

15  sometimes puts on performances for adults, it cannot also put

16  on performances for children.  That is not responsive to the

17  question of whether HB 359 sweeps in speech that is nonobscene.

18      HB 359 -- and this is a way in which HB 359 is

19  distinguishable from the statutes that were considered in

20  Tennessee and in Florida and is, in fact, worse than those

21  statutes.  HB 359 does not even attempt to incorporate the

22  Miller test.

23      The statute enjoined in *Friends of George's*

24  incorporated the Harmful to Minors test, which is the Miller

25  test, kind of by way of Ginsburg.  It is the test for obscenity

1  as applied to minors, and the law considered in *HM Florida*

2  expressly incorporated the Miller test.

3          THE COURT:  So why do you say it makes no attempt?

4          MS. VAN KLEY:  I'm sorry, Your Honor?

5          THE COURT:  Why do you say HB 359 makes no attempt?

6          MS. VAN KLEY:  You know, maybe I should revise that.

7  It might -- it winks to the purulent interest in sex

8  requirement of the Miller test.  So maybe it makes an attempt,

9  but it does not attempt to incorporate all of the requirements

10 of the Miller test.

11          Your Honor, may I --

12          THE COURT:  You may.

13     (Handing documents.)

14          MS. VAN KLEY:  In Section 1, Subsection 10, the

15 definition of sexually oriented performance incorporates one

16 piece of the Miller test, a sliver of it, that a performance

17 that regardless of whether performed for consideration is

18 intended to appeal to a purulent interest in sex, but it does

19 not otherwise satisfy the Miller test in a few different ways.

20          First, it does not require that it appeal to a

21 purulent interest in sex on the whole and applying contemporary

22 community standards.  That is required under Miller.  It does

23 not require that on the whole and, again, applying contemporary

24 community standards, the speech that is proscribed be patently

25 offensive and it does not -- and it does not require that the

1   speech on the whole has no serious literary, artistic, or
2   educational value.  Miller requires all of that.  And the
3   Tennessee and Florida laws, despite their flaws, at least had
4   those words on the page.  HB 359 does not.

5       The state also argues -- and we explored this a
6   little bit during the TRO hearing -- that it has the right to
7   condition state funding on certain speech.  That's generally a
8   correct statement of law, but it is not unqualified.  A
9   government can subsidize -- can allow subsidies that will
10  require the recipient of the funds to engage in some form of
11  speech.  It has to be tied to the particular speech activities.

12      We have an example.  In Montana, if you go to the
13  Roxy Theater's web page or to the Myrna Loy's web page, both
14  receive funding from the Montana Arts Council, you'll see on
15  their website that next to -- that next to its acknowledgement
16  of this funding it cites, "We receive funding that is paid for
17  by Coal Severance Taxes."  So that's an example of a time in
18  which the state of Montana says, "We'll give you this money;
19  you need to include this speech on your website because you are
20  taking this money."

21      HB 359 does something very different than that.  It
22  does not merely condition funding that is related to a specific
23  activity on carrying a particular message.  And I will -- I am
24  looking at Section 3 of HB 359, subsection -- Section 3,
25  Subsection 3:  "A sexually oriented performance is prohibited,"

sub b, "in a location owned by an entity that receives any form of funding from the state."

This is not an example of the state saying, "We'll give you money for your arts program, but you need to fly this particular banner or hand out this leaflet."  It's immediately distinguishable from the cases *Rust v Sullivan* and *American Library Association*, both of which involved funding for particular activities that was very closely tethered to what the government was trying to do.

In *American Library Association*, the federal government was offering money to public libraries to expand their internet access.  And when public -- in order for a public library to take that money, they had to agree to install pornography blockers.  That's an example of how this government funding of speech doctrine works.

This is something really different.  Not only that, none of those cases involve the government criminalizing speech.  The penalty -- the penalty for a violation of one of those provisions -- you don't comply with the terms of your contract with the government, then the money goes back.

Here, however, if you don't do what we tell you to do, you suffer criminal penalties.  This is not the same fact pattern.  It's not the same issue.

