```
 1   Kim Marchwick
     Registered Professional Reporter
 2   Certified Realtime Reporter
     Federal Certified Realtime Reporter
 3   2601 2nd Ave. N., Suite 4209
     Billings, Montana 59101
 4   (406) 671-2307 cellular
     marchwickkim@gmail.com
 5


 6
                 IN THE UNITED STATES DISTRICT COURT
 7                 FOR THE DISTRICT OF MONTANA
                          BUTTE DIVISION
 8               _____

 9   THE IMPERIAL SOVEREIGN COURT      )
     OF THE STATE OF MONTANA;          )
10   ADRIA JAWORT; RACHEL CORCORAN;    )
     MONTANA BOOK COMPANY; IMAGINE     )
11   BREWING COMPANY, LLC d/b/a        )
     IMAGINE NATION BREWING COMPANY;   )
12   BUMBLEBEE AERIAL FITNESS;         )
     MONTANA PRIDE; THE WESTERN        )
13   MONTANA COMMUNITY CENTER;         ) APPEAL NO. 23-3581
     THE GREAT FALLS LGBTQ+ CENTER;    ) CASE NO: CV-23-50-BU-BMM
14   THE ROXY THEATER; and             )
     THE MYRNA LOY,                    )
15                                     ) Motions Hearing
                       Plaintiffs,     )
16                                     )
          vs.                          )
17                                     )
                                       )
18   AUSTIN KNUDSEN; ELSIE ARNTZEN;    )
     J.P. GALLAGHER; and THE CITY OF   )
19   HELENA,                           )
                                       )
20                     Defendants.     )

21

22               _____

23

24
                 Proceedings recorded by machine shorthand
25        Transcript produced by computer-aided transcription
```

```
 1                    _____

 2                    TRANSCRIPT OF PROCEEDINGS
                      Wednesday, July 26, 2023
 3                    2:01 p.m. to 3:52 p.m.

 4                    _____

                 BEFORE THE HONORABLE BRIAN M. MORRIS
 5                UNITED STATES DISTRICT COURT JUDGE
             FOR THE DISTRICT OF MONTANA - BUTTE DIVISION
 6
                 Paul G. Hatfield Federal Courthouse
 7                        901 Front Street
                       Helena, Montana 59626
 8                    _____

 9

10                         APPEARANCES

11   For the Plaintiffs:

12        Constance Van Kley, Esq.
          UPPER SEVEN LAW
13        Post Office Box 31
          Helena, Montana 59624
14        cgvankley@gmail.com

15        Rylee K. Sommers-Flanagan, Esq.
          UPPER SEVEN LAW
16        Post Office Box 31
          Helena, Montana 59624
17        rylee@uppersevenlaw.com

18        Niki Zupanic, Esq.
          ZUPANIC LAW, PLLC
19        Post Office Box 1982
          Helena, Montana 59624
20        niki@zupaniclaw.com

21

22   For the Defendants:

23        Thane P. Johnson, Esq.
          JOHNSON BERG & SAXBY, PLLP
24        221 1st Avenue East
          Kalispell, Montana 59901
25        thane.johnson@mt.gov
```

 1                          **APPEARANCES (Continued)**

 2       For the Defendants:

 3           Michael Russell, Esq.
             **MONTANA DEPARTMENT OF JUSTICE**
 4           1712 9th Avenue
             Helena, Montana 59601
 5           michael.russell@mt.gov

 6           Cynthia L. Walker, Esq.
             **BOONE KARLBERG, P.C.**
 7           Post Office Box 9199
             201 West Main
 8           Missoula, Montana 59807
             cwalker@boonekarlberg.com

 9

10           Rebecca Dockter, Esq.
             **MONTANA DEPARTMENT OF FISH, WILDLIFE, & PARKS**
11           1420 East 6th Avenue
             Post Office Box 200701
12           Helena, Montana 59620
             rdockter@helenamt.gov

13

14

15                              **CONTENTS**

16                                                            PAGE

17       Proceedings                                          3

18       Certificate of Reporter                             78

19       Word Indexing                                       79

20

21

22

23

24

25

1          AFTERNOON SESSION, WEDNESDAY, JULY 26, 2023

2     (Whereupon, the court convened at 2:01 p.m., with all

3   interested parties present, and the following proceedings

4   were had:)

5          THE LAW CLERK:  Judge Brian Morris, United States

6   District Court for the District of Montana.

7          THE COURT:  Please be seated.

8          Madam Clerk, please call the first case on the

9   Court's calender.

10          THE CLERK:  Yes, Your Honor.

11          This is the time the Court has set aside for a

12   hearing in Civil Cause 23-50-BU-BMM; The Imperial Sovereign

13   Court of the State of Montana, et al., vs. Knudsen, et al.

14          THE COURT:  Good afternoon.  We have enough counsel

15   here, why don't we make appearances here, please.

16          Ms. Van Kley?

17          MS. VAN KLEY:  Good afternoon, Your Honor.

18   Constance Van Kley on behalf of the plaintiffs.

19          THE COURT:  And with you at counsel table?

20          MS. VAN KLEY:  With me is Rylee Sommers-Flanagan

21   and Niki Zupanic.

22          THE COURT:  And Mr. Johnson?

23          MR. JOHNSON:  Good afternoon, Your Honor.  I

24   represent Austin Knudsen and Elsie Arntzen.

25          THE COURT:  Okay.

1          MR. JOHNSON:  And Michael Russell is an Assistant

2     Attorney General, as well, representing the same.

3          THE COURT:  Okay.

4          MS. DOCKTER:  Good afternoon, Your Honor.

5     Becky Dockter with the City of Helena.

6          THE COURT:  Okay.

7          MS. WALKER:  And Cindy Walker with J P Gallagher.

8          THE COURT:  Thank you.

9          All right.  This is a hearing with a motion for a

10    temporary restraining order, preliminary injunction filed by

11    the plaintiffs.

12         Ms. Van Kley, do you want to go first?

13         MS. VAN KLEY:  Thank you, Your Honor.

14         May it please the Court, Constance Van Kley on

15    behalf of plaintiffs, who are a broad and diverse coalition

16    of individuals, businesses, and nonprofit organizations

17    affected by Montana's House Bill 359.

18         HB 359 is unconstitutional under the First and

19    Fifth Amendments, and it is causing real harm in realtime

20    all across the State of Montana.  Plaintiffs, therefore, ask

21    the Court to grant their motion for a temporary restraining

22    order in time for Montana Pride to begin this Sunday,

23    July 30th.

24         The *Winter* standard applies to the motion for a

25    temporary restraining order, just as it applies to the

1    motion for preliminary injunction.  And so my plan is to

2    address the *Winter* factors, just as we did in the brief, but

3    because we're here on a temporary restraining order, I'd

4    like to start out of order with what is traditionally the

5    second factor, irreparable harm.  And the --

6            THE COURT:  Before you get there, Ms. Van Kley,

7    could you focus on standing for the plaintiffs?

8            MS. VAN KLEY:  Yes, absolutely, Your Honor.

9            With regard to standing in the case as a whole, we

10   are looking for an injury in fact, it must be concrete and

11   particularized, it must be actual or imminent and looking

12   for causation and redressability.

13           With regard to the First Amendment standard, it is

14   clearly established that chilled speech based on a fear of

15   prosecution under the criminal laws of the state for forced

16   speech and expressive conduct confers standing.  We can look

17   at a few cases that outline that.

18           One is *Babbitt v. United Farm Workers National*

19   *Union* -- that's not in our brief so I'll give you the cite.

20   It's 442 US 289 and it's a 1979 case.  And I'll quote from

21   *Babbitt:*  "When fear of criminal prosecution under an

22   allegedly unconstitutional statute is not imaginary or

23   wholly speculative, a plaintiff need not first expose

24   himself to actual arrest or prosecution to be entitled to

25   challenge the statute."

1          Importantly, in *Babbitt*, we were -- the Court was

2    looking at a pre-enforcement challenge, just as here we have

3    seen the law take effect, and it has directly affected the

4    plaintiffs in different ways.  Nobody has been charged under

5    the criminal laws similar to *Babbitt*, and in *Babbitt* the

6    Court was particularly convinced by the fact that the state,

7    and again I will quote, "Has not disavowed any intention of

8    invoking the criminal penalty provision against individuals

9    who violate this restriction on speech."

10          So we're in the same situation here.  We have

11    actual injury that has occurred, is ongoing in the form of

12    chilled speech, and we have the likelihood of criminal

13    prosecution.  So we have both -- both actual and imminent

14    harm here.

15          THE COURT:  Does harm apply to all plaintiffs?

16          MS. VAN KLEY:  I'm sorry?

17          THE COURT:  Do those harms apply to all the

18    plaintiffs?

19          MS. VAN KLEY:  I think there is a spectrum of harms

20    at issue here, so Plaintiff Rachel Corcoran is a Billings

21    Public School teacher, she has standing to challenge

22    Defendant Elsie Arntzen's enforcement of the statute.  The

23    other plaintiffs face the possibility of criminal liability.

24          And so we see -- we see some individuals who have

25    had the law applied against them, for example, Plaintiff

1   Adria Jawort scheduled to give a lecture at the Butte Silver

2   Bow Public Library, that lecture was cancelled because the

3   library determined that it created the risk of violating

4   HB 359.

5           I do think there is a question as to whether or not

6   her planned lecture really does fall within the purview of

7   the statute, but that certainly gives her standing to

8   challenge it on the grounds of overbreadth.  Everybody who

9   engages in speech or expressive conduct and faces potential

10  criminal liability has standing to bring a pre-enforcement

11  challenge.

12          And, moreover, it isn't necessary that all

13  plaintiffs establish standing, because the rule is that

14  standing for one is standing for all, but in this case all

15  plaintiffs have standing.

16          THE COURT:  What about the business entities;

17  what's the basis for their standing?

18          MS. VAN KLEY:  Your Honor, if I may, I have copies

19  of HB 359 with me.  May I approach and bring you a copy and

20  we can walk through it?

21          THE COURT:  Give it to the clerk, please.  Make

22  sure counsel has it.

23          MR. JOHNSON:  I do; I do, Your Honor.

24          THE COURT:  Go ahead, Ms. Van Kley.

25          MS. VAN KLEY:  And so I will take a look at Section

1    2 of the statute, which is on the second page of the bill:

2    "A sexually oriented business may not allow a person under

3    18 years of age to enter the premises of a business during a

4    sexually oriented performance."  We can talk as we go

5    through the argument about what exactly a "sexually oriented

6    performance" is.

7               THE COURT:  What's a sexually oriented business?

8               MS. VAN KLEY:  A "sexually oriented business" is

9    defined under Section 1(9).  It is:  A commercial

10   enterprise, nightclub, bar, restaurant, or similar

11   commercial enterprise that provides for an audience of two

12   or more individuals, live nude entertainment or live nude

13   performances or a sexually oriented performance and

14   authorizes on-premises consumption of alcoholic beverages."

15              So it's circular, with regard to the -- with regard

16   to Imagine Nation Brewing, one of the plaintiffs, they

17   authorize on-premises consumption of alcoholic beverages.

18   They are a brewery, and they put on events on premises that

19   may fall within the purview of sexually oriented

20   performances defined --

21              THE COURT:  You don't challenge the ability of the

22   State to regulate sexually oriented performances, zoning

23   laws, where these businesses can be located, the type of

24   entertainment they can provide?