The only conclusion is that HB 359 proscribes protected speech, and it does so on the basis of content and

viewpoint.  A law is content based when it applies to
particular speech because of the topic discussed or the idea or
message expressed.  With regard to both of the categories of --
both of the categories of restrictions under HB 359, the law is
certainly content based and in some ways also viewpoint based.
And whenever a law is a content-based restriction on speech,
strict scrutiny applies.

Under strict scrutiny, the government has to offer a
compelling interest for the restriction on speech and the
restriction has to be narrowly tailored to that interest.
Neither step is met here.  The only compelling interest that's
offered is to protect minors from harm, but there's no
explanation about why existing law is not adequate to do that.

And, in fact, the legislative record suggests that
the state was instead intending to protect minors from
divergent gender expression, which is certainly not the same
thing as protecting minors from truly obscene speech.

But even crediting the state's argument of a
compelling interest that this is intended to protect minors
from obscenity, there is -- the law is so overbroad.  It is
also underbroad in some ways.  It is overbroad because it
restricts speech from adults -- between adults in certain
places.  It is overbroad because it protects innocent speech.
It protects -- or it proscribes innocent speech.  It prevents
individuals from reading to children in costumes.  It appears

to apply whether that costume is that of a -- at least on the
face of HB 359, it appears to apply whether the person in
costume is dressed as a drag queen, a drag king, a Disney
princess, a superhero.  All of those are flamboyant or parodic
personas with glamorous or exaggerated costumes and makeup.
There is so much speech that is encompassed within HB 359 that
falls far outside the zone of obscenity.

        And relatedly, plaintiffs are likely to succeed on
Count 5, the void for vagueness challenge, because it is nearly
impossible to know how to tailor one's conduct to HB 359.  The
state's argument, as I read it, is essentially that HB 359
can't mean what we say it means because that would be too
crazy.  But the question is what do the words say?  And the
words themselves encompass a variety of innocent speech-related
activities, including, for example, showing PG-13 movies at the
Roxy Theater or the Myrna Loy.

        And, Your Honor, we address the remaining three
prongs of the Miller analysis, because this is a First
Amendment case, because chilled speech is a result of
unconstitutional government action is irreparable injury.  The
second prong of the *Winter* analysis is met because the
government has no interest -- no legitimate interest in
silencing speech.  The third and fourth prongs are met as well.
        We, therefore, ask the Court to grant our motion for
a preliminary injunction as to Counts 4 and 5 of the complaint

1  and against Defendants Knudsen and Arntzen.

2          THE COURT:  Thank you.

3          MR. RUSSELL:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. RUSSELL:  It seems like there's confusion as to

6  the proper analysis to apply in plaintiffs' facial challenge.

7  Plaintiffs clarified that the only two counts that are at issue

8  with respect to the preliminary injunction are Counts 4 and 5,

9  which are both facial challenges to HB 359, one on First

10  Amendment grounds, the other on Fifth Amendment/Fourteenth

11  Amendment grounds.

12          That analysis is described by the Supreme Court as

13  balancing -- I can find the exact quote -- but, paraphrasing,

14  balancing the overbreadth of -- the alleged overbreadth of the

15  statute on its face, but also, in fact, judged in relation to

16  the plainly legitimate sweep of that statute.

17          And that's a very specific special test developed by

18  the US Supreme Court for this specific kind of case.  And

19  that's the -- it appears to be the balancing of their

20  relaxation of the typical third-party standing requirements and

21  allowing potentially the facial invalidation of the statute.

22  Because, normally, facial invalidation or facial challenge, the

23  plaintiff has to prove unconstitutionality of the statute in

24  all possible applications.  That's not the question or the test

25  when it comes to a facial challenge to the first amendment on

1    overbreadth grounds.

2           And I've seen the case law that -- it appears to me

3    that the facial challenge is synonymous with an overbreadth

4    challenge, at least in the First Amendment context.  I know

5    that's what the Tennessee court noted in its opinion.  And I

6    think that makes sense in this context where we're loosening

7    the third-party standing requirements.

8           So with that proper analysis in mind -- and I don't

9    need to, unless you want me to, go through the briefs.

10          THE COURT:  You mentioned the Tennessee case.

11          MR. RUSSELL:  Yes.

12          THE COURT:  Where did that court go wrong?

13          MR. RUSSELL:  Well, I'm not necessarily saying that

14   it did.  It's very different --

15          THE COURT:  Okay.  If you don't think -- I'm sorry.

16   I shouldn't put words in your mouth.  If I don't think the

17   Tennessee court was wrong, why does that statute differ from

18   HB 359 regarding its constitutionality?

19          MR. RUSSELL:  Well, it's a different statute with

20   different provisions and different statutory instruction.