25              MS. VAN KLEY:  Not with regard to what -- what,

1    under any ordinary understanding of the term sexually

2    oriented business would suggest.  The problem here is with

3    the definition of sexually oriented business, which means

4    that businesses like Imagine Nation, which is a family

5    friendly brewery and community center.

6            THE COURT:  What's a family friendly brewery?

7            MS. VAN KLEY:  It is a brewery that never has any

8    events, the Imagine Nation never puts on events that are

9    limited to 18 plus or older, everything -- all of the

10   programming there is open to individuals of all ages, and

11   they have historically and intend to in the future put on

12   drag story hours, for example.

13           THE COURT:  And I assume they are not allowed to

14   serve alcohol to people under 21.

15           MS. VAN KLEY:  They do not and the State, without

16   question, has the ability to enforce that restriction

17   against Imagine Nation Brewing.  The problem comes in when

18   you look at the definition of "sexually oriented

19   performance."

20           And that, Section 1, subsection 10 here:  A

21   sexually oriented performance means a performance that,

22   regardless of whether performed for consideration, is

23   intended to appeal to a prurient interest in sex and

24   features:

25               (a), the purposeful exposure, whether complete or

1    partial, of:  A human genital, the pubic region, the human

2    buttocks, or female breast if the breast is exposed below a

3    point immediately above the top of the areola; or two

4    prosthetic genitalia, breasts, or buttocks; (b) stripping;

5    or (c) sexual conduct.

6            And there, I think at first glance, it's not

7    entirely clear why that's a problem, right?  Certainly, when

8    we talk about a strip club, we are talking about an

9    adult-oriented business in everybody's understanding of the

10   term.

11           But, here, when the bill defines stripping to

12   include not only the removal of clothing to the point of

13   nudity, but the simulated removal of clothing, regardless of

14   whether or not nudity may result.

15           Nudity is also defined in HB 359 or --

16           THE COURT:  What is the simulated removal of

17   clothing?

18           MS. VAN KLEY:  It's pretending to remove clothing,

19   Your Honor.

20           THE COURT:  It's that simple?

21           MS. VAN KLEY:  That's -- I don't know what else it

22   could mean.

23           THE COURT:  All right.

24           MS. VAN KLEY:  I don't know how else you would

25   simulate the removal of clothing, but I'll let the State

1    respond to that.  That's my reading of the term.

2         And "nudity" in turn doesn't mean exclusively

3    entirely unclothed, and this is (4) within Section 1, but

4    also "clothed in a manner that leaves uncovered or visible

5    through less than fully opaque clothing any portion of the

6    breasts below the top of the areola of the breasts in the

7    person is female or any portion of the genitals or buttocks.

8         And, again, under this definition a person is nude

9    if they walk through the streets with a bikini top on or

10   wearing a Speedo, and people may not particularly appreciate

11   those displays of the human body, but you can go to any

12   public beach, and you will see partial exposure of breasts

13   or partial exposure of buttocks.

14        Another problem --

15   THE COURT:  But doesn't context matter in that

16   circumstance?  People at the beach wearing those type of

17   clothing as opposed to walking down Last Chance Gulch.

18        MS. VAN KLEY:  Yes, Your Honor.  I think -- I think

19   context does matter; and there's a way in which the existing

20   obscenity law in the State of Montana and the *Miller* test,

21   which is the test set forth by the U. S. Supreme Court in

22   *Miller v. California*, tells us how context does matter.

23        The problem here is that the statute -- the bill

24   does not track the *Miller* test the way that exiting Montana

25   law does.  So under the *Miller* test, conduct or expressive

1    conduct or speech that falls within the purview of obscenity

2    is outside the scope of the First Amendment.

3           So if it's obscenity, we aren't doing the viewpoint

4    or content-based test, we're not going to get to strict

5    scrutiny because obscenity is outside the scope of the First

6    Amendment, so that's a threshold question here.  Does

7    this law regulate obscenity?

8           And there are two -- there are two, there are

9    overlapping penalty, for example, business like Imagine

10   Nation Brewing that allows for a -- that becomes defined as

11   a sexually oriented business because it allows a sexually

12   oriented performance, which again, includes the simulated

13   removal of clothing.

14          It also includes the exposure, et al., of the

15   prosthetic breasts, which is not limited to the exposure of

16   prosthetic breasts at a point analogous to the areola, so

17   prosthetic breasts are treated differently than natural

18   breasts.  But the Imagine Nation Brewing faces criminal

19   charge if it is found to be in violation of the statute.

20          THE COURT:  Ms. Van Kley, you described it as a

21   family frequently brewery.  Section 2 here, and you agree

22   they can't serve alcohol to someone under 21.  Section 2 of

23   the bill restricts "a sexually oriented business from

24   allowing a person under 18 to enter."

25          Any problem with that restriction?

1          MS. VAN KLEY:  I would have no problem with that

2    restriction if sexually oriented performance and sexually

3    oriented business had definitions that matched with the --

4    with the constitutional standard for obscenity but they

5    don't.

6          THE COURT:  The *Miller* tests?

7          MS. VAN KLEY:  Yes.

8          And so taking a look at --

9          THE COURT:  Is there any room for a state to go

10   beyond the *Miller* test if they if they are trying to protect

11   children, that was the alleged motivation for this law.

12         MS. VAN KLEY:  Yes, Your Honor.  There's -- the

13   *Miller* test still applies, but each of the pieces is a

14   little bit looser when you're dealing with children and that

15   comes from *Ginsberg.*  I can give you the citation for it.

16   *Ginsberg v. New York*, it's 390 US 629, from 1968.

17         That case involved the commercial sale of what

18   we're called within the case "girly magazines" to a minor

19   who was 16 years old.  And it predates *Miller*, but since

20   there's been some synthesis of these propositions, so what

21   is "obscene" as to minors can be defined a little more

22   loosely than what is obscene as to adults.

23         The *Miller* test still applies, but instead of just

24   asking, does it -- taken as a whole, does it appeal to the

25   prurient interest in sex, applying contemporary community

standards?  That would be *Miller*, prong 1.  When you track
them together the question is instead:  Taken as a whole,
does it apply to the prurient interest of the sex -- in sex
applying contemporary community standards as to minors?

         And *Reno*, which is a far more recent Supreme Court
case, it is *Reno vs. ACLU* from 1997, the Court really broke
down what *Ginsberg* does and does not allow.  And *Reno*
involved a challenge to the Communications Decency Act,
which was an early attempt to regulate sexual content on the
internet in order to protect minors from it.

         And in *Reno* the Court struck down the
Communications Decency Act for a number of reasons.  And the
Court talked specifically about *Ginsberg*, and said *Ginsberg*
doesn't reach as broadly as to encompass every attempt by
the state to regulate sexual content that may be viewed by
minors, right?

         And the Court laid out four reasons why *Ginsberg*
did not apply in that particular instance.  First, and I
quote from *Reno*:  "The prohibition against sales to minors
does not bar parents, who so desire, from purchasing the
magazines for their children."

         They were talking about *Ginsberg*.  So in *Ginsberg*
there was ultimately the decision could be made by the
parent.  HB 359 is different from *Ginsberg* and more like
*Reno*.  It takes control away from parents.  There is no

1    carve-out when a parent chooses to bring their kid to a drag

2    story hour or to a so-called sexually oriented performance,

3    which could include a PG 13 movie.  It could include some PG

4    movies.  It certainly includes a whole lot of R-rated

5    movies.

6          The parents, under HB 359, aren't given the

7    opportunity to bring their kids to these movies consistent

8    with, you know, everybody's expectation that certainly the

9    Motion Picture Association ratings guidelines, so that's the

10   first part of *Ginsberg*, and like *Reno*, it doesn't apply

11   here.

12         Second, the New York statute addressed in *Ginsberg*

13   applied only to commercial transaction; again, not the case

14   here.  We're talking about speech, in some cases -- on

15   public property in traditional property fora on city

16   streets.  We're talking about speech in libraries.

17         Third, the New York statute, had its definition of

18   material that is harmful to minors with the requirement that

19   it be utterly without redeeming social importance for

20   minors.  We have no similar carve-out with regard to HB 359.

21   It doesn't matter if the performance has artistic merit.

22         It doesn't matter if it has educational merit.  It

23   doesn't matter if it had scientific merit or literary merit.

24   There is no carve-out within HB 359 for performances or drag

25   story hours that have redeeming social importance for

1   minors.

2          THE COURT:  Ms. Van Kley, you mentioned the

3   publicly owned property.  Under time, place, manner

4   restrictions, doesn't the state have slightly more leeway in

5   imposing restrictions on public property than private

6   property?

7          MS. VAN KLEY:  It does, Your Honor, in some ways.

8          What the state can't do is impose a content-based

9   restriction on speech in a traditional public forum.  So

10  with regard to, for example, Montana Pride, when we're

11  talking about fora that are generally made available for

12  speech and expressive activities, you apply for the permit,

13  you follow the requirements, and then you can show up.

14         The City, and this is clear from the City's filing

15  on Monday, the City does not want to be in the position of

16  scrubbing these applications for their content; and, in

17  fact, if the City did, that just wouldn't be a content and

18  viewpoint based restriction on speech, it would be a prior

19  restraint on speech.

20         It would say, you know, this is a traditional

21  public forum, this is where people gather to engage in

22  protests and in protected First Amendment activity, but you

23  can't have access to it, and so we will not allow you to

24  speak.  That is what HB 359 tells city governments to do.

25         And so, yes, there are time, place, and manner

1    restrictions.  Here, I don't think that we get into time,

2    place, and manner restrictions because they don't apply to

3    privately owned businesses, and they don't apply to

4    traditional public fora.

5         And then there's one more piece about why *Ginsberg*

6    didn't apply in *Reno* which also shows why it doesn't apply

7    here.  And that is that in *Ginsberg*, the New York statute

8    defined a minor as a person under the age of 17; whereas,

9    the Communications Decency Act, in applying to all those

10   under 18 years, includes an additional year of those nearest

11   majority.

12        And that's not a strict test, but if you draw the

13   line at 16 and under, it's okay; and if you draw the line at

14   17 and under, it's okay.  What that tells us, is that these

15   restrictions on speech have to take into account the

16   differences between a 17 year old versus a 13 year old

17   versus a 5 year old.

18        And that's where the *Miller* test requires the

19   application of contemporary community standards so that

20   there is some sort of flexibility.  Because what a 17 year

21   old has -- is mature enough to see is different than what a

22   five year old is mature enough to see, but --

23        THE COURT:  Ms. Van Kley, with regard to that

24   maturity level you mentioned earlier, about if a parent

25   decides to take their child, we have -- in the movie context

1    we have ratings, to tell the parent this is R, under 17, not

2    without a parent, it's going to be a rough scene.  PG 13 be

3    careful, PG, nah.

4         So what obligation to these businesses who have the

5    events you are describing, do they have any obligation to

6    the public to let them know what to expect, I mean, if I

7    walk in with my young child and I'm shocked by what I see,

8    is that on me for not knowing or is that on the business for

9    not disclosing?

10        MS. VAN KLEY:  Your Honor, I think there are a

11   couple -- a couple of things.  With regard to -- with regard

12   to the plaintiffs to this lawsuit, thinking specifically in

13   this instance about the Roxy Theater and the Myrna Loy,

14   which are two plaintiffs, that do show films that include

15   performances that are defined under HB 359 as sexually

16   oriented performances.

17        They follow the MPA ratings guidelines.  They allow

18   children under the age of 17 to attend an R-rated movie with

19   their parent, just like, you know, AMC or any other theater.