21   Under Montana law, the statutory construction rules are set

22   forth in title -- I think it's Title 1-2, where a statute has

23   to be construed according to its context and in relation to

24   its -- the purpose of the intent, the intent that the

25   legislature clearly -- that the legislature conveyed.

1              In any event the -- so, for example, the Tennessee
2    statute defines adult cabaret entertainment, and it has
3    different definitions.  It has different provisions.  It's a
4    different statute that is applied in the context of its
5    enactment and enforcement.

6              In that case, for example, the Tennessee court only
7    enjoined it with respect to the one county attorney.  And I
8    don't claim to be familiar with the enforcement provisions of
9    criminal law in Tennessee, but that's one reason that it's
10   different.

11             THE COURT:  Well, let's talk about that issue.  You
12   argue that Attorney General Knudsen is not a proper defendant
13   here.  Why?

14             MR. RUSSELL:  I'm thinking that "not a proper
15   defendant" is maybe not the best way to describe it.  I'm
16   thinking that the -- being a proper party is not the same as
17   being a necessary party for purposes of standing.

18             So, for example, if the Court enjoins HB 359's
19   enforcement by Attorney General Knudsen, that does not enjoin
20   its enforcement entirely.  Each individual county attorney has
21   discretion to bring a charge under the laws irrespective of the
22   attorney general.

23             THE COURT:  I thought counsel argued that under
24   Montana law the attorney general has the authority to direct
25   the county attorney to initiate or halt the prosecution.

1      MR. RUSSELL:  And I think it does, but in conjunction
2   with the county attorney.  So, in other words, if the
3   injunctive relief doesn't direct -- and I'm not sure that it
4   could; that's not the injunctive relief that's requested by
5   plaintiffs -- to direct the AG to instruct all county attorneys
6   or prohibit all of them from bringing charges under this
7   statute.

8      THE COURT:  If the county attorney in some county
9   decides to bring an action, irrespective of the wishes of the
10  attorney general, doesn't MCA Section 2-15-501 allow the
11  attorney general to bind the county attorney to act in a
12  particular way?

13     MR. RUSSELL:  It does.

14     THE COURT:  So why wouldn't an injunction against the
15  attorney general require the attorney general to prevent other
16  county attorneys from acting?

17     MR. RUSSELL:  That's not my understanding of the
18  injunctive relief requested.  The injunctive relief requested
19  against the AG is that the AG not enforce it.  So there are
20  many cases that are filed all the time that the AG has
21  absolutely no involvement in.

22     THE COURT:  So plaintiffs, I guess, are stuck -- if
23  that were to happen, stuck bringing a new action against that
24  county attorney?

25     MR. RUSSELL:  I don't pretend to direct plaintiffs

1  how to prosecute their case.  But I think what you're getting

2  at, perhaps it's a defect in the pleading under Section 1983,

3  for example.  I didn't see any declaratory judgment action, for

4  example, that -- and that wasn't briefed, and I don't want to

5  speak out of line on that but that -- for example, that might

6  be one.

7          THE COURT:  What about the superintendent of public

8  instruction?

9          MR. RUSSELL:  So similar lines on that.  The

10  superintendent is not the only person or entity that can bring

11  disciplinary or licensing proceedings against a teacher or

12  administrator, et cetera.

13          And I am not aware of any statutory authority that

14  allows the superintendent to prevent the Board of Trustees for

15  a school district, for example, the other identified entity or

16  entities that could request or petition the board to initiate

17  such proceedings.  I am not aware of any statutory authority

18  for that.

19          But on that note, the only plaintiff in this case

20  where the superintendent and her responsibilities or duties are

21  relevant is Plaintiff Corcoran -- sorry if I'm mispronouncing

22  the name.  She has not demonstrated standing with respect to

23  this particular defendant.  And that is, first of all, because

24  it's clearly established precedent that a public employee -- or

25  a state employee doesn't have First Amendment protection for

1   the speech of the -- of that employee while on the job in the
2   scope of their duties.