20   So they follow those -- those -- they follow the ratings

21   guidelines.

22        THE COURT:  And those ratings guidelines are --

23   that's a private entity, the MPA?

24        MS. VAN KLEY:  Yes.  Yes.

25        With regard to the -- with regard to what we think

1    of as truly obscene speech, right?  With regard to the strip

2    club, they are criminally liable under existing Montana law,

3    if they -- if they show a legitimately obscene performance

4    to a minor.

5         THE COURT:  A parent wouldn't have the right to

6    come up and say, "I want my child to come in."

7         MS. VAN KLEY:  No, I don't believe that that is the

8    case, yes.  But, I mean, we're pretty far afield of that

9    when we're talking about, for example, with the Roxy Theater

10   and the Myrna Loy putting on the film Asteroid City, which

11   is rated PG 13, and includes a scene that meets the

12   definition of stripping under HB 359.

13        We are very far afield of that set of facts.  We

14   are not representing any businesses that could be defined as

15   sexually oriented businesses in any reasonable understanding

16   of that phrase.

17        Turning back to the *Winter* standard.  I'd like to

18   talk a little bit about irreparable harm first, and the

19   reason that I want to do that is because this is the factor

20   under the *Winter* test that tells us why this isn't just a

21   case in which a preliminary injunction is warranted.  It is

22   a case in which a temporary restraining order is necessary.

23        Montana Pride is scheduled to begin this Sunday,

24   July 30th, when we filed the motion for a temporary

25   restraining order, based on a conversation between one of

the plaintiffs and the City of Helena.  It was our

understanding that permits would not be issued as to certain

Montana Pride events.

I think the confusion about the permits and the

We understand from the City's filing on Monday that

the City is planning to issue those permits; and that's

great, that's welcome news.  We don't know for sure that it

won't be conditioned on compliance with state law, which

would require compliance with the HB 359, but regardless, it

doesn't moot the request for emergency request.

I think the confusion about the permits and the

City's well-grounded concern about employee liability just

for issuing permits to events featuring drag performances,

really drives home that without a TRO in place, people are

going to have to choose between speaking freely and facing

criminal prosecution.

And that, in itself, is not permissible under the

First Amendment for any length of time.  I'll quote from

*Elrod v. Burns*:  "The loss of First Amendment freedoms for

even minimal periods of time unquestionably constitutes

irreparable injury."

And that was repeated by the Supreme Court recently

in 2020 in *Roman Catholic Diocese vs. Cuomo*, and that's

exactly why faced with a request for a temporary restraining

order the Western District of Tennessee issued a TRO in the

*Friends of Georgia*'s case, another case involving a drag

1    ban, even though in that case the law had not yet caused

2    harm to the plaintiffs.

3            THE COURT:  How does the law in Tennessee compare

4    to HB 359?

5            MS. VAN KLEY:  Well, they are -- they are similar

6    in some ways and different in others, which I don't think

7    gets us very far.

8            One thing that is true about the law in Tennessee

9    that is an imprisonment on the law in Montana is that it

10   does incorporate the *Ginsberg/Miller* test with regard to

11   material that is obscene to minors.  The Montana's HB 359

12   does not even attempt to incorporate that provision.

13           I think the ways in which they are very similar is

14   that they both are intended to target drag performances

15   because of a perceived fear that exposing children to

16   nonconforming gender expression is harmful to minors.

17           THE COURT:  What's the procedural posture of that

18   case now?

19           MS. VAN KLEY:  That case has gone through trial and

20   is permanently enjoined.

21           THE COURT:  Was there an appeal filed?

22           MS. VAN KLEY:  I believe there was, but I don't

23   know, Your Honor.

24           THE COURT:  And what about the Florida case?

25           MS. VAN KLEY:  The Florida case has gone through

1    the preliminary injunction stage.

2            THE COURT:  How does the law compare first?

3            MS. VAN KLEY:  Oh, thank you.

4            The law, similar to the Tennessee law, we are

5    looking at a law that incorporates the *Miller* test, at least

6    on its face, says that it is applying *Miller*.  We're also

7    looking at a law that intentionally targets drag

8    performances because they are a drag performances.

9            And that is a case that -- the case is

10   *HM Florida-ORL, LLC v. Griffin*, in the Middle District of

11   Florida.  And that case was brought by a business that put

12   on family friendly drag performances.

13           And so HB 359 doesn't track either of these

14   statutes exactly, but it includes some -- some really --

15   some similarities and actually some differences that I think

16   are worse than the laws considered in Tennessee and Florida;

17   and, specifically, that there isn't even an attempt to

18   comply with the constitutional standard for obscenity.

19           THE COURT:  All right.  Let's go back to

20   irreparable harm for a moment with regard to the City of

21   Helena.

22           MS. VAN KLEY:  Yes.

23           THE COURT:  If they are issuing the permits, the

24   potential harm is that the jeopardy that is in place is on

25   performance who get approval for their performance or for

1    whom, for the sponsors?

2         MS. VAN KLEY:  Your Honor, if and when -- and I

3    believe the City when it says it intends to issue the

4    permits, although, again, I think there's still this

5    question about whether or not there will be a demand or

6    expectation of compliance with state law.  That will moot

7    Count 3 in the First Amended Complaint, which is the

8    as-applied challenge brought by Montana Pride against the

9    City of Helena.

10        THE COURT:  Okay.

11        MS. VAN KLEY:  However, it does not moot Counts 4

12   and 5, and plaintiffs have also moved for a TRO on Counts 4

13   and 5.  And these are facial challenges; Count 4 brought

14   under the First Amendment, Count 5 brought under the Fifth

15   Amendment.  These are facial challenges to the statute, and

16   plaintiffs ask the Court to enjoin implementation of the law

17   by the state Defendants Knudsen and Arntzen.

18        And it is, again, these state defendants that that

19   piece about, you know, requiring -- requiring citizens to

20   either stifle their speech or face criminal prosecution,

21   that is actual injury, that confers standing.  And the

22   reality is that there is a -- there is a considerable and

23   growing body of evidence that demonstrates that HB 359 is

24   actually chilling protected speech right now.

25        We talked about Ms. Jawort, who was scheduled to

1   give a lecture, an educational lecture at a library whose

2   event was cancelled.  The Imperial Sovereign Court of the

3   state of Montana has had multiple events cancelled.

4        And I would like to turn briefly to the declaration

5   of Annathea Smith, which was filed -- it's docketed as

6   Document 5-3, and Annathea Smith is the president of The

7   Imperial Sovereign Court of the State of Montana.  In

8   paragraph 18, "Since HB 359 went into effect, we have had

9   shows across the state cancelled, modified, and placed in

10  limbo.  A show at the Museum of the Rockies has been

11  repeatedly rescheduled without -- without an indication that

12  it will be allowed to happen at all.  Drag story hour event

13  cancelled."

14       The Imperial Court changed their behavior, they

15  chilled their speech as a result of the HB 359 at different

16  Pride events across the state; most notably at Billings

17  Pride they were unable to perform any drag on public

18  property.  That is paragraph 23 of that declaration.

19       THE COURT:  What do you mean "perform drag"?

20       MS. VAN KLEY:  They were not allowed to perform --

21  to perform in drag on city streets.

22       THE COURT:  All right.

23       MS. VAN KLEY:  Yeah.  They have hired police

24  officers to ensure safety at events.  They have changed

25  costuming.  They have not advertised their events the way

1  that they had this historically.  They have changed their

2  behavior this year as a result of HB 359.

3          And then turning to paragraph 27 of that same

4  declaration, I will just read it verbatim:  "Our

5  performances planned for Montana Pride in Helena from

6  July 30th to August 6, 2023, are still uncertain.  While we

7  hope we can participate in uplifting and building community

8  in downtown Helena, we anticipate that we will again follow

9  our new self-imposed restrictions and may not advertise our

10  events out of fear of HB 359."

11          So as long as HB 359 is in place, two things are

12  true:  First, performers are currently chilling their

13  speech.  And this is a separate issue, but because of how

14  vague and overbroad the law is, they are -- they are

15  probably in -- they are probably not saying things that are

16  even beyond the bounds of HB 359.

17          The second piece is, as long as HB 359 is in place

18  and not enjoined, individuals can be arrested and prosecuted

19  for violations of HB 359.  And that is why we seek relief

20  against Defendant Knudsen, who under state law has the

21  ability to direct all County Attorneys in the performance of

22  their official duties.

23          And so, regardless, whether the permit issues or

24  not, Pride will not go forward unchanged and without

25  restriction, and that is a First Amendment violation.  It is

1    the reason that there's a compelling need for a TRO now in

2    time for Pride to begin.

3            I'll turn next to the first *Winter* factor,

4    likelihood of success on the -- I think we did a little bit

5    of this work already, but we seek -- we seek a preliminary

6    injunction on our First and Fifth Amendment claims.  I'll

7    start with the First Amendment claim, that kind of breaks

8    into three separate questions.

9            First, is this law regulating only obscene speech

10   and, therefore, outside the scope of the First Amendment

11   altogether?  If the answer to that question is no, then we

12   say:  Is it content or viewpoint based?  And if the answer

13   to that question is yes, we apply strict scrutiny.

14           We talked to some degree about the *Miller* test.  I

15   just want to be very clear about what *Miller* does require.

16   It requires that the speech or expressive conduct that is

17   being prescribed be specifically defined.  That is not the

18   case with HB 359.

19           There remains, no how many times I look at this

20   law, there remains a lot of confusion what is within and

21   what is without the definition of sexually oriented

22   performances.  And then the classic *Miller* factors, it has

23   to take in as a whole appeal to the prurient interest in

24   sex.

25           There is kind of a tip of hat to this requirement

1   in HB 359; however, it isn't correctly applied.  It doesn't

2   require that the performance, as a whole, appeal to the

3   prurient interest in sex, and it doesn't account for the

4   application of contemporary application standards.

5           *Miller*, step 2 --

6           THE COURT:  Hold on.  In Section 1, "prurient

7   interest in sex," it says has the same meaning as provided

8   in 45-8-205.  Subsection 1, part (5).

9           MS. VAN KLEY:  Yeah, thank you, Your Honor.  I

10  think I have 40 --

11          THE COURT:  That's the existing law that you said

12  comports with *Miller*.

13          MS. VAN KLEY:  Well, yes, I said Section 201,

14  specifically -- Section 205 defines prurient interest in sex

15  to mean "a shameful or morbid interest in sex or excretion."

16  Looking at 45-8-201, and I do have a copy of this as well.

17  May I --

18          THE COURT:  And these are the 45-8-201?

19          MS. VAN KLEY:  I have a copy of 45-8-201 here.

20          THE COURT:  All right.  Do you have that?

21          MR. JOHNSON:  I do have the statute book.

22          MS. VAN KLEY:  I have more.

23          MS. DOCKTER:  Thank you.

24          MS. VAN KLEY:  And this was amended in the 2023

25  legislative session.  The amendments have not yet gone into

1    effect, and with regard to this particular law, the only

2    change is within the final subsection (5), and it is

3    modified so that cities, towns, counties, or school

4    districts may adopt ordinances that are more restrictive.

5            So with looking at 45-8-201, it is under Section

6    2(B), where we see a straightforward requirement that before

7    speech can be prescribed under this statute, it satisfied

8    the *Miller* test.  And, specifically, it requires the

9    application of contrary community standards and requires

10   that, as a whole, the material appeal to the prurient

11   interest of sex.