3           And that's my understanding of what that particular
4   plaintiff alleged was that she wouldn't be able to engage in
5   this conduct in her job, and she also alleges that she intends
6   to do it anyway.  So I'm not seeing what chilling effect there
7   is with respect to her anyway.  And, again, she's the only
8   plaintiff where Defendant Arntzen comes into play.

9           But with regard to the statutory construction aspect,
10  I think it's helpful to heed the codification instructions that
11  are set forth in Section 5 of HB 359.  So Section 5 states
12  that -- Sections 1 and 2, the definitions and the provisions
13  regarding sexually oriented businesses are to be codified under
14  Title 45, Chapter 8.  That is one.

15          I think these specific sections need to be
16  compartmentalized when it comes to their construction.  Because
17  under Montana's rules of statutory construction, the statutes
18  relate to the law of the state respecting the subjects to which
19  they relate, and the provisions and all proceedings under them
20  are to be literally construed with a view to affect their
21  objects and promote justice.

22          So, for example, Section 2 would need to be construed
23  in the context of that particular statutory section which sets
24  forth the offenses against public order.  I haven't seen it
25  codified yet, and I am not sure what the timeline is on that.

1  Maybe my --

2          THE COURT:  So how do I do that?  How would I

3  evaluate that pursuant to the rest of --

4          MR. RUSSELL:  Title 45, Chapter 8.

5          THE COURT:  -- Title 45, Chapter 8?

6          MR. RUSSELL:  Well, for example, we brought this up

7  in the brief.  You look to other terms that are defined in that

8  section of the code.

9          In the particular example we provided was the

10  definition of performance, which specifically exempts motion

11  picture -- motion pictures rated by the Motion Picture

12  Association of America, I think is the entity.

13          So these movies that the Myrna Loy and the

14  Roxy Theater bring up, they're specifically exempted from the

15  definition of performance.  And simply because those

16  particular -- that particular definition applies to that -- to

17  the obscenity statutes in that section of the code doesn't mean

18  that that definition doesn't apply.  So --

19          THE COURT:  So how would that work in practice?

20          MR. RUSSELL:  So if we're looking to see whether a

21  performance was -- violated the law, we look to see what the

22  performance is.  And if this -- if these movies are exempted

23  from the definition of performance, then there's no liability,

24  no potential liability associated by playing those to a minor.

25          THE COURT:  So anything besides the movies?

1        MR. RUSSELL:  Well, so the definition --

2        THE COURT:  What if it was a live performance?

3        MR. RUSSELL:  Then that's not exempted, at least

4  under that definition.

5        And so the performance is defined as any motion

6  picture film or videotape exempting those that I mentioned --

7  phonograph, record, compact disk, et cetera -- or other

8  exhibition played or performed for an audience of one or more

9  with or without consideration.

10        So it has to be -- when construing the words in the

11  statute, they have to be construed in that context of a

12  performance.  So, for example, just walking down the street in

13  a bikini that might show somebody's buttocks, that's not a

14  performance.  That couldn't possibly be considered a violation

15  under this law.

16        And so that's -- with regard to Section 2, that

17  creates a specific -- a new category of -- a legal category of

18  businesses that are subject to these regulations, and it's set

19  forth in the definitions.

20        The state is not trying to -- as plaintiffs

21  mentioned, the state's not establishing a new obscenity

22  standard.  We're not arguing that the performances set forth in

23  HB 359 amount to obscenity.  We're arguing that they're

24  indecent and improper for minors only.  And as precedent has

25  set forth, the state has compelling interest in protecting

1  minors from this kind of conduct.

2          The question then is whether any overbreadth of that
3  statute is substantial in relation to the legitimate sweep of
4  the law.

5          With regard to Section 3, that again is codified
6  under Title 20, Chapter 7-1.  And that makes sense given the
7  provisions under the education code with respect to the
8  particular teachers, administrators, specialists, et cetera,
9  whose licensing may be in jeopardy if in violation of this
10  section.

11          THE COURT:  So the Florida law, among other things,
12  sought to ban admitting a child to an adult live performance.
13  That was part of the analysis by the court there.  Why was that
14  wrong?