12           But, you know, the prurient interest in sex

13   requirement of the *Miller* test is certainly the closest

14   called under *Miller*, and *Miller* includes a conjunctive, not

15   a disjunctive test.  So in order to fall within the

16   constitutional standard for obscenity, it has to not only

17   appeal to the prurient interest in sex, it also has to, as a

18   whole, and, again, applying contemporary community standards

19   portray sexual conduct in a patently offensive way.

20           There is no argument that drag story hours portray

21   sexual conduct at all, let alone in a patently offensive

22   way.  When we look at the definition of stripping or the

23   purposeful exposure requirements for the sexually oriented

24   performance piece.  Again, this is going to encompass a

25   great deal of expressive conduct that does not involve the

1   portrayal of a sexual conduct in a patently offensive way.

2           And unlike the prurient interest in sex

3   requirement, there isn't even an attempt to incorporate this

4   into HB 359.  Third, the law, in order to satisfy *Miller*,

5   taken as a whole, cannot have serious literary, artistic,

6   political, or scientific value.

7           Once again, we don't even have a nod to this

8   requirement in HB 359, and that's why we have plaintiffs

9   like the Roxy Theater and the Myrna Loy that are putting on

10  films that certainly would not fall under *Miller* because

11  they have social value.

12          Under HB 359, without that carve-out, those are

13  sexually oriented performances.  And so the law certainly

14  regulates speech that is not obscene by constitutional

15  standards.  It, therefore, falls within the First Amendment,

16  and the next question is whether it's a content- or

17  viewpoint-based restriction on speech.

18          There are two ways to address this question:  You

19  can look at the statute on its face, and you can look at

20  legislative history.  I think both of these approaches will

21  bring you to the same place.

22          I'm focusing on legislative history.  It clearly

23  events as a goal to prescribe speech on the basis of content

24  and viewpoint legislators intended to target drag.  As we

25  explained in our brief, legislators even said that they had

1    to call it "drag" because otherwise performers would call it

2    art, raising real concern under *Miller*.

3          Whether or not they were successful at targeting

4    drag, I think that is a wholly separate question that we can

5    address within the void for vagueness challenge, but they

6    certainly intended to target drag.

7          And they intended to target drag specifically

8    because drag questions and satirizes conventional gender

9    norms and because it celebrates nonconventional expressions

10   of gender.  I will quote the bill's sponsor, Representative

11   Braxton Mitchell:

12         "Due to the mature theme surrounding drag shows and

13   the exposure to inappropriate activities, children may adopt

14   and accept certain stereotypes or attitudes that can lead to

15   social, psychological, linguistic difficulties.  Children

16   may also create an inadequate understanding of gender roles

17   and experiences, which is damaging to their long-term social

18   and emotional development."

19         Setting aside the complete lack of any evidence

20   offered into the legislative record to suggest this is in

21   fact the case.  What Representative Mitchell was saying, is

22   that children shouldn't be able to see drag because it may

23   make them question gender norms.  That is certainly

24   targeting speech on the basis of viewpoint.

25         There's still -- there's no need even to discuss

1    Legislative history.  HB 359 is content- and viewpoint-based

2    on its face.  Again, it has these two pieces.  There are

3    restrictions on drag queens -- or on drag story hours.  If

4    you look at the definition of what is a drag story hour, it

5    is any -- "An event hosted by a drag queen or drag king who

6    reads children's books and engages in other learning

7    activities with minor children."

8           Somebody is a drag king or a drag queen if they are

9    "A male or female performer who adopts a flamboyant or

10   parodic male or female persona with glamorous or exaggerated

11   costumes and/or makeup."  It is a person dressed in a

12   gendered costume engaging in learning activities with

13   children.

14          The line is drawn between individuals dressed in

15   some sort of gendered costume whether it comports with

16   biological sex and gender, identity or not, it is dressing

17   in a gendered costume and engaging in learning activities

18   with children.  The line is drawn between those individuals

19   and individuals who are not dressed in gendered costume.

20          That is a restriction that is based solely on the

21   identity of the speaker.  It is necessarily viewpoint book

22   based.  It's a little messier when we get to the sexually

23   oriented performances, which, again, is a problem under the

24   Fifth Amendment.

25          It's hard to say exactly what is in and not in this

1    definition, but it seems to generally be a restriction on

2    speech based on some relationship to sex and/or gender, but

3    we know it's not limited to obscenity because the *Miller*

4    test does not apply, and nonobscene speech about sex is

5    constitutionally protected.  We can look to *Reno* for that.

6         So HB 359 is content based, it's viewpoint based.

7    The final question is:  Does it survive strict scrutiny?

8    There needs to be a compelling government interest and

9    narrow tailoring.  The government has an interest that is

10   compelling in some circumstances in protecting children, but

11   that really isn't the story here.

12        Here, the government appears to be -- to intend to

13   protect children from gender nonconformity or nonobscene

14   communications which relate in some, in any way, to sex,

15   which is just another way of saying that it is a content and

16   viewpoint restriction on speech.

17        It's not compelling.  There is no evidence in the

18   record to suggest that there has been any harm faced by

19   Montana children, that any Montana children have been forced

20   to attend some performance that doesn't fall within the

21   existing criminal restrictions on obscenity that causes

22   harm.

23        There's no evidence to support Representative

24   Mitchell's claims about the dangers of drag, but even if

25   there were, the law is both overbroad and under-inclusive.

1    So it fails, again, of Step 2 of strict scrutiny.  It's

2    overbroad, it sweeps in speech that is not obscene as to

3    minors, it's not even indecent.  It's under-inclusive

4    because it applies only to certain activity in certain

5    places.  It doesn't shield minors from all drag or all

6    expressive conduct.

7         And just very briefly I will address why we are

8    also likely to succeed on the merits of Count 5, which is

9    the void for vagueness challenge.  Under the Fifth

10    Amendment, there's no need to reach it, if the Court agrees

11    that plaintiffs are likely to succeed on Count 4, but it is

12    just as strong a case.

13         Essentially, the Void for Vagueness Doctrine says:

14    That criminal law have to give a fair warning of what is or

15    is not allowed to avoid a due process violation and the risk

16    of selective enforcement.

17         And we see both of these things happen, we see

18    HB 359 being used against Adria Jawort when she's going to

19    give an educational lecture at the Butte Silver Bow Public

20    Library simply because she is a transgender.  We see it as

21    events are cancelled for the Imperial Court.  And

22    ultimately, we just don't have a clear idea of what is and

23    is not included in HB 359.

24         So people, declarants, plaintiffs are legitimately

25    struggling to avoid liability, and they are forced to, and

1    I'll quote from the case *Grayned*:  "They are forced to steer

2    far wider from the lawful zone than if the boundaries of the

3    forbidden area were clearly marked."

4        I don't think we need to spend much time on the

5    third and fourth *Winter* factors.  These are equitable

6    considerations in the public interest; they merge when the

7    government is a defendant.  We're dealing with essential

8    constitutional rights.

9        We are dealing with a restriction on First

10   Amendment freedom, and the -- HB 359 already has, it is

11   continuing to have a serious impact on protected speech.

12   There is no assurance that absent an injunction the law will

13   not be used to arrest and prosecute individuals engaged in

14   protected speech, and there's no countervailing public

15   interest as existing law already fully protects minors from

16   materials that meet the constitutional standard.

17       Plaintiffs, therefore, ask the Court to grant their

18   motion for a temporary restraining order.

19       THE COURT:  Thank you, Ms. Van Kley.  I'll give you

20   a chance to rebut.

21       MS. VAN KLEY:  I'm sorry, I missed that.

22       THE COURT:  I said I'll give you a chance to offer

23   rebuttal.

24       MS. VAN KLEY:  Thank you.

25       THE COURT:  All right.

1          Mr. Johnson.

2          MR. JOHNSON:  May I just have a moment?

3          THE COURT:  You may.

4          MR. JOHNSON:  Your Honor, this is a classic case of

5   statutory construction, and I want to start with the

6   standing argument that was questioned initially.

7          Injury and fact.  Your Honor, under House Bill 359

8   no performer can be prosecuted.  There's a private cause of

9   action against a performer, but no chance for being

10  prosecuted by a performer or a marcher in the Pride parade.

11         I'm taking a look at Section 2.  This is in regard

12  to sexually oriented business:  "The owner, operator,

13  manager, or employee."  Doesn't say anything about

14  "performer."

15         And when we go to Section 3, it talks where

16  sexually oriented performances are prohibited.  It's "a

17  library or school, a library school personnel, a public

18  employee, or entity, described in Section (3)(b) or an

19  employee."  There's nothing that says anything about a

20  performer or a marcher participating in a Pride parade;

21  hence, a fear of prosecution does not exist under the

22  statute.

23         Now, Ms. Corcoran, the teacher, she doesn't face

24  irreparable injury because school isn't going to start until

25  probably September, and we will have our preliminary

1    injunction by that time -- our preliminary injunction

2    hearing by that time.  And the purpose of a TRO is to

3    preserve the status quo until we can get to that preliminary

4    injunction hearing.

5            So there is no -- there is no standing under -- for

6    any of these plaintiffs as we sit here right now.

7            THE COURT:  What about Plaintiff Jawort?

8            MR. JOHNSON:  Jawort?  Jawort is a performer.  She

9    has no fear of prosecution, none whatsoever.  It was the

10   library that had the fear of prosecution.

11           The brewery hasn't asserted a declaration that

12   there was any injury in fact.  So we have nothing there as

13   well.  And that one's a different baby, Section 2, but as we

14   stand here right now, there is no -- there is no need for a

15   temporary restraining order because there is no risk of

16   irreparable harm.

17           And there is no standing for all of the plaintiffs,

18   except Ms. Corcoran, but she does not face irreparable harm

19   because we will have the preliminary injunction hearing by

20   that time.

21           Let's talk about the Imagine Nation Brewery.

22   Again, the key is reading the statute, Your Honor, and it's

23   an sexually orientated business.  It may not allow a person

24   under the age of 18 years to enter the premise of the

25   business during a sexually orientated performance.

1          So that business has to be one that either is a

2    nightclub, bar or restaurant, or similar commercial

3    enterprise, and that defines the nearest antecedent, which

4    would be bar or restaurant, and it must serve alcohol.

5          So let's take a hard look at sexually orientated

6    performance, so that's the only way that that bar or

7    restaurant, the Imagine Nation Brewing, can get in any

8    punishment is if they allow an 18 year old to enter the

9    premise during a sexually orientated performance.

10          And that performance has been defined by prurient

11    interests, which as Your Honor noted, is defined under

12    Section 45-8-205, (7).

13          THE COURT:  But the law goes well beyond prurient

14    interests.

15          MR. JOHNSON:  It -- and then it requires -- so it

16    has to be prurient interest and one of the other -- one of

17    the other items, which is purposeful exposure of --

18          THE COURT:  Where does --

19          MR. JOHNSON:  -- of nudity.

20          THE COURT:  Where does it say that, what section?

21          MR. JOHNSON:  This is Section 1, (10) which defines

22    the sexually oriented performance.  So it must appeal first

23    to the prurient interest in sex, which is defined, and

24    feature (a) the purposeful exposure, whether complete or

25    partial, of the human genitalia, et cetera, et cetera,

 1   including a prosthetic, but it has to appeal to the prurient

 2   interest.

 3         THE COURT:  If your interpretation is correct, why

 4   is the law needed?  We're already doing -- banning

 5   performances that appeal to prurient interest.