15          MR. RUSSELL:  Well, again, I'm not saying that was
16  necessarily wrong.  I'm not sure with which part of the court's
17  opinion you are referring to necessarily.  But my understanding
18  of that law is that it revised the -- I think it was -- it
19  addressed it under the licensing scheme for liquor licenses,
20  but I could be getting those mixed up.

21          But, again, that's a different law, different
22  definitions, different context.

23          It's clear from the face of the bill and from the
24  legislative history that the legislature intended -- well,
25  first of all, found that these kinds of performances are

1   inappropriate and potentially harmful to minors.  And it

2   targeted the areas and context situations where minors are

3   likely to be and where these performances are likely to occur

4   and attempts to draw that line there.

5           So it's really a balancing test, and that's what the

6   court noted in the *US V Williams* case and the *Hansen* case.  On

7   the one hand, it may prevent the expression covered by the

8   First Amendment; but, on the other hand, it also -- it also --

9   it protects or it -- the words are escaping me.  But it

10  furthers the state's interest in protecting minors at the same

11  time.

12          So that's why I mention that this is the analysis

13  that is appropriate under this circumstance for these kinds of

14  claims.

15          With regard to concerns about code funding for

16  example, this law is not retroactive.  There's no provision in

17  it making it retroactive.  And Section 1-2-109 says no law

18  contained in these statutes is retroactive unless expressly so

19  declared.

20          THE COURT:  How do you respond to counsel's argument

21  about the receipt of state funds?  Typically, they argue,

22  that's a situation -- for example, the Arts Council requires a

23  recipient to post on their website that money comes from the

24  Coal Severance Tax, or something to that effect.

25          MR. RUSSELL:  So that sounds like compelled speech.

1   In this case it's -- the state is asserting its interest in not
2   allowing its funds with the taxpayer funds to subsidize conduct
3   that is deemed to be inappropriate for minors.  I'm not aware
4   of precedent that squarely addresses that in that context, but
5   the precedent we've cited in our brief we believe supports the
6   proposition that the state is not required to subsidize speech.
7   And any challenge to those regulations should be analyzed under
8   rational basis scrutiny which this law clearly satisfies.

9           So regarding the *Winter* factors, the likelihood of
10  success on the merits, of course, is the first one.  And, I
11  guess, before I go further, I noticed a typo in our -- on
12  page 13 of 36, quoting *Benisek v Lamone*, "As a matter of
13  equitable discretion, a preliminary injunction" -- something
14  got lost in the formatting there, but it should say, "does not
15  follow as a matter of course from a plaintiff's showing of a
16  likelihood of success on the merits."  So the Court is familiar
17  with that.  I just wanted to point that out.

18          So that likelihood of success, of course, we've
19  discussed briefly that the facial challenges -- but also
20  standing, again, that you can't have success on the merits if
21  you don't have standing.

22          So with regard to the injury, the only injury that I
23  heard plaintiffs argue is the chilling effect.  And in a
24  pre-enforcement action like this where none of the state
25  defendants have enforced this bill, the purported chilling

1   effect, just by the fact that the law on the books is

2   potentially unconstitutional -- or allegedly constitutional law

3   is on the books is not sufficient for purposes of establishing

4   injury -- or, well, I would argue injury under the standing

5   analysis, also irreparable harm under the *Winter* factors.

6   There has to be something more concrete, and there simply is

7   not here.

8           The closest thing that I heard was Plaintiff Jawort

9   having that performance canceled by Plaintiff Gallagher.

10  Reviewing Defendant Gallagher's submissions indicates to me

11  that there's a significant speed of fact as to the

12  circumstances of what was actually said to and from, I believe,

13  the individual who conveyed to Plaintiff Jawort that the

14  performance has been canceled.  And the full -- her full

15  statements were not authorized by that defendant, and

16  Defendant Gallagher's affidavit demonstrates that he attempted

17  to reach out to Plaintiff Jawort and work out an arrangement

18  that would allow Jawort to do this performance, but those

19  attempts were rebuffed.

20          THE COURT:  How would I sort out that disputed fact?

21          MR. RUSSELL:  Well, at this stage, I'm not sure.  I

22  mean it's -- it goes back to plaintiffs' burden.  Again,

23  that's -- and maybe I'm conflating these things because that

24  doesn't -- that's not relevant to my clients with respect to

25  the facial challenge.