 6         MR. JOHNSON:  I think there's a gap here, and I

 7   think the gap is under obscenity.  So I think the gap is

 8   here, and especially with sexually orientated business.  In

 9   order for the ban -- for a business to be obscene, I mean,

10   it has to meet those definitions.

11         I think -- and it's the community standards under

12   *Miller*, and ultimately, I think, you -- arguably in this day

13   and age, I could take maybe my 17-year-old son into a strip

14   club that only shows above the waist, and that may not be

15   deemed obscene by the community standards.

16         This takes care of that.  I can't take my son into

17   a bar, strip club, or restaurant or similarly commercial

18   enterprise that serves alcohol and shows nudity.  I think

19   that's the difference, and that's why it's a stopgap.

20         The other reason for the House Bill 359 is the drag

21   shows.  Now, that is limited to whom?  It's limited to

22   schools that are publicly funded, so public schools and

23   publicly funded libraries.

24         And under Section -- and we're going to get to that

25   under Section 3(2), and I think there is an error in

1   drafting, I'd be candid on (1) versus (2), I think that

2   meant to be library and school can't permit sexually

3   oriented performances, they left out "school" -- public

4   library, public school.  And they added sexually oriented

5   performances in subsection 2, but "A school or library that

6   receives any form of funding from the state may allow a drag

7   story hour --"

8           THE COURT:  May?

9           MR. JOHNSON: -- on its premises during -- "may not

10   allow during regular operating hours or at a school-

11   sponsored extracurricular activity."

12          It's not saying you can't hold a drag story hour at

13   the school.  I mean, you could literally, as long as it's

14   after regular hours, hold one at the Cut Bank Library or the

15   Cut Bank High School gym, that's where that's saying.

16          THE COURT:  Where does it say that?  Explain that

17   to me again.

18          MR. JOHNSON:  Okay.  Go ahead, Subsection 3,

19   subsection 2:  "A school or library that receives any form

20   of funding from the state may not allow a sexually

21   orientated performance or a drag story hour as defined in

22   Section 1 on its premises during regular operating hours or

23   at a school-sanctioned extracurricular activity."

24          THE COURT:  So the library is open until 9 o'clock

25   at night.

1          MR. JOHNSON:  So they can do it at 11 o'clock.

2          THE COURT:  They can't do it during regular hours?

3          MR. JOHNSON:  They just can do it during regular

4   hours.  And I don't know whether a library is open until --

5   I mean...

6          THE COURT:  Right.  What I was -- what are schools'

7   hours?

8          MR. JOHNSON:  Schools' hours would be from when the

9   kids are there until 4 o'clock.

10         THE COURT:  What about extracurricular activities?

11  You go to school, you go to basketball games.

12         MR. JOHNSON:  You can't hold it at a basketball

13  game, you can't hold it at a choir concert, you can't hold

14  it at a football game.

15         THE COURT:  All right.  Go ahead.

16         MR. JOHNSON:  So I think that's the difference, so

17  that's why there is a need for House Bill 359 because it's a

18  stopgap on what's in between obscenity and what's less than

19  obscenity, which the state has a right to limit minors from

20  seeing something that is less than obscene in accordance

21  with adult standards, and that is *Sable Communications vs.*

22  *FCC*, 492 US 115.

23         THE COURT:  So the state could stop a parent from

24  taking a child to an R-rated movie?

25         MR. JOHNSON:  Yeah, I think they probably could.  I

1    think the state could.

2          Now, let's take a look at the state statute --

3          THE COURT:  Can the state subject the parent to

4    criminal penalties for it?

5          MR. JOHNSON:  Let's take the state statute though.

6    It excludes R-rated -- G through R-rated under section --

7    I'll get to it -- 45-8-205, (5).  And if I -- I brought my

8    statute book, I assumed you would have one.

9          THE COURT:  Go ahead, just tell me what it says.

10         MR. JOHNSON:  45-8-206 -- no, 205 (5):

11   "Performance" means any motion picture film or videotape

12   except a motion picture or videotape rated G, PG, PG 13, or

13   R by the Motion Picture Association of America."  And that's

14   what's under the definitions for obscenity.  It excludes it,

15   expressly excludes movies that are rated by --

16         THE COURT:  Right so the Motion Picture Association

17   of America rates those films.

18         MR. JOHNSON:  Correct.

19         THE COURT:  Who rates some of the activities at

20   issue that are addressed by House Bill 359?

21         MR. JOHNSON:  It has to appeal to the sexually --

22   it has to meet that standard, the sexually prurient

23   interest, and meet the other standards, one of the other

24   standards.  So it's got two things that are required.

25         And then all it says is, you can't show it to

1    somebody under the age of 18, which the State has a right to

2    do and restrict under *Sable*, so it has that right, and it

3    has to meet that definition.  Which "prurient interest" is a

4    pretty tough definition.

5            I mean, it means:  A shameful or morbid interest in

6    sex or excretion.

7            THE COURT:  Mr. Johnson, how do you compare the law

8    here to the law that had been --

9            MR. JOHNSON:  Tennessee and Florida.

10           THE COURT:  -- in Tennessee and Florida; the --

11           MR. JOHNSON:  They did not define "lewd conduct."

12           THE COURT:  Those two states?

13           MR. JOHNSON:  Yes; that's my best reading of them.

14   I mean, I -- we've been scrambling to prepare for this

15   hearing, I have been doing the best I can.  But that's my

16   understanding is the difference is, they did not define

17   "lewd conduct" as opposed to the State of Montana defined

18   "prurient interests," excluding motion pictures, defining

19   "sexual conduct" under the same section, under (8).

20           And defining "simulated."  That is under -- it is

21   in the sexual conduct portion under 8(a), and it's also

22   defined in Section 45-5-625.  That expressly defines

23   simulated (5) (c).

24           And so that is the difference, is Montana is using

25   definitions that are stated in statutes as opposed to the

1    Tennessee and Florida cases which did not define "lewd

2    conduct," and that's the difference.

3            So, Your Honor --

4            THE COURT:  Where do those cases rely upon this

5    lack of definition lewd contact; in the orders of the

6    Courts?

7            MR. JOHNSON:  It's cited.  The one I have is State

8    of Florida, and I have a quote here:  "Vague and overbroad

9    for similar reasons as the Tennessee such as not defining

10   "lewd conduct," and I think that was the big one.  And that

11   was 2023 Westlaw 415, 7542.

12           Whereas, our statute, House Bill 359, does rely on

13   definitions, and; hence, the vague argument has a

14   substantial amount of problems because I know what I'm being

15   prosecuted for.

16           Now, let's -- so let's go to the standards with

17   regard to a temporary restraining order.  Number one, there

18   must be a likelihood of success on the merits and a

19   likelihood of irreparable injury if not granted.

20           I think plaintiffs have a huge problem with that.

21   There has not been any restriction and no evidence that the

22   State -- or no evidence from the plaintiffs that the State

23   has done anything to prevent any Pride parade.  And, in

24   fact, in their declarations, they have had an Anaconda Pride

25   Parade, a Libby Pride Parade, and a Red Lodge Pride Parade,

1   and I maybe missed one.

2          And there has been no evidence that has been

3   presented by the plaintiffs that the State is investigating

4   or thinking about doing any prosecution of the Pride Parade

5   in Helena and, admittedly, they've been able to conduct one.

6          And then, again, the -- a huge problem with their

7   irreparable injury is that they, under the statutes, the

8   plain meaning of the statutes, they fear no prosecution.

9          And then we also have a problem with regard to

10  Elsie Arntzen.  She has sovereign immunity because she

11  cannot enforce the restriction against the teachers.  Only

12  the Board of Education can, so right from the git-go, they

13  have a huge problem with Elsie Arntzen.  The Board of

14  Education is given authority --

15          THE COURT:  Well, she has sovereign immunity from

16  monetary damages; she doesn't have sovereign immunity from

17  an unconstitutional act.

18          MR. JOHNSON:  But she isn't -- isn't given the

19  right to do anything to teachers.  She can't suspend them.

20  She can't expel them.  She can't do that, and that's what

21  the statute -- the house bill envisions for --

22          THE COURT:  Well, what about Plaintiff Corcoran, if

23  she were to continue her performances, what potential

24  discipline would she face?

25          MR. JOHNSON:  So she could face it from the Board

1   of Education, and I would acknowledge that.

2        THE COURT:  The state Board of Education?

3        MR. JOHNSON:  Yes.  Yes.  But it's a problem for

4   the plaintiffs as they stand here today, but yes, she could

5   face it from the Board of Education.

6        THE COURT:  Because she is not facing any

7   discipline?

8        MR. JOHNSON:  Correct, yes.

9        THE COURT:  Okay.

10       MR. JOHNSON:  Then we go to the likelihood of

11  success on the merits, and let's go to a facial attack.  Is

12  there any set of circumstances that allows a portion of this

13  house bill to be valid?  And yes, the biggest one is Section

14  2.  The state has the right to -- to restrict and prevent

15  harm to minors, both psychological and physical, and that is

16  the *Sable* case.

17       And that is exactly what that's doing, and it is

18  restricted to a facility that serves alcohol and is either a

19  -- provides stripping in the form of live nude entertainment

20  or sexually oriented performances and must authorize

21  alcoholic beverages.

22       Under a facial attack, it has to be -- every

23  application must be invalid.  That one is not invalid.  In

24  addition --

25       THE COURT:  Why?

1          MR. JOHNSON:  That is not invalid.

2          THE COURT:  Yes.

3          MR. JOHNSON:  Because the State has the right to

4    prevent minors from seeing -- to protect their physical

5    welfare and their mental well-being, and they have the right

6    under *Sable* to restrict beyond what is deemed obscene for

7    adults.

8          THE COURT:  Well, back to the R-rated movie

9    question.

10         MR. JOHNSON:  Yep.

11         THE COURT:  Does the State have the right to

12   prosecute a parent that takes their 14 year old to an

13   R-rated movie?

14         MR. JOHNSON:  It's not violated in the statute

15   because of the definition of "performance," so your parent

16   can take -- and because it's outside of the definition of

17   performance, your parent can take the 17 year old to the

18   R-rated movie.

19         THE COURT:  Well, but a parent can't take a 14 to a

20   drag story hour because of what?

21         MR. JOHNSON:  Because -- okay.  Let's talk about

22   drag story hour.  Drag story hour is a publicly funded

23   restriction.

24         THE COURT:  You mean the buildings?

25         MR. JOHNSON:  Yes; it's meant for places that are

1   publicly funded.

2          THE COURT:  So if the Imagine Nation Brewery or the

3   Roxy Theater hosted drag story hour, they are not subject to

4   prosecution?

5          MR. JOHNSON:  Correct, that is true.  It's limited

6   to libraries, libraries and schools.  And the libraries and

7   schools fit under the restriction on public funds, and

8   that's also the place that receives public funding, so if

9   they receive public funding.

10         And if the government appropriates public funds to

11  establish a program, it is entitled to define the limits of

12  that program.  That's the *Rust* case, where they restricted

13  speech on abortion, prior to the *Dobbs* case, they restricted

14  speech on abortion.

15         And the rationale is, you can talk about abortion

16  all you want, you just can't talk about abortion and receive

17  public funds.  And the First Amendment -- the First

18  Amendment right is meant to prevent the government from

19  restricting private speech, not governmental speech.

20         And the other case is *U. S. v. American Library*

21  *Association*.  If you want the cites, I can give you those to

22  you.

23         THE COURT:  Yes, please.

24         MR. JOHNSON:  The *U. S. vs. American Library*

25  *Association*, it's 539 US 194.  I'll say that again, 539 US

1    194, and *Rust* is 500 US 173.