1    It may demonstrate potentially a problematic
2 application of this statute in one case which is in dispute,
3 but that's a heavy burden.  The courts have described facial
4 invalidation as strong medicine.  And on top of that, a
5 preliminary injunction is an extraordinary remedy never awarded
6 as a right.

7    So against that backdrop, these disputes to fact, I
8 don't believe the Court should give -- I don't know what the
9 truth is with respect to that issue to be honest.  I don't
10 think the Court should take that into account for its purposes
11 on the preliminary injunction.

12    And on the standing, aside from the injury element,
13 causation -- and maybe this goes back to the problem with it
14 being a Section 1983 claim -- there's been no alleged injury
15 caused by Defendants Knudsen or Arntzen.  There hasn't been any
16 enforcement.

17    And, again, the redressability aspect, if there were
18 to be a preliminary injunction preventing them from enforcing
19 it, I don't believe that prevents, first of all, the Board of
20 Education from enforcing a certain aspect where it has power
21 under this bill or the county attorneys to initiate proceedings
22 under this bill.

23    That's the narrow scope of the request of preliminary
24 relief as far as I am aware of.

25    Briefly, on the void for vagueness issue, I think,

1   again, everything -- all of these provisions need to be read in

2   context and alongside the other -- the statutes where they're

3   supposed to be confined.  There's been, at least from the

4   allegations in the complaint and in the motion for preliminary

5   injunction, there's conflation of where, you know, Drag Story

6   Hours come into play versus sexually oriented performance or

7   drag shows.  Nowhere in the bill does it say "drag show."

8        The one place that it mentions Drag Story Hours,

9   aside from the definitions, is Section 3(2).  There are no

10  criminal sanctions against a performer based on the plain

11  language of this bill.

12       I'm jumping all over the place here, but I think with

13  respect to the void for vagueness issue, the test is whether

14  the statute is -- it's not whether there can be ed cases or

15  certain cases that are problematic.  It's whether the statute

16  in the vast majority of its applications is clear -- or what

17  the statute prohibits, and the vast majority of its

18  applications is clear.  So these arguments of what exactly

19  stripping means in a very specific situation or so on and so

20  forth.

21       I think it's clear when read in its entirety what the

22  statute -- these statutes, I should say, the three separate

23  statutes that this bill affects -- what conduct is proscribed.

24  And that is sexually oriented performances that aren't

25  necessarily obscene but are inappropriate, potentially harmful,

1   to minors, and Drag Story Hours, in this very limited context,

2   in a school or library receiving funding from the state before

3   the close of normal business hours or as part of a

4   school-sanctioned activity.  That's a very narrow context with

5   respect to that portion.

6           I think in summary -- well, that's on the likelihood

7   of success on the merits.  I addressed the irreparable harm.

8   All I've heard is the chilling effect, and that is not enough

9   in a pre-enforcement action.

10          But then, lastly, the last two elements of the *Winter*

11  test merge when it's a governmental defendant.  The balance of

12  equities in the public interest, clearly the public's interest,

13  as demonstrated by the fact that the legislature had consensus

14  and passed this law, is in favor -- weighs in favor of allowing

15  this law to stand during the pendency of this litigation.

16          And in the absence of any enforcement action or

17  negative effects as I discussed, the balance of equities also

18  does not weigh in favor of plaintiffs under the *Winter* factors.

19          So, in summary, plaintiffs are not entitled to the

20  extraordinary remedy of preliminary injunction.  They can't

21  satisfy the *Winter* factors, both because the overbreadth

22  analysis indicates that this law is -- the plainly legitimate

23  sweep of this law is far greater than the alleged overbreadth,

24  and plaintiffs can't demonstrate standing with respect to these

25  particular defendants at issue.

1               THE COURT:  All right.  Thank you, Counsel.

2               MR. RUSSELL:  Thank you.

3               THE COURT:  City of Helena.

4               MS. DOCKTER:  Your Honor, may it please the Court,

5     Becky Dockter from the City of Helena.

6               We are going to forgo making any statements here

7     today given the plaintiffs' statements about the relief being

8     limited only to the state defendants.  And because the facts of

9     this case bore out that the permit was issued.  Montana Pride

10    events occurred.  And we believe that this case is moot, and

11    it's appropriate for dismissal.