2           And in *U. S. vs. American Library*, it was -- they

3    were -- the government required this program to be placed on

4    the internet that prevented patrons from seeing pornography,

5    what the government deemed restricted.

6           And the U. S. Supreme Court found because it's

7    public funds, public funds to the library, that was not a

8    restriction on speech because the library had the right to

9    say, okay, I'll either accept the funds or I'll allow the

10   speech, but I just can't do both.  Because the government

11   has the right to appropriate public funds to establish a

12   program and define the limits of that program.

13          THE COURT:  Mr. Johnson, let's go back to the *Reno*

14   *vs. ACLU* case.

15          MR. JOHNSON:  Okay.

16          THE COURT:  The Communications and Decency Act.  So

17   the Supreme Court strikes down an effort by Congress to

18   regulate content on the internet because children might be

19   viewing it.

20          MR. JOHNSON:  Okay.

21          THE COURT:  Right?  That's a pretty broad area --

22          MR. JOHNSON:  It's --

23          THE COURT:  -- where the Congress might have

24   authority to regulate; Supreme Court says it's not -- they

25   can't go that far.

1          MR. JOHNSON:  Is that -- is that an entity that is

2    receiving government funds?

3          THE COURT:  No.  I understand your restriction on

4    government -- the government fund restriction, but here

5    we're talking about the other businesses.

6          MR. JOHNSON:  Sure.

7          THE COURT:  The Imagine Nation, The Roxy Theater,

8    the Myrna Loy Theater, those places.

9          MR. JOHNSON:  Okay.  So let's --

10         THE COURT:  -- or the Pride Parade events.

11         MR. JOHNSON:  Let's take -- let's take the Roxy

12    Theater.

13         THE COURT:  Okay.

14         MR. JOHNSON:  The only way they have any fear of

15    being restricted is if they show a sexually oriented

16    performance to persons under the age of 18.  That's -- or if

17    they receive government funds, if they are receiving

18    government funds, then that restriction can go -- and

19    doesn't necessarily have to have the minors in place because

20    that's under Section 3.

21          Because a public property in any location where the

22    performance is in the presence under the age of 18, that's

23    the Pride Parade, this is Section 3, (3)(a) and (b).  So

24    (3)(b) in a location owned by an entity that receives any

25    form of funding from the State.

1          So let's take the theater, their only -- the only

2    way they get restricted is if they provide a sexually

3    orientated performance, under the definition, to people

4    under the age of 18 or if they are receiving public funds.

5          THE COURT:  And it's on public property which would

6    be the Town Square.

7          MR. JOHNSON:  If it's on public property then it

8    requires that 18 year olds be there.

9          THE COURT:  Right.  And who controls that if they

10   are have a Pride Parade down the street, who controls who's

11   standing on the sidewalk watching the parade?

12         MR. JOHNSON:  Law enforcement, I would assume,

13   would be the ones that would have to control it.  I mean,

14   you would -- I think the Pride Parade sponsors could say "no

15   minors allowed" and put signs up.  And then if it's at the

16   minors -- then if they do it, then it's on the minor, but

17   you can put up "no minors allowed."

18         THE COURT:  Where?

19         MR. JOHNSON:  On the parade street; put signs up,

20   just temporary signs.  I mean, that's very plausible.  And

21   the rationale for there is pretty clear, it has to be a

22   sexually oriented performance that is -- appeals to the

23   prurient sexual interest, which is pretty severe, and

24   probably obscene, but maybe not rises to the level of

25   obscene.

1           And that's the rationale behind the -- behind the

2   House Bill 359 is a stopgap.  We don't want that argument

3   that it has to be obscene, because the definition of obscene

4   under the statute is pretty severe.

5           THE COURT:  Let's go back to the Communication and

6   Decency Act.  The electronic public square is the internet;

7   the Supreme Court said Congress can't regulate content on

8   the internet --

9           MR. JOHNSON:  Okay.

10           THE COURT:  -- beyond the standard that -- beyond

11   those obscenity standards.  Why is that different than the

12   actual public square?

13           MR. JOHNSON:  Because we are dealing with minors.

14           THE COURT:  Right, but minors can go on the

15   computer.

16           MR. JOHNSON:  They can.  Would they -- I don't

17   think there's any way of preventing them from going on it,

18   but the schools do it all the time.  They prevent minors

19   from accessing --

20           THE COURT:  Sure, but on a school computer.

21           MR. JOHNSON:  Correct.

22           THE COURT:  But what about their home computer?

23           MR. JOHNSON:  Okay.  Then that's up to the parent.

24           THE COURT:  Right; so why it is up to the parent to

25   decide well, I'm going to take my child to the drag story

1   hour, to whatever event that is being held at this -- by

2   this plaintiff.

3            MR. JOHNSON:  There's no restriction on it.  There

4   is no reason that a parent can't take their that child to

5   the drag story hour.  No reason.  The drag story hour, the

6   only restriction on the drag story hour is in a public

7   library or a public school.  That's it.  And there's no

8   restriction on a parent.

9            THE COURT:  So if the plaintiff Montana Book

10  Club -- Books and Toys post a drag story on it, they are not

11  subject to the law?

12           MR. JOHNSON:  Yes, that's true, they're not.  It's

13  only if -- the drag story hour is only limited to public

14  libraries and public schools, that's Section 3 (2).

15           Carrying it -- go ahead.

16           THE COURT:  What other content can be prohibited

17  from a public school or public library?

18           MR. JOHNSON:  What other content?

19           THE COURT:  Yes.

20           MR. JOHNSON:  Items that --

21           THE COURT:  We say we don't like your point of

22  view, we are not going to allow you to speak.  How do we

23  determine -- most of these public buildings, schools,

24  libraries, things of that nature, are where people come to

25  have dialog, to speak, political actors will show up and

1    give a speech oftentimes, you know, if there are any

2    problems or not, at a library or school auditorium or some

3    facility like that.

4             Is there any limit on what the State can do, what

5    kind of conduct they are prohibiting?

6             MR. JOHNSON:  If they are provided public funding

7    to them, they can put legitimate restrictions, which must

8    not -- they can't be arbitrary and capricious.  They have to

9    have a rational basis.

10            THE COURT:  Well, isn't *Miller* determining what is

11   legitimate?

12            MR. JOHNSON:  I don't think so, not when it's

13   public funding to a governmental facility, no.  Then the

14   government has the right to put restrictions on that.

15            THE COURT:  So what's your authority for that claim

16   that meets --

17            MR. JOHNSON:  That is --

18            THE COURT:  What's Supreme Court, what court--

19            MR. JOHNSON:  Yes, it's the Supreme Court -- it's

20   the two cases I gave you.  *Rust v. Sullivan* --

21            THE COURT:  Okay.

22            MR. JOHNSON:  -- and then *U. S. American Library*

23   *Association*.

24            THE COURT:  Okay.  All right.  Go ahead.

25            MR. JOHNSON:  So bottom line is, facial attack is

1  not here, so that's Count 4 and 5 against Elsie Arntzen and

2  Austin Knudsen.

3        Under facial attack, Section 2 is most definitely

4  valid and enforceable, because it is restricting sexually

5  oriented performances with regard to a person under the age

6  of 18 to facilities that either permit stripping or nudity

7  or do sexually oriented performances.

8        Section 4 is definitely in play because there's --

9  I don't think there's any plaintiff that's -- or any

10 different that has asserted a private cause of action, and

11 our clients aren't a part of that, so Section 4 is there.

12        We also believe that Section 3(1) and (2), without

13 the errors, are also clearly constitutional because it's

14 public funding and they have the ability to do that.  So the

15 bottom line is, Your Honor, I don't think they can

16 prevail -- they are not likely to prevail with regard to the

17 case and --

18        THE COURT:  So go back to Section 4 for a moment,

19 the private right of action.

20        MR. JOHNSON:  Yeah.

21        THE COURT:  That's not right now, you're telling

22 me, as though --

23        MR. JOHNSON:  I know of no -- I know of no child or

24 person that is suing, and the government does not have a

25 right to sue under the private right of action, and I have a

1  case for that if you want it.

2      THE COURT:  And the plaintiffs have to wait until

3  someone brings a private right of action that challenges

4  part of the statute?

5      MR. JOHNSON:  None of the -- there's no defendant

6  here to even challenge and get a TRO against, we don't have

7  that right as the government.  And I can give you that case

8  if you would like.

9      THE COURT:  Well, it's the State's private right of

10  action?

11      MR. JOHNSON:  Yes.

12      THE COURT:  All right.

13      Anything else, Mr. Johnson?

14      MR. JOHNSON:  The bottom line, Your Honor, is what

15  separates us -- it's *Whole Women's Health vs. Jackson*, and I

16  don't have the cite.  *Whole Women's Health vs. Jackson*, that

17  is the state has no private right of action.

18      The bottom line here, Your Honor, is a restraining

19  order is not appropriate under the circumstances, especially

20  in light of the plain reading of the statute, including the

21  definitional portions that are already provided under the

22  Montana code, which I have cited.

23      First and foremost, there is no irreparable

24  imminent threat of an injury, and the plaintiffs have failed

25  to establish such by clear and convincing evidence, which is

 1    required.  Secondly, there is no fear of prosecution, as I

 2    have indicated, and the statutes are very clear about that.

 3          And the only one that is at issue is Ms. Corcoran,

 4    and school won't start before we can have a preliminary

 5    injunction hearing.

 6          Secondly, there is no -- plaintiffs would -- cannot

 7    establish that there is a likelihood of success on the

 8    merits, especially with the facial attack --

 9          THE COURT:  Well, Mr. -- let me interrupt you for a

10    second.

11          MR. JOHNSON:  Yep.

12          THE COURT:  I want to go back to some of these

13    definitions.

14          MR. JOHNSON:  Sure.

15          THE COURT:  And this is, you would agree, that

16    under the First Amendment, there's -- a person generally has

17    the right to speech.

18          MR. JOHNSON:  Yes.

19          THE COURT:  There has to be a compelling state

20    interest to limit that right.

21          MR. JOHNSON:  Unless it's a public fund issue

22    that that --

23          THE COURT:  Then there are narrow tayloring

24    requirements, typically?

25          MR. JOHNSON:  Yes.

1          THE COURT:  All right.  So some of these

2     definitions here:  The "drag king" is a male or female

3     performer who adopts a flamboyant or parodic male persona

4     with glamorous or exaggerated costumes and makeup.  Who

5     decides that?  How would a court go about deciding what's

6     flamboyant or parodic?

7          MR. JOHNSON:  The jury would; I mean, a finder of

8     fact.  I mean, that's all I can tell you.

9          THE COURT:  We put that up to a jury, that you

10    could be subject to criminal liability because you were too

11    flamboyant?

12         MR. JOHNSON:  Because the school allowed it, and

13    understand who it is.  It's not the performer that is

14    subject to prosecution; it's the school or the school

15    employee, that person.  That's Section 3 (4).  So the

16    performer can't be subject to prosecution; the drag king or

17    queen can't be.

18         THE COURT:  Well, Mr. Johnson, if the scope of this

19    fashion is as limited as you say, what's the point?  Why do

20    we need it?

21         MR. JOHNSON:  Why do we need it?  I think there's a

22    couple reasons.  I think that the stopgap that I've talked

23    about, I think there is some gray area with regard to what

24    is obscene and what we want -- what the State of Montana

25    wants their children to see.