12              We will file something, if necessary, after this

13    hearing to that effect.  But here today, we don't feel the need

14    to respond, unless Your Honor has questions.

15              THE COURT:  No.  Thank you.

16              MS. DOCKTER:  Thank you.

17              Ms. Walker.

18              MS. WALKER:  And the same would apply with respect to

19    Defendant JP Gallagher, Your Honor.  He's not taking a position

20    on the preliminary injunction, and he's not a subject of that

21    proceeding based upon plaintiffs' acknowledgments here today.

22              THE COURT:  Thank you.

23              MS. WALKER:  Thank you.

24              THE COURT:  Rebuttal?

25              MS. VAN KLEY:  Your Honor, I'm happy to answer any

1  questions; otherwise, I will waive.

2          THE COURT:  Well, why don't you answer a few

3  questions.

4          MS. VAN KLEY:  I'm sorry?

5          THE COURT:  Why don't you answer a few questions.

6          MS. VAN KLEY:  I would love to.

7          THE COURT:  So you heard counsel argue I have to read

8  section -- if you look at Section 5, it directs that Sections 1

9  and 2 of the law are codified, Title 45, Chapter 8.  And as a

10  result, it has to be read in context with other definitions in

11  Title 45, Section 8.

12          MS. VAN KLEY:  Your Honor --

13          THE COURT:  Do you agree with that, first of all?

14          MS. VAN KLEY:  I agree that it will be codified

15  there.

16          THE COURT:  As a matter of statutory interpretation,

17  do you agree with the premise that the definitions in the

18  Sections 1 and 2 should be construed consistent with the

19  definitions in Title 45, Section 8?

20          MS. VAN KLEY:  Your Honor, the provision which sets

21  forth the definitions within Title 45, Section 8, is 45-8-205.

22  This statute does not apply to every law that is codified

23  within the same part of the code.

24          It defines performance, and I agree with opposing

25  counsel's reading of what -- how it defines performance.  The

1  definitions apply only in Sections 45-8-205 through 45-8-208.

2  HB 359 does not amend any provision that falls between 45-8-205

3  and 45-8-208.

4          That section of the code says that the definitions

5  apply exclusively -- well, it doesn't say exclusively.  It says

6  that the definitions apply to those provisions, which

7  necessarily implies that they don't otherwise apply.  And

8  HB 359 does not touch any of those provisions.

9          THE COURT:  Do you agree with counsel that Title 45,

10  Section 8, exempts motion pictures from the definition of

11  performance?

12          MS. VAN KLEY:  I agree that Section 45-8-205 exempts

13  motion pictures or videotapes rated G, PG, PG-13, or R by the

14  Motion Picture Association of America from Sections 45-8-205

15  through 45-8-208, none of which will incorporate HB 359 when

16  it's codified.  And so, no, I don't agree that it applies to

17  HB 359.

18          THE COURT:  How do you respond to the argument that

19  when you have a challenge like the one in issue, the void for

20  vagueness, you have to look at both factors, both the sweep of

21  the law with the alleged harm and try to balance those factors?

22          MS. VAN KLEY:  Your Honor, I believe that there's a

23  little bit of confusion between what's described as the

24  overbreadth doctrine and the general First Amendment analysis.

25          So, generally, the overbreadth doctrine is used by

somebody who is being criminally prosecuted as a challenge to
the prosecution.  That individual has engaged in speech that
can lawfully be proscribed by the state or the federal
government, and the response of the criminal defendant is "You
can't prosecute me.  This law is facially invalid because of
its overbreadth."

And a relatively recent example is *United States v
Stevens*, which involves somebody who was prosecuted for selling
videos of dog fighting and challenged the facial
constitutionality of the federal law that he was indicted under
because he said that included a bunch of not only his speech
but a lot of innocent speech.

On the other hand, the plaintiffs in this case are
engaged -- when it comes to interactions with minors, they are
engaged exclusively in innocent speech.  We are not dealing
with a circumstance in which somebody whose speech lawfully may
be proscribed is trying to say the whole statute needs to get
thrown out, and that's usually where that arises.

And I would turn to the court's analysis in *Friends
of George's*.  I'm using the Pacer version.  This is on page 37.
And the court sets forth the standard of review for the
First Amendment challenge.