1          And the state has the right to protect children

2    with regard to material that is less-than-adult obscene.  I

3    think that's the stopgap here.  I think that's the one under

4    Section 2 of House Bill 359 that really is applicable under

5    this house bill.

6          THE COURT:  So you say less-than-adult obscene; so

7    you mean typically the obscenities standard set forth in

8    *Miller* and Supreme Court cases apply to adult entertainment?

9          MR. JOHNSON:  Yes.

10         THE COURT:  But there is a lower standard for

11   children with parental consent?

12         MR. JOHNSON:  There is a lower standard for

13   children, yes, and the State can govern -- the State can

14   say, "No, that's not gonna happen with -- on our public

15   dime."

16         THE COURT:  All right.

17         MR. JOHNSON:  That's the difference.

18         THE COURT:  Anything else?

19         MR. JOHNSON:  And then, Your Honor, I think it's

20   also to prevent drag story hour in public libraries and

21   schools, and that's it, but there is an exception to it;

22   those public buildings can be used for drag story hour in

23   after-hour times or not for extracurricular activity.  I

24   think that's the purpose.

25         THE COURT:  Why would they be singled out compared

1    to the Mother Goose story hour or some other story hour?

2           MR. JOHNSON:  I think because of the definition of

3    drag king and drag queen, and the definition of drag story

4    hour; because the legislation has deemed that that's not

5    appropriate for -- for let's say kindergartners or first

6    graders or third graders.  And I know -- I realize it goes

7    all the way up to seniors in high school.  I understand

8    that.

9           THE COURT:  So what about the -- Mr. Mitchell, the

10   sponsor?

11          MR. JOHNSON:  Yes.

12          THE COURT:  His statement of standards he's worried

13   about children getting the wrong impression about gender

14   roles.  Is there anything in the record that supports that

15   concern?

16          MR. JOHNSON:  Nothing that I have right here.  I

17   mean, again, with the limited amount of time I was not able

18   to review the entire record that -- to change --

19          THE COURT:  And you understand this is an emergent

20   situation?

21          MR. JOHNSON:  Yeah.

22          THE COURT:  I mean, you certainly have an

23   opportunity to respond fully in writing at the appropriate

24   time?

25          MR. JOHNSON:  I understand.

1          THE COURT:  We're operating here on an expedited

2    basis --

3          MR. JOHNSON:  Yes.

4          THE COURT:  -- based upon the allegations?

5          MR. JOHNSON:  And I would argue that a TRO should

6    not be granted; if you are so inclined, it should be narrow

7    in scope to the portions that you deem that there is a risk

8    of irreparable injury and that they are likely to succeed on

9    their merits.

10          THE COURT:  Thank you, Mr. Johnson.

11          MR. JOHNSON:  Thank you.

12          THE COURT:  Ms. Dockter?

13          MS. DOCKTER:  May it please the Court.  I'm

14    Becky Dockter; I'm here on behalf of the City of Helena, and

15    here to defend against -- or to actually provide a couple of

16    points on this matter.

17          First, the permit itself, clear up confusion about

18    the permit itself; and then the second one, to discuss the

19    impact on City of Helena and its employees in the

20    implementation of House Bill 359.

21          First, the City plans to and has always planned to

22    issue the permit for Pride.  The question here that I heard

23    today was whether or not it would issue the permit

24    conditioned on House Bill 359 factors, and it does not

25    intend to -- to condition the permit at all, and I can

1    elaborate on that in a second here.

2         The reason why that is important is because the

3    burden that we see in House Bill 359 is placed under Section

4    3 on a sexually oriented performance is prohibited on

5    subsection (a) of public property in any location where the

6    performance is in the presence of an individual under the

7    age of 18 and in a location owned by an entity that receives

8    any form of funding from the State.

9         So the City of Helena receives funding from the

10   State in the form of grants and such.  It has nothing to do

11   with performances on public property, but this statute

12   doesn't clarify that.  More importantly, though, public

13   property includes the streets, the town squares that we've

14   already talked about, so sexually oriented performances are

15   prohibited.

16        It doesn't in that section, though we had a lot of

17   discussion about whether or not a school or library, whether

18   it's a very limited school or library, this section actually

19   is broad in that it prohibits those performances on public

20   property.

21        And then in Subsection (4) under that Section 3 --

22   sorry -- House Bill 359, Section 3, Subsection (4) includes

23   public employees.  And a criminal penalty for those public

24   employees who are -- that violate and allow sexually

25   oriented performances, which again is more broad than what

we talked about, libraries and schools, it's on public

property.

THE COURT:  Ms. Dockter, can you explain how you

think Subsection (4) in the language applies to public

employees who issues a permit or is responsible for

reviewing the permit.

MS. DOCKTER:  Thank you, Your Honor.

In looking at a permit application for a special

event there are many factors to decide.  There are whether

or not it can be safely on city streets, whether or not the

crowd can be dispersed amongst an area so it's not so

crowded, transportation, safety, police protection.

In, I think, last year this Pride event, which is

the event that we're talking about here in particular, had

11 or 15,000 people on the Last Chance Gulch.  That is

something that the City actually does look at to ensure

those time, place, and manner restrictions to ensure that

those are going to be an event that can be safely held on

public property within the city.

What it doesn't do is determine content-based

performance on public property; for example, interviewing

each individual performer and asking them whether they

intend to appeal to the prurient interest of sex of their

performance in order to determine whether or not a sexually

oriented performance can occur on public property.

1          That's not something this country has wanted the

2     government to be involved in questioning individuals when

3     they are expressing their freedom of speech on a public town

4     square, and that's what House Bill 359 asks us to do.

5          So in issuing a permit, the burden is then on

6     plaintiffs to determine whether or not to either, as

7     plaintiffs' counsel was discussing, curtail their speech or

8     face criminal liability, although I hear what the State

9     said, it's limited.

10          I'm proposing that for the City employees and the

11     public employee section, subsection, it is much more broad

12     than how the State characterized it.  Public employees in

13     just looking at allowing those performances on public

14     property face the criminality liability on Subsection --

15          THE COURT:  So you are taking issue with

16     Mr. Johnson's claim that this doesn't apply to performers,

17     but it doesn't -- one of his arguments was, performers

18     aren't at risk, it's the people who sponsor.  And in this

19     case, you're claiming that applies to public employees --

20          MS. DOCKTER:  Your Honor, I am, yes.

21          THE COURT:  Okay.

22          MS. DOCKTER:  Subsection (4) then also creates a

23     conundrum, I guess, for City employees, in that it creates a

24     private right of action by a minor who attends a

25     performance, in violation, so sexually oriented performance,

1    which we have talked about what that means and its

2    vagueness, but bring an action against who knowingly

3    promotes, conducts, or participate as a performer.

4           Now, a city employee in looking at a permit, our

5    police officers last year and several years prior were

6    actually at the performance ensuring safety.  Are they

7    helping them promote or conduct a performance and then are

8    subject to that private right of action as well?

9           And that's a question I believe that this Court

10   could answer in preserving the status quo to ensure public

11   employees who are doing their jobs to just analyze whether

12   or not an event can safely occur on public property are not

13   subjected to both criminal, under Section 3, and civil

14   liability under Subsection (4).

15          That is precisely the reason why Helena is issuing

16   the permit and will not condition it to House Bill 359

17   conditions.  We believe that the *Reed* case that's cited in

18   the plaintiffs' brief, this *Reed vs. City of Gilbert*, where

19   it creates or it cites -- I'll read from that case:

20          "Government, including municipal government, vested

21   with state authority, has no power to restrict expression

22   because of its message, its idea, its subject matter or its

23   content."  And in that case it dealt with signs, some

24   regulations on signs and the directional signs vs. political

25   signs and, basically, said that when it does on its face

1    regulate content, it's presumed unconstitutional.

2          City of Helena, in reviewing this permit, will not

3    subject its employees to asking performers whether or not

4    they intend to appeal -- it says sexually oriented

5    performance, which is singular, whether or not that

6    performer, in that performance, intends to appeal to the

7    prurient interest in sex.

8          And while the State referenced the definition of

9    prurient interest, it did -- it only referenced the

10    definition of 205.  It did not incorporate any of the

11    standards of obscenity that were already found in the

12    obscenity case, and I think you heard that from plaintiffs

13    already.

14          For those reasons, we do not dispute a temporary

15    restraining order to be issued and would appreciate that as

16    well, on behalf of the City of Helena and the City

17    employees.

18            THE COURT:  Thank you, Ms. Dockter.

19            MS. DOCKTER:  Thank you.

20            THE COURT:  Hold on.

21          Ms. Walker, did you want to address the Court

22    first?  You'll have a chance, Mr. Johnson.

23            MS. WALKER:  No, Your Honor.  Mr. Gallagher is not

24    the subject of the motion or the --

25            THE COURT:  Okay.

1          MS. WALKER:  -- temporary restraining order.

2          THE COURT:  All right.  Let me hear from the

3     plaintiffs first, and I'll give you a chance, and then I'm

4     sure they may say something you might want to respond to.

5          MR. JOHNSON:  (Indicating.)

6          THE COURT:  All right.

7          Ms. Van Kley, would you please start with the

8     statutory definitions for, particularly subsection --

9     Section 1, Subsection (10), sexually oriented performance?

10    Mr. Johnson argues that all this law does is add some

11    criteria to you prurient interest standard.

12         So the appeal to a prurient interest in sex and

13    features any of the following elements and lists those in

14    Subsection (10).

15         MS. VAN KLEY:  Your Honor, two things; first, under

16    *Miller*, the prurient interest in sex is only one element of

17    a test that requires three elements.  There is no -- this

18    definition does not address the other two required elements

19    under *Miller*, which are that they depict sexual conduct in a

20    patently offensive way, and that there is a carve-out for

21    materials that have legitimate social value, including

22    artistic value.

23         And so it, at best, incorporates one piece of

24    *Miller*, and, again, I would disagree with the attempt to

25    distinguish the Tennessee and Florida cases.  Both of those

1    laws did incorporate the *Miller* test, but because they were

2    targeted towards drag, the laws were enjoined.

3         THE COURT:  Well, how do you respond to

4    Mr. Johnson's argument about those states failed to define

5    lewd.

6         MS. VAN KLEY:  Your Honor -- well, two things:  One

7    is, that in that quote that Mr. Johnson read, that was an

8    example of one way in which the Florida law was vague.

9    Second, there's no definition of lewd within HB 359.

10        And to Mr. Johnson's point, that there are other

11   provisions in Montana criminal code that do include more

12   targeted definitions, they are not incorporated into this

13   definition of sexually oriented performance.  There is no

14   cross-reference to any other piece of the Montana code

15   within this definition.

16        There is, under Subsection (7), a definition of

17   obscene that includes a cross-reference.  The word "obscene"

18   doesn't appear anywhere else in HB 359 so I don't know what

19   we do with that.  It certainly is not incorporated into this

20   definition of sexually oriented performance.

21        There's also a cross-reference to sexual conduct

22   within Subsection (8) of Section 1, and I'll read that piece

23   because I do think it's important particularly for the

24   vagueness piece to read:  "Sexually oriented means any

25   simulation of sexual activity, stripping, salacious dancing,

1  lewd or lascivious depiction or description of human

2  genitals or of sexual conduct as defined in 45-5-625."

3       45-5-625 has to do with criminal sexual abuse, I

4  believe.  And if -- if this cross-reference to 45-5-625

5  applies to the definition of sexually oriented

6  performance --

7            THE COURT:  Where is the cross-reference?

8            MS. VAN KLEY:  Under Section 1, (8), there is a

9  definition of sexually oriented.  Sexually oriented, again,

10 doesn't appear as a stand-alone phrase anywhere else in

11 HB 359 so I don't know what we do with it, but there is a

12 cross-reference to more a limited definition of sexual

13 conduct there.