And I would just point that it does not say that
there is a higher standard of review.  The court says, "A
content-based regulation, which targets 'speech based on its

communicative content,' is presumptively unconstitutional and
must pass strict scrutiny."

The Court's first question is whether the law's
content based on its face as a matter of text alone; this is
because a facially content-based law is subject to strict
scrutiny regardless of the government's motive.

And so the same standard was applied to the
plaintiffs' challenge to the First Amendment in *Friends of
George's* that we are requesting here.

And even if it were the case that we were applying
this tougher standard that applies in the overbreadth doctrine
line of cases, the standard would be met because so much
speech -- and we have the examples of the motion pictures shown
by The Roxy Theater, by the Myrna Loy.  We have the Imperial
Court not allowed to perform drag on the streets during
Billings' Pride.  That is in their declaration.

We have the law being applied against Adria Jawort.
And I think, setting aside the factual disputes, what is clear
from Defendant JP Gallagher's response is that her talk was
canceled because of concerns about HB 359.

We have the City of Helena's response, previously, to
the temporary restraining order, where it says, "We are stuck
between a rock and a hard place.  We know we have to comply
with the federal constitution, and we also -- we don't know how
to square that with HB 359.  We are concerned about our

1   employees being subject to criminal liability."

2          So we have these examples of enforcement.  The fact

3   that there are disputes about whether or not this speech is

4   correctly inside the scope of HB 359 really highlights the

5   overbreadth.

6          And it also goes to Count 5, void for vagueness,

7   which is separate.  I will just point to the concerns that

8   motivate the void for vagueness doctrine.  Those concerns are

9   the risks of self-censorship, that in order to avoid

10  prosecution an individual is going to not engage in speech that

11  should be protected.

12         The other primary motivating concern is that of

13  selective enforcement.  And the record of HB 359 being on the

14  books for a short period of time shows that that is exactly

15  what happens, that the hammer comes down on individuals who are

16  transgender, who are in the drag community.  And so the risk of

17  selective enforcement is not only real, it has been

18  demonstrated.

19         THE COURT:  All right.  Anything else?

20         MS. VAN KLEY:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you.

22         So the arguments on preliminary injunction are

23  submitted.

24         That brings us to the next question about:  Where do

25  we go from here, on any further proceedings that would be

1  wanted, such as a bench trial, on the remaining claims -- or

2  all the claims, I guess, for final resolution?

3          So I'd like the parties to submit a joint filing by a

4  week from today, 5:00 o'clock.  Before that time, I want you to

5  have a discussion and see where you see this going, if you want

6  to present witnesses and evidence to support your arguments or

7  if you want to submit it on the arguments and briefs we've

8  heard so far.

9          Any questions about that?

10         MS. VAN KLEY:  No, Your Honor.

11         MR. RUSSELL:  Yes, Your Honor.  The state defendants

12  submitted jury demand in their answer.  I'm not sure whether

13  that affects your --

14         THE COURT:  All right.  I have not seen that.

15         MR. RUSSELL:  Also a week from today is Labor Day.

16         THE COURT:  Good point.

17         I will review the jury demand and get back to the

18  parties as to the next step.

19         All right.  Thank you, Counsel.

20     (The proceedings concluded at 3:48 p.m.)

21

22                        --o0o--

23

24

25

# REPORTER'S CERTIFICATE

1

2   I, Yvette Heinze, a Registered Professional

3 Reporter and Certified Shorthand Reporter, certify that the

4 foregoing transcript is a true and correct record of the

5 proceedings given at the time and place hereinbefore mentioned;

6 that the proceedings were reported by me in machine shorthand

7 and thereafter reduced to typewriting using computer-assisted

8 transcription; that after being reduced to typewriting, a

9 certified copy of this transcript will be filed electronically

10 with the Court.

11   I further certify that I am not attorney for, nor employed

12 by, nor related to any of the parties or attorneys to this

13 action, nor financially interested in this action.

14   IN WITNESS WHEREOF, I have set my hand at Great Falls,

15 Montana, this 19th day of November, 2023.

16

17                               /s/ *Yvette Heinze*

18                               _____
                                Yvette Heinze
19                              United States Court Reporter

20

21

22

23

24

25