14      If we are going to import that cross-reference into

15 the definition of sexually oriented performance under

16 Subsection (10), then we need to import all of that

17 definition of sexually oriented and so that would include

18 salacious dancing as a sexually oriented performance.

19      That would include any lewd or lascivious depiction

20 or description of human genitals, that includes books,

21 right?  Like, that includes books at the Montana Book

22 Company if we are going to be willing to take that cross-

23 reference and import it into sexually oriented performance,

24 then we need to import all of it.

25            Bottom line, is Subsection (10), which is the

1    definition of sexually oriented performance, does not cross-

2    reference anything; it doesn't even attempt to incorporate

3    the other required elements of the *Miller* test nor does the

4    definition of "drag story hour," which doesn't even require

5    the prurient interest in sex.

6            THE COURT:  Ms. Van Kley, what about Mr. Johnson's

7    arguments under the injury and fact.  At this stage, no one

8    is facing any prosecution, and there is no imminent harm?

9            MS. VAN KLEY:  Your Honor, I think there is some --

10   a conflation here, and I definitely bear some of the

11   responsibility for this.  There is a conflation of injury in

12   fact with regard to standing and then the injury with regard

13   to the temporary restraining order.

14           First, to Mr. Johnson's argument, that no one

15   actually faces prosecution under the statute among the

16   plaintiffs.  I disagree.  Imagine Nation sells alcohol;

17   Imagine Nation, as alleged in the first amended complaint,

18   has allowed drag story hours while there is -- I agree --

19   the restriction on drag story hours doesn't apply to Imagine

20   Nation, the restriction on the exposure of prosthetic

21   breasts, which are treated differently than female breasts

22   do -- does apply to Imagine Nation.

23           The Myrna Loy and the Roxy both serve alcohol and

24   receive public funding.  They are both subject to criminal

25   penalties.  Rachel Corcoran, as a teacher, is subject to

1  criminal penalties, and I would just like to very briefly --

2          THE COURT:  -- Mr. Johnson -- Ms. Corcoran's not

3  back in school until the fall.

4          MS. VAN KLEY:  Yes.  So I mean, I think when we

5  talk about injury, we talk about injury with regard to both

6  standing and with regard to the TRO.  So addressing

7  specifically that argument that there is no standing to

8  challenge the law because nobody actually faces criminal

9  prosecution, that's not true.

10          Rachel Corcoran does, the Roxy does, the Myrna Loy

11  does, Imagine Nation does, and so does the Montana Book

12  Company, which receives public funding.

13          THE COURT:  What about Mr. Johnson's argument, he

14  cited *U. S. vs. American Library Association* and the other

15  five -- those two cases, the Supreme Court cases about

16  public funding?

17          MS. VAN KLEY:  Yes.  So I think there are a few

18  points to make here.  One is that is it absolutely true that

19  the government can engage in speech on its own behalf.  It

20  can do that through the use of the purse.

21          So when the government conditions spending on

22  certain speech-related activities, that is allowable; that

23  is something very different than criminalizing conduct

24  because you have received public funding in the past.  It

25  just is different.

1          Schools do have more latitude, and the classic case

2    is *Tinker v. Des Moines.*  Schools do have more latitude as

3    long as the restrictions are used to facilitate a learning

4    environment.  I have no idea how specifically targeting

5    performers, individuals who engage in learning activities

6    while wearing a gendered costume could possibly do that,

7    particularly when -- even if it were applying a rationale

8    basis, there is a very clear showing of animus.

9          THE COURT:  What about Mr. Johnson's argument that

10   during regular hours you can't hold these events?

11         MS. VAN KLEY:  I don't -- I don't know exactly what

12   to make of that.  I mean, regardless, under -- in regular

13   hours, there are -- there is some latitude for schools,

14   again, to enact regulations in order to improve the -- and

15   protect the learning environment.

16         And so students, for example, you know are limited

17   in -- they can be disciplined for swearing in class and

18   those kinds of things.  Again, whether it is -- it is

19   your -- a normal person's definition of a drag queen or if

20   it's somebody coming to school dressed in a superhero

21   costume or dressed as a Disney princess, I have no idea how

22   you can make that argument that this restriction on drag

23   story hours, as defined, actually furthers or promotes a

24   learning environment.  So I think it's to the side entirely.

25         And one other point is drag story hours; again,

1    engaging in learning activities with minor children present

2    while dressed in some sort of gendered costume; well, what

3    about extracurricular activities that include theater?  What

4    about a school performance of a Shakespeare play that

5    involves cross-dressing -- or doesn't -- any theatrical

6    performance probably includes people dressed in gendered

7    costumes.

8            So I think even this -- this -- I -- forcing

9    people -- whether or not a drag story hour could potentially

10   be allowed on school grounds outside of normal school

11   operating hours, I think just has no bearing.  We're looking

12   at the restriction on drag story hours during

13   extracurricular activities in schools and libraries.

14           Schools, I will note, are not specifically defined

15   as public schools within the section; nor are the libraries,

16   it's a library that receives any public funding.  Setting

17   that aside, we are just looking at whether or not they can

18   do the thing that is being done here, which is restricting

19   them within normal operating hours.

20           Whether or not there is any possibility that they

21   would be able to put on a drag story hour at is 11:00 p.m.

22   in the library is irrelevant.

23           So going back to standing, we have -- we certainly

24   have plaintiffs who do face actual prosecution, and that is

25   a reason that we can bring in the state defendants with

1    regard to Elsie Arntzen.

2            We'll point out really quickly Montana Code

3    Annotated 23-106, Subsection 2.  "The superintendent of

4    public instruction has the general supervision of the public

5    schools and districts and shall perform the following duties

6    or acts:  Subsection (2), issue, renew, or deny teacher

7    certification."

8            HB 359 provides that if Section 3 provides that a

9    teacher such as Ms. Corcoran will see her certificate

10   revoked and then suspended, and that is why Defendant

11   Arntzen is included in the lawsuit.

12           And so we have the risk of actual prosecution of

13   roughly half of the plaintiffs to this lawsuit.  On top of

14   that, we have the fact that all plaintiffs are suffering

15   chilled speech.

16           And I think Ms. Dockter's argument explains a

17   little bit about the effects which may be downstream but are

18   nonetheless traceable directly to enforcement of the

19   criminal laws against other entities.

20           All of the plaintiffs are unable to speak freely,

21   whether it is they themselves will directly be prosecuted,

22   roughly half of them do face that reality, roughly half of

23   them are, nonetheless, suffering from chilled speech, as a

24   result of the threat of criminal enforcement against others.

25           And then to very briefly address *Whole Women's*

1    *Health v. Hellerstedt*, which is the Texas abortion law.

2    That's a case in which there wasn't standing because there

3    was no criminal provision whatsoever.  The issue there was

4    Texas created a private right of action for individuals to

5    sue other people for getting abortions or helping other

6    people get abortions.

7            And they tried to sue the clerks of court in order

8    to do that, and the Supreme Court said no, they are immune

9    under *Ex Parte Young*.  You can't do that, that's -- 'cause

10   suing the Court, you're not allowed to see them.  We just

11   aren't in that situation.

12           We are allowed to consider everything within HB 359

13   because there is the reality of state enforcement of this

14   law.  This is not a law like SB 8 considered in *Whole*

15   *Women's Health*, which exclusively provides for a private

16   cause of action.  There is action to be taken by Defendants

17   Knudsen and Arntzen.

18           And unless there are further questions, Your Honor,

19   we ask, again, that the Court grant the motion for a

20   temporary restraining order.

21           THE COURT:  Thank you, Ms. Van Kley.

22           Mr. Johnson, do you wish to rebut the City of

23   Helena's arguments briefly?

24           MR. JOHNSON:  Just the City of Helena, Your Honor.

25           Your Honor, the City of Helena is not a plaintiff

1    and could have made a cross-claim and did not make a

2    cross-claim and thus is not entitled to injunctive relief

3    with regard to a temporary restraining order.  That's my

4    point.

5            THE COURT:  Okay.  Thank you.

6            MR. JOHNSON:  Thank you.

7            THE COURT:  All right.  This matter is submitted.

8            Let's talk scheduling for a moment.

9            Mr. Johnson, when is your Answer to the Complaint

10   and the motion for preliminary injunction due?

11           MR. JOHNSON:  I may need my assistant.

12           THE COURT:  Take a moment and just figure that out,

13   if you would.

14           MR. JOHNSON:  Thank you.  The preliminary

15   injunction response is due Monday.

16           THE COURT:  Due Monday?

17           MR. JOHNSON:  Yes.

18           THE COURT:  And how about the Answer to the

19   Complaint?

20           MR. JOHNSON:  Same day -- no, following Monday.

21           THE COURT:  Okay.  All right.  Well, then I will

22   try to get an order out on this issue as soon as possible,

23   on the temporary restraining order.  We still face the

24   preliminary injunction and then ultimately the merits of the

25   underlying case.

1          So given the issues at stake, it might be helpful

2    to try to work out a schedule for the preliminary injunction

3    hearing, and today is July 26th, I believe.

4          MR. JOHNSON:  Yes.

5          THE COURT:  All right.  So I'd like to get back

6    here -- I've not had a written response from you.  I know

7    you're fighting with one hand behind your back at this

8    point, so I want to have a written response from you and

9    from the State, and then, of course, the plaintiffs have a

10   chance to offer their reply briefs.

11         And then the City of Helena and Defendant Gallagher

12   will have a chance to file their reply briefs as well.  So I

13   think looking at about August 25th, that's a Friday.  I have

14   to verify -- I'll have my staff contact you, but I would

15   think let's say about 1:30 on the 25th of August for the

16   preliminary injunction hearing.

17         And we'll verify that with -- if I have to change

18   that, I have a status call with counsel.

19         All right.  Anything else today?

20         MR. JOHNSON:  No, Your Honor.  Thank you.

21         THE COURT:  Well, I also want to thank all you

22   counsel for being here today.  I know this is a very

23   contentious issue for some people, and I appreciate your

24   professionalism.

25         Thank you for your time.

1          (Whereupon, court adjourned at 3:52 p.m.)

2                          --o0o--

3

4                   **CERTIFICATE OF REPORTER**

5          I, Kim Marchwick, a Registered Professional

6    Reporter and Certified Realtime Reporter, do hereby certify

7    that the foregoing 77 pages of transcript is a true and

8    correct record of the proceedings given at the time and

9    place hereinbefore mentioned; that the proceedings were

10   reported by me in machine shorthand and thereafter reduced

11   to typewritten form using Computer-Aided Transcription; that

12   after being reduced to typewritten form, a certified copy of

13   this transcript will be filed electronically with the court.

14         I further certify that I am not an attorney for,

15   nor employed by, nor related to any of the parties or

16   attorneys to this action, nor financially interested in this

17   action.

18         Whereupon, this document was signed by me in

19   Billings, Montana, this Wednesday, the 22nd day of November,

20   2023.

21                          */s/ Kim Marchwick*

22                          _____
                            Kim Marchwick
                            Registered Professional Reporter
23                          Federal Certified Realtime Reporter
                            Certified Realtime Reporter
24                          2601 2nd Avenue North
                            Billings, Montana 59101
25                          (406) 671-2307
                            marchwickkim@gmail.